RECORD NOS. 13-2235(L), 13-2252, 13-2325 XAP

In The

# United States Court of Appeals
### For The Fourth Circuit

# CSX TRANSPORTATION, INCORPORATED,

*Plaintiff – Appellee/Cross-Appellant*,

**v.**

# ROBERT N. PEIRCE, JR.; LOUIS A. RAIMOND; DR. RAY A. HARRON, M.D.,

*Defendants – Appellants/Cross-Appellees*,

**and**

## ROBERT V. GILKISON; PEIRCE, RAIMOND & COULTER, PC, a/k/a Robert Peirce & Associates, P.C., a Pennsylvania Professional Corporation; JOHN DOE(S); MARK T. COULTER,

*Defendants*,

## RICHARD CASSOFF, M.D.,

*Party-in-Interest*,

## LUMBERMENS MUTUAL CASUALTY COMPANY,

*Intervenor*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING

_____

## PAGE PROOF BRIEF OF DEFENDANTS-APPELLANTS/CROSS-APPELLEES ROBERT N. PEIRCE, JR., LOUIS A. RAIMOND, AND DR. RAY A. HARRON, M.D.

_____

**L. Steven Emmert**
SYKES, BOURDON, AHERN & LEVY, P.C.
281 Independence Boulevard, 5th Floor
Virginia Beach, Virginia 23462
(757) 499-8971

**Walter P. DeForest, III**
David J. Berardinelli
DEFOREST KOSCELNIK
  YOKITIS & BERARDINELLI
463 Seventh Avenue, 30th Floor
Pittsburgh, Pennsylvania 15219
(412) 227-3100

**Jerald E. Jones**
WEST AND JONES
360 Washington Avenue
Post Office Box 2348
Clarksburg, West Virginia 26301
(304) 624-5501

*Counsel for Defendants-Appellants/*
*Cross-Appellees Robert Peirce, Jr.*
*and Louis Raimond*

*Counsel for Defendants-Appellants/*
*Cross-Appellees Robert Peirce, Jr.*
*and Louis Raimond*

*Counsel for Defendant-Appellant/*
*Cross-Appellee Dr. Ray Harron, M.D.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2235__    Caption: __CSX Transportation, Inc. v. Robert N. Peirce and Louis A. Raimond__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Robert N. Peirce_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: _s/ Matthew S. McHale_____        Date: ___October 23, 2013___

Counsel for: _Robert N. Peirce, Louis A. Raimond___

## CERTIFICATE OF SERVICE
**************************

I certify that on ___October 18, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_s/ Matthew S. McHale_____                    ___October 23, 2013_____
      (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2235__     Caption: __CSX Transportation, Inc. v. Robert N. Peirce and Louis A. Raimond__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Louis A. Raimond_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                          ☐YES ☑NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      ☐YES ☑NO
       If yes, identify all such owners:

- 1 -

4.　　Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?　　☐YES ☑NO
　　　If yes, identify entity and nature of interest:

5.　　Is party a trade association? (amici curiae do not complete this question)　☐YES ☑NO
　　　If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.　　Does this case arise out of a bankruptcy proceeding?　　　☐YES ☑NO
　　　If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/ Matthew S. McHale_____　　　Date: ___October 23, 2013____

Counsel for: __Robert N. Peirce, Louis A. Raimond___

## CERTIFICATE OF SERVICE
**************************

I certify that on ___October 18, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

　s/ Matthew S. McHale_____　　　　___October 23, 2013_____
　　　　　(signature)　　　　　　　　　　　　　(date)

07/19/2012　　　　　　　　　- 2 -
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2235__       Caption: __CSX Transportation, Inc. v. Robert N. Peirce and Louis A. Raimond__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ray A. Harron, M.D.__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Jerald E. Jones                    Date:    October 28, 2013

Counsel for: Ray A. Harron, M.D.

## CERTIFICATE OF SERVICE
****************************

I certify that on    October 28, 2013    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 s/Jerald E. Jones                            October 28, 2013
(signature)                                    (date)

07/19/2012                    - 2 -
SCC

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................1

STATEMENT OF JURISDICTION.......................................................2

STATEMENT OF THE ISSUES ON APPEAL ....................................2

STATEMENT OF THE CASE................................................................3

     A.    For many decades, CSX exposed countless thousands of its employees to asbestos, and has been called to account for that exposure in FELA lawsuits ....................................................3

     B.    The Peirce Firm develops a FELA asbestosis practice to handle the claims of CSX's workers and others exposed to asbestos ..............5

     C.    The Peirce Firm retains Dr. Harron to read the films of CSX's workers and settles numerous FELA claims against CSX based on his readings...................................................................6

     D.    Beginning in 2000, the Peirce Firm, at CSX's behest, begins filing FELA claims on behalf of CSX's workers................................10

     E.    After CSX informs the Peirce Firm that it will no longer settle asbestosis claims based on Dr. Harron's reads, one of two new B-Readers reads each of the 11 FELA claimants' x-rays positive ...............................................................................11

     F.    CSX initially sues Peirce and Raimond for fraud under RICO and the common law relating to a different worker and unrelated to Dr. Harron ....................................................12

     G.    On remand, CSX amends again, alleging that Peirce and Raimond violated West Virginia's Rule 11 when they filed 11 specific FELA claims .........................................................14

     H.    At trial, CSX argues that Peirce and Raimond committed fraud when they violated Rule 11 in filing the 11 underlying FELA claims, which caused CSX to incur fees defending those 11 claims...............................................................................15

I.    The jury awards CSX over $400,000 under RICO only—which the District Court trebles—and CSX moves for nearly $11 million in attorneys' fees ....................................................19

SUMMARY OF THE ARGUMENT ....................................................20

STANDARDS OF REVIEW ................................................................23

ARGUMENT ......................................................................................24

    A.    CSX's liability theory—that improper Rule 11 certifications of 11 allegedly fraudulent FELA claims caused CSX's claimed damages—contains three fundamental legal flaws ...........................24

        1.    Rule 11 cannot support a private civil recovery for fraud under RICO or the common law ................................................25

        2.    CSX could not justifiably have relied on the allegations or certifications relating to the 11 underlying claims ..............30

            a.    CSX was required to prove that it justifiably relied on the allegedly flawed Rule 11 certifications of the specific 11 FELA claims at issue ............................30

            b.    CSX could not, as a matter of law, justifiably have relied on the certifications or the allegations relating to the specific 11 FELA claims ........................34

        3.    Litigation activities are not "predicate acts" of mail or wire fraud ...............................................................................36

    B.    No reasonable jury could have found that CSX met its burden of proof on essential elements of its claims ........................................41

        1.    CSX failed to adduce any evidence that, in justifiable reliance on the allegations or Rule 11 certifications in the underlying FELA lawsuits, it incurred recoverable damages..................................................................................42

        2.    CSX failed to adduce sufficient evidence that the Rule 11 certifications of the 11 underlying claims were false ..............44

C.    Alternately, this Court should order a new trial because the District Court improperly permitted CSX to present irrelevant and prejudicial testimony ................................................................. 49

1.    Dr. Parker's testimony on the asbestosis prevalence rate was unreliable, irrelevant, and highly prejudicial .................... 49

2.    CSX, in violation of the District Court's order, repeatedly referenced unspecified, supposedly false, FELA claims filed by the Peirce Firm beyond the 11 claims at issue ............ 54

CONCLUSION ........................................................................................ 57

REQUEST FOR ORAL ARGUMENT ................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Adams Labs., Inc. v. Jacobs Eng'g Co.,*
  761 F.2d 1218 (7th Cir. 1985)..............................................................56

*Al-Abood v. El-Shamari,*
  217 F.3d 225 (4th Cir. 2000)................................................................37

*Auburn Med. Ctr., Inc. v. Andrus,*
  9 F. Supp. 2d 1291 (M.D. Ala. 1998)............................................. 39, 40

*Badella v. Deniro Mktg. LLC,*
  2011 WL 5358400 (N.D. Cal. Nov. 4, 2011)........................................32

*Baltimore Scrap Corp. v. David J. Joseph Co.,*
  237 F.3d 394 (4th Cir. 2001) ..................................................... *passim*

*Bartles v. Hinkle,*
  472 S.E.2d 827 (W. Va. 1996) ..............................................................27

*BE & K Constr. Co. v. NLRB,*
  536 U.S. 516 (2002) ..............................................................................38

*Bedi v. Grondin,*
  51 F.3d 265, 1995 WL 139331 (4th Cir. Mar. 31, 1995)....................26

*Belk, Inc. v. Meyer Corp., U.S.,*
  679 F.3d 146 (4th Cir. 2012)................................................................23

*Brewer v. Landrigan,*
  131 S. Ct. 445 (2010) ...........................................................................42

*Bridge v. Phoenix Bond & Indem. Co.,*
  553 U.S. 639 (2008) ............................................... 31, 32, 33, 34

*Bridgewater v. Double Diamond-Delaware, Inc.,*
  2011 WL 1671021 (N.D. Tex. Apr. 29, 2011)............................. 33-34

*Brown v. Royalty,*
  535 F.2d 1024 (8th Cir. 1976)..............................................................54

*Business Guides, Inc. v. Chromatic Comm'cns Enters., Inc.,*
  498 U.S. 533 (1991) .............................................. 20, 26, 36

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991) ................................................................................27

*Coffey v. Healthtrust, Inc.*,
   1 F.3d 1101 (10th Cir. 1993) ............................................................47

*CSX Transp., Inc. v. Gilkison*,
   406 F. App'x 723 (4th Cir. Dec. 30, 2010) ................................. *passim*

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*,
   758 F. Supp. 2d 153 (E.D.N.Y. 2010), *aff'd sub nom.*
   *Curtis v. Law Offices of David M. Bushman, Esq.*,
   443 F. App'x 582 (2d Cir. 2011) ....................................... 28, 38, 39, 40

*Daddona v. Gaudio*,
   156 F. Supp. 2d 153 (D. Conn. 2000) ...............................................39

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................. 17, 50

*Davis ex rel. Davis v. Wallace*,
   565 S.E.2d 386 (W. Va. 2002) .........................................................27

*Dixon v. CSX Transp., Inc.*,
   990 F.2d 1440 (4th Cir. 1993) .........................................................50

*D'Orange v. Feely*,
   877 F. Supp. 152 (S.D.N.Y. 1995) ...................................................39

*Dungan v. Academy at Ivy Ridge*,
   2008 WL 2827713 (N.D.N.Y. July 21, 2008) .....................................32

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011) .........................................................35

*Flip Mortg. Corp. v. McElhone*,
   841 F.2d 531 (4th Cir. 1988) ...........................................................25

*GE Inv. Private Placement Partners II v. Parker*,
   247 F.3d 543 (4th Cir. 2001) ...........................................................31

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .......................................................................52

*Green Leaf Nursery v. E.I. DuPont de Nemours*,
   341 F.3d 1292 (11th Cir. 2003) ............................................. 27, 35, 36

*H.J., Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989) ................................................................. 25, 42

*Handeen v. Lemaire*,
   112 F.3d 1339 (8th Cir. 1997) .........................................................26

*Hill v. Crum*,
   727 F.3d 312 (4th Cir. 2013) ..............................................................23

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992) ..........................................................................31

*In re Silica Prods. Liab. Litig.*,
   398 F. Supp. 2d 563 (S.D. Tex. 2005)................................................11

*Jared & Donna Murayama 1997 Trust v. NISC Holdings, LLC*,
   727 S.E.2d 80 (Va. 2012) ..................................................................35

*Kashelkar v. Rubin & Rothman*,
   97 F. Supp. 2d 383 (S.D.N.Y. 2000) .................................................38

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..........................................................................50

*Lawyer Disciplinary Bd. v. Neely*,
   528 S.E.2d 468 (W. Va. 1998) ..........................................................48

*Lenoir v. Tannehill*,
   660 F. Supp. 42 (S.D. Miss. 1986) ....................................................26

*McWhorter v. City of Birmingham*,
   906 F.2d 674 (11th Cir. 1990) ...........................................................56

*Miranda v. Ponce Fed. Bank*,
   948 F.2d 41 (1st Cir. 1991) ...............................................................25

*Morris v. Wachovia Sec., Inc.*,
   448 F.3d 268 (4th Cir. 2006) ...................................................... 15, 44

*Nolan v. Galaxy Scientific Corp.*,
   269 F. Supp. 2d 635 (E.D. Pa. 2003).......................................... 38, 39

*Office of Senator Mark Dayton v. Hanson*,
   550 U.S. 511 (2007) ..........................................................................38

*Operating Eng'rs Pension Trust v. A-C Co.*,
   859 F.2d 1336 (9th Cir. 1988) ...........................................................27

*O'Rear v. Fruehauf Corp.*,
   554 F.2d 1304 (5th Cir. 1977) ...........................................................56

*Painter v. Peavy*,
   451 S.E.2d 755 (W. Va. 1994) ..........................................................25

*Port Drum Co. v. Umphrey*,
   852 F.2d 148 (5th Cir. 1988)...................................................20, 25, 26

*Redman v. John D. Brush & Co.*,
   111 F.3d 1174 (4th Cir. 1997) ................................................................51

*Schering Corp. v. Vitarine Pharm., Inc.*,
   889 F.2d 490 (3d Cir. 1989) ................................................................47

*Schlaifer Nance & Co. v. Estate of Warhol*,
   194 F.3d 323 (2d Cir. 1999) ................................................................29

*Schultz v. Capital Int'l Sec., Inc.*,
   466 F.3d 298 (4th Cir. 2006) ................................................................23

*Spiegel v. Cont'l Ill. Nat. Bank*,
   609 F. Supp. 1083 (N.D. Ill. 1985), *aff'd*,
   790 F.2d 638 (7th Cir. 1986) ................................................................40

*Taylor v. Va. Union Univ.*,
   193 F.3d 219 (4th Cir. 1999), *abrogated on other grounds as recognized
   in Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
   354 F.3d 277 (4th Cir. 2004) ........................................... 23, 49, 54, 56

*Terra Firma Co. v. Morgan*,
   674 S.E.2d 190 (W. Va. 2008) ................................................................34

*United States v. Gillion*,
   704 F.3d 284 (4th Cir. 2012) ................................................................31

*United States v. Mejia*,
   545 F.3d 179 (2d Cir. 2008) ................................................................51

*United States v. Murr*,
   681 F.2d 246 (4th Cir. 1982) ................................................................41

*United States v. Neder*,
   527 U.S. 1 (1999) ................................................................31

*von Bulow v. von Bulow*,
   657 F. Supp. 1134 (S.D.N.Y. 1987) ........................................... 38, 39

*Walter v. Palisades Collection, LLC*,
   480 F. Supp. 2d 797 (E.D. Pa. 2007) ................................................................31

*Warner v. Wingfield*,
   685 S.E.2d 250 (W. Va. 2009) ........................................... 25, 35, 36

*Whorton v. Malone*,
   549 S.E.2d 57 (W. Va. 2001) ................................................................10

## Statutes

18 U.S.C. § 1341 ...................................................................................31

18 U.S.C. § 1343 ...................................................................................31

18 U.S.C. § 1961(1) ..............................................................................30

18 U.S.C. § 1962 ...................................................................................30

18 U.S.C. § 1964 .....................................................................................2

18 U.S.C. § 1964(c) ......................................................................... 30, 31

28 U.S.C. § 1291 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................2

45 U.S.C. § 51 *et seq.* (1908) .................................................................4

## Rules

Fed. R. Evid. 403 ....................................................................... 17, 50, 52

Fed. R. Evid. 702 ..................................................................................50

W. Va. R. Civ. P. 11............................................................................ *passim*

W. Va. R. Civ. P. 11(b)..........................................................................35

W. Va. R. Civ. P. 11(c) ..........................................................................26

## Other Authorities

5 C. Wright, A. Miller & A. Kane, *Federal Practice and Procedure*, § 1334 (Supp. 1986) ........................................................................................26

*Amicus Curiae* U.S., *Bank of China, New York Branch v. NBM L.L.C.*, 2005 WL 2875061 (U.S. Oct. 31, 2005) .......................................................31

Daniel Fisher, "Embattled Gasket Maker Sues Asbestos Lawyers For Fraud," Forbes.com, Jan. 10, 2014 ..........................................................1

G. B. Joseph, *Civil RICO: A Definitive Guide* 115-16 (3d ed. 2010)................ 32-33

Greg Ryan, "RICO A Tempting Route For Companies Facing Tort Trickery," Law360, Oct. 22, 2013.........................................................1

Tiger Joyce, "Companies Find A New Way To Fight Fraudulent Lawsuits," Pittsburgh Post-Gazette, Oct. 17, 2013 ............................................. 1-2

W. L. Prosser, *Law of Torts* § 108, at 714 (4th ed. 1971) ................................. 31-32

## PRELIMINARY STATEMENT

Over the course of several decades, CSX has faced numerous Federal Employers Liability Act (FELA) lawsuits brought by its employees who were harmed by exposure to asbestos while working for CSX.  Until this case, the railroad settled these claims or defended them in a conventional manner.  This case reflects CSX's new and aggressive strategy:  It has attempted to weaponize Rule 11 of the West Virginia Rules of Civil Procedure by using its alleged violation in a select few out of thousands of claims to trigger massive liability under RICO against lawyers who represented CSX's injured workers.   No other court has permitted this misuse of Rule 11, no doubt because controlling law forbids it and because it improperly charges juries, not judges, with regulating the conduct of lawyers.  But the District Court ignored this judicial consensus and allowed CSX's claims to proceed to trial.  That was plain error.

Make no mistake:  This case is in the vanguard of a nationwide movement by corporations to use RICO to destroy lawyers who have dared to sue them on behalf of injured individuals.[1]  It seeks to wrench Rule 11 from its moorings,

---

[1]    *See* Daniel Fisher, "Embattled Gasket Maker Sues Asbestos Lawyers For Fraud," Forbes.com, Jan. 10, 2014 ("By suing the asbestos lawyers who are suing it, Garlock is following in the steps of CSX, which in 2012 won a $429,000 fraud verdict against Pittsburgh lawyers Robert Peirce and Louis Raimond"); Greg Ryan, "RICO A Tempting Route For Companies Facing Tort Trickery," Law360, Oct. 22, 2013 (noting call "on companies to wield [RICO] as a weapon against plaintiffs' attorneys"); Tiger Joyce, "Companies Find A New Way To Fight

Continued on following page

meaning that every state-court lawsuit would contain the seeds of vengeful federal civil RICO litigation that will threaten to flood the federal courts. This Court should reject this dangerous expansion of Rule 11 and the civil RICO statute, and reverse.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964. It entered a final judgment for CSX on September 25, 2013. (Dkt.1636). Mr. Peirce and Mr. Raimond timely appealed on October 3. (Dkt.1639). Dr. Harron timely appealed on October 11. (Dkt.1648). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES ON APPEAL

By its own account, CSX's claims depend on a theory it "has always made clear": that when lawyers in Mr. Peirce and Mr. Raimond's law firm signed complaints asserting FELA asbestosis claims on behalf of thousands of CSX's workers, they violated Rule 11 of the West Virginia Rules of Civil Procedure with respect to 11 of those claims. (Dkt.1588 at 18; Dkt.1521 at 1-2).

---

Continued from previous page
Fraudulent Lawsuits," Pittsburgh Post-Gazette, Oct. 17, 2013 (noting that businesses "have begun to look to CSX's aggressive RICO lawsuit as a new model for punishing" plaintiffs' lawyers).

The issues on appeal are:

1. Whether the judgment is defective because, as a matter of law, (a) Rule 11 cannot support a private civil recovery, (b) CSX could not justifiably rely to its detriment on the Rule 11 certifications of the 11 FELA claims at issue, and (c) litigation conduct, in particular the filing of lawsuits, is not a "predicate act" under RICO.

2. Whether Peirce, Raimond, and Dr. Harron are entitled to judgment as a matter of law because no reasonable jury could fairly conclude (a) that Peirce and Raimond violated Rule 11 when they filed the 11 FELA claims or (b) that CSX justifiably relied to its detriment on the Rule 11 certifications of those claims.

3. Whether the District Court erred in refusing to grant a new trial because of testimony and innuendo adduced by CSX at trial that went well beyond the 11 specific claims at issue, and the sole purpose of which was to smear the Peirce law firm—this evidence included the highly prejudicial opinion testimony from CSX's expert, Dr. Parker, that the vast majority of railroad workers do not have asbestosis and CSX's repeated references to the Peirce firm filing other supposedly baseless FELA claims beyond the 11 at issue.

## STATEMENT OF THE CASE

**A.    For many decades, CSX exposed countless thousands of its employees to asbestos, and has been called to account for that exposure in FELA lawsuits.**

As the undisputed trial evidence showed, CSX exposed its railroad workers to asbestos for decades.  (Trial Transcript ("Tr.") 1138:9-1152:10, 1165:10-1167:9, 1181:4-7; Defendants' Trial Exhibit ("DX") 63).  Inhaled asbestos fibers scarred those workers' lungs—*i.e.*, caused asbestosis—and increased their risk of cancer, among other things.  (Tr.1194:5-1198:10, 1238:16-25).  Scarring alone, without

proof of physical impairment, is compensable under FELA, 45 U.S.C. § 51 *et seq.* (1908). (Tr.320:23-322:11, 1584:20-1585:12).

The standard for proving a FELA claim is "very liberal." (Tr.321:7-24, 1304:10-1306:7, 1371:10-18, 1537:9-1542:13). To file a FELA lawsuit, a worker need only have and allege (1) sufficient occupational exposure to asbestos, (2) a sufficient latency period, and (3) a "positive" chest x-ray interpreted by a certified "B-reader" as showing lung scarring "consistent with asbestosis."[2] (Tr.278:3-7, 1039:11-21, 1306:8-1309:9, 1521:20-1522:5, 1570:5-7, 1584:20-1585:12).

A "B-reader" is a medical doctor certified by the National Institute for Occupational Safety and Health to interpret chest x-rays for signs of pneumoconiosis through the "B-reading" process defined by International Labor Organization ("ILO") guidelines. (Tr.527:12-528:12, 691:6-11, 698:9-20). Abnormalities on an x-ray are documented on an ILO form using a spectrum, ranging from negative ("0/0"), to negative but seriously considered a positive ("0/1"), to positive but seriously considered a negative ("1/0"), to positive ("1/1" and above). (Tr.528:10-12, 723:7-725:24, 727:7-728:11; Plaintiff's Trial Exhibit ("PX") 572). An ILO form indicating scarring consistent with asbestosis—*i.e.*, a

---

[2]   A medical or differential diagnosis is not required to file a FELA claim. (Tr.611:13-613:2, 1219:25-1220:6, 1357:8-25, 1521:20, 1522:5).

positive B-reading of 1/0 or greater—generally triggers the statute of limitations on the worker's FELA asbestosis claim. (Tr.989:4-10, 1310:14-21, 1571:18-22).

**B.     The Peirce Firm develops a FELA asbestosis practice to handle the claims of CSX's workers and others exposed to asbestos.**

Following the lead of numerous law firms that had already launched FELA asbestosis practices, Robert Peirce & Associates, f/k/a Peirce, Raimond & Coulter, P.C. (the "Peirce Firm"), began offering asbestosis screenings in the 1990s to CSX workers in several locations, including the numerous states in which CSX operated. (Tr.173:24-176:8, 189:21-24, 253:17-24, 311:5-7, 409:17-21; Dkt.853¶13). At screenings, CSX workers provided their employment history to Peirce Firm paralegals and had a chest x-ray taken by a certified radiologic technologist using a mobile hospital-grade x-ray machine. (Tr.162:1-63:20, 181:9-14, 201:25-205:25, 207:10-20, 212:8-13, 388:16-19, 1062:1-14). The x-rays were eventually interpreted by a B-reader to determine whether, assuming the requisite occupational exposure, the x-rays showed scarring consistent with asbestosis. (Tr.189:21-24, 255:19-256:18, 283:16-284:23, 286:8-23, 346:6-18, 518:13-519:3, 636:22-637:8, 658:13-17, 670:6-671:8, 679:18-680:20). These screening procedures were common among law firms engaged in FELA litigation on behalf of railroad workers, and had been used long before the Peirce Firm began prosecuting asbestosis claims. (Tr.434:16-439:15, 972:14-973:5, 1055:2-1056:6, 1308:8-14, 1371:23-1373:8, 1521:15-1523:14, 1526:4-1527:11).

ILO forms received from a B-reader were forwarded to the FELA railroad-litigation section of the Peirce Firm. (Tr.256:19-257:13). The firm then would either try to negotiate a settlement or file a FELA lawsuit for the worker on a contingent-fee basis. (Tr.1010:4-21, 1300:7-19).

By its own admission, CSX knew that the Peirce Firm and other firms conducted screenings, how screenings were conducted, that CSX's workers filed FELA claims based on screenings, and that most asbestosis cases resulted from screenings. (Fitch Dep. at 27-29, Dkt.1538; Bobersky Dep. at 37-38, Dkt.1536; Weldon Dep. 58-59, Dkt.1534).[3] This knowledge did not affect CSX's settlement calculations. (Bobersky Dep. at 44, Dkt.1536).

## C. The Peirce Firm retains Dr. Harron to read the films of CSX's workers and settles numerous FELA claims against CSX based on his readings.

In the mid-1990s, CSX asked the Peirce Firm to negotiate FELA asbestosis claims, rather than file lawsuits. (Tr.1392:23-1393:24). Peirce and Raimond engaged in numerous settlement discussions with CSX's in-house counsel and personnel in charge of handling occupational disease claims, including Ed Codd, Templeton Fitch, and Heath Weldon. (Tr.1064:15-1070:14, 1072:2-20). During these negotiations, CSX acknowledged that it exposed its workers to asbestos and informed Peirce that it would not dispute occupational exposure in settling cases;

---

[3]   These and other video deposition excerpts were played to the jury at trial.

instead, the issue would be value.     (Tr.422:4-423:2, 1067:7-17, 1068:14-24, 1069:23-1070:3).

The positive ILO forms the Peirce Firm submitted to CSX formed the basis of the negotiations.  (Tr.412:7-14; White Dep. at 32-33, Dkt.1535).  Starting in the mid-1990s, the firm normally used Dr. Ray Harron, a radiologist, as its B-reader.[4] (Tr.510:20-21, 1039:6-10).  It had identified Dr. Harron after it learned that his testimony supported a large verdict for a worker in an asbestos case.  (Tr.292:20-293:17).   Over the years, Dr. Harron's testimony supported substantial jury verdicts for the Peirce Firm (Tr.1316:11-1317:2) and against CSX, even when the B-reading showed minimal scarring (1/0) and was opposed by CSX's experts (Kelly Dep. at 76-77, Dkt.1531).

CSX could find its own doctor to rebut a positive B-reading "99 percent of the time."  (Fitch Dep. at 79-80, 95, Dkt.1538).  For example, CSX asked Dr. Joseph Renn, nicknamed "0/0 Renn" because he never read any film positive (Tr.1551:24-1552:24), to read x-rays and told him that Dr. Harron had read them positive.   (Adkins Dep. at 61-62, 67-71, Dkt.1541; White Dep. at 55-56, Dkt.1535).

---

4     Prior to the mid-1990s, the Peirce Firm used several other B-readers. (Tr.255:20-23).

CSX had seen a number of firms use Dr. Harron. (Fitch Dep. at 93, Dkt.1538). Both CSX and the Peirce Firm regarded Dr. Harron as a liberal reader. (Tr.337:18-25, 1065:1-10; Fitch Dep. at 94, Dkt.1538; PX156). CSX's experts disagreed with Dr. Harron, "[b]ut there were other Dr. Harrons out there who were just as liberal as he was." (Fitch Dep. at 94-95, Dkt.1538).

During several negotiations between CSX and the Peirce Firm in the mid-1990s, Dr. Harron's positive-read rate was discussed at length. (Tr.1064:15-1065:10, 1070:4-14, 1072:2-20). Peirce told CSX that he thought Dr. Harron was reading "slightly more than half" of the x-rays as positive.[5] (Tr.1065:1-10). Dr. Harron, who did not track his positive-read rate, estimated that it was 60%. (Tr.584:8-18). CSX, by contrast, told Mr. Peirce that it thought Dr. Harron had a 90-100% positive read rate. (Fitch Dep. at 93, Dkt.1538; Tr. 413:1-14, 1070:4-14, 1072:2-8).

Witnesses from the Peirce Firm and CSX testified to dealings showing that CSX was not relying on allegations in the FELA suits relating to whether claimants had asbestosis. For example, at one settlement meeting, Fitch told Peirce directly that he was "familiar with Dr. Harron, that other law firms had been using him,"

---

[5] At the time, Peirce personally did not know Dr. Harron's exact overall positive read rate. (Tr.1080:18-10811:14). Mr. Raimond explained the meaning of Dr. Harron's positive read rate as reflecting "some evidence of minor to minimal lung scarring in 50 to 60 percent of these people who had worked on the railroad for 25 to 30 years. . . . 1/0 and 1/1 is minor to minimal scarring." (Tr.307:23-308:23).

and that "we're not going to pay you very much on these cases because he's a very liberal reader." (Tr.1065:18-1066:17). Peirce responded, "[W]e'll get another reader, because we're not going to settle these cases cheaply." (*Id.*) Fitch answered, "[D]on't bother getting another reader. I know there are many B-readers out there that will find most of these people positive," and at "the same rate as Dr. Harron was reading." (Tr.1065:18-1066:17; *see also* Fitch Dep. at 118-19, Dkt.1538). Fitch added, "[W]e can find B-readers that will find most of them negative. So if you go to trial, it'll be a disputed diagnosis." (Tr.1065:18-1066:17).

CSX discounted claims if they were based on a Dr. Harron B-read. (Weldon Dep. at 21-22, 50, Dkt.1534). Bo Bobersky, who handled asbestosis claims for CSX, did not believe Dr. Harron's readings were accurate, yet still authorized settlements on Dr. Harron-read claims. (Bobersky Dep. at 48, 71-72, Dkt.1536; *see also* White Dep. at 58-59, Dkt.1535; Codd Dep. at 12, 44-45, Dkt.1537). But CSX also recognized that a jury could conclude that Dr. Harron was correct, and made settlement decisions on that basis. (Bobersky Dep. at 71-72, Dkt.1536). As Fitch put it, "most . . . FELA claims have some value," so CSX "might be better off paying a minimal settlement to make the case go away, rather than litigating and potentially getting an adverse verdict." (Fitch Dep. at 126-27, Dkt.1538; Adkins Dep. at 72-73, Dkt.1541 (discussing a claim settled after conflicting expert

readings); White Dep. at 58-59, Dkt.1535 (same)).  Settlement was a "business decision[]."  (Bobersky Dep. at 71, Dkt.1536).

**D.    Beginning in 2000, the Peirce Firm, at CSX's behest, begins filing FELA claims on behalf of CSX's workers.**

Around 2000, CSX informed the Peirce Firm that it would need to file lawsuits on behalf of CSX's present or former workers before the claims would be negotiated.  (Tr.1393:2-24).  Between 2002 and 2008, the firm filed FELA claims on behalf of thousands of workers against CSX in West Virginia state court in a series of 5 complaints.  (Tr.994:6-24, 1005:19-1006:14, 1323:1-1324:8; DX101).  These 5 complaints included the 11 claims at issue here—those of Morris Collier, Miledge Hill, James Petersen, Lewis Schabow, Aubrey Shelton, Donald Wiley, Earl Baylor, Archie Wilkins, Nelson Andrews, Hubert Harrison, and Herman Lincoln.  (PX8; PX10; PX21; PX23; PX27).  Mark Coulter and Bob Daley, attorneys in the Peirce Firm's railroad litigation section, drafted and signed these complaints; Peirce and Raimond did not.  (Tr.261:1-262:14, 264:16-21, 269:1-16, 989:11-990:8, 1302:1-1304:2).

Consistent with West Virginia's liberal notice pleading standards and FELA's lenient pleading requirements,[6] the allegations in each complaint covered

---

6    "It is well established that complaints are to be read liberally as required by the notice pleading theory underlying the West Virginia Rules of Civil Procedure." *Whorton v. Malone*, 549 S.E.2d 57, 63 n.6 (W. Va. 2001) (citations omitted).

all manner of asbestosis-related injuries for all of the claimants, including past and potential future harm. (*Id.*; Tr.990:14-991:6, 992:8-18, 992:22-994:2, 1004:18-1005:3, 1309:10-1311:17, 1523:15-1526:3). As a matter of course, CSX denied the allegations and moved to dismiss each complaint on venue or *forum non conveniens* grounds. (Dkt.853¶¶111, 118, 128, 132, 164; Tr.1332:14-19; Adkins Dep. at 80-81, Dkt.1541). There is no evidence that CSX incurred any fees in defending the merits of any of the 11 FELA claims at issue.

**E.      After CSX informs the Peirce Firm that it will no longer settle asbestosis claims based on Dr. Harron's reads, one of two new B-Readers reads each of the 11 FELA claimants' x-rays positive.**

In June 2005, in a silica multi-district litigation that did not involve CSX, the Peirce Firm, its clients, or the 11 FELA claimants at issue in this case, a Texas district court issued an opinion critical of Dr. Harron. *See In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563 (S.D. Tex. 2005). Following that decision, CSX told the Peirce Firm that it would not settle claims based solely on a Dr. Harron read, so the Peirce Firm had x-rays re-read by other certified B-readers, including Drs. Donald Breyer and Robert Mezey. (Tr.1047:9-25, 1049:9-14, 1054:1-1059:9).

Dr. Breyer confirmed the great majority of Dr. Harron's positive reads.[7] (Tr.1269:11-21). With respect to the 10 of the 11 FELA claims at issue that had

---

7    Dr. Harron's positive reads were confirmed on other occasions. Attorney Dean Hartley, whose firm followed the same procedure, retained three B-readers who confirmed Dr. Harron's readings 82% of the time. (Tr.1550:15-22). One of
Continued on following page

not settled, either Dr. Breyer or Dr. Mezey read as positive the x-ray on which the claim was based,[8] (PX201, 231, 255, 277, 301-02, 325, 351, 374, 397, 419; DX38-D).  All of the claims filed by the Peirce Firm after 2005 were supported by a positive reading from Dr. Breyer or Dr. Mezey prior to filing.  (*Id.*).

## F.    CSX initially sues Peirce and Raimond for fraud under RICO and the common law relating to a different worker and unrelated to Dr. Harron.

In December 2005, CSX sued the Peirce Firm and Robert Gilkison, a Peirce Firm paralegal and formerly a CSX employee.  CSX alleged that two CSX workers (whose last names were May and Jayne) committed fraud when one impersonated the other at an x-ray screening to obtain a positive x-ray, and that the Peirce Firm, which filed and settled with CSX an asbestosis claim based on that x-ray, was vicariously liable for fraud based on the actions of Gilkison (the "May/Jayne Incident").  (Dkt.1; *CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 734-36 (4th Cir. Dec. 30, 2010)).  These claims were tried to a jury in 2009.  (Dkt.701).  At trial, Peirce testified that he had no knowledge of the incident and that, as soon as he learned of the allegations, he told May he was "no longer our client and he

_____

Continued from previous page
Hartley's B-readers, Dr. Rob Altemeyer, whom CSX expert Dr. John Parker defended once and respects as a physician, confirmed "about 80 percent" of Dr. Harron's B-reads.  (Tr.924:3-18,1550:15-1551:3).

[8]    CSX settled Morris Collier's bladder cancer claim in 2003 for $25,000.  (Collier Dep. at 54, 75, Dkt.1508; Dkt.853¶147(a)).  The parties' stipulation as to possibly recoverable damages—which the jury awarded in full—did not include the Collier settlement.  (Dkt.1516; PX694 at 3).

better get a lawyer to defend himself on the allegations that CSX had made. . . ." *CSX Transp.*, 406 F. App'x at 735.  The jury returned a verdict in favor of Gilkison and the Peirce Firm.  (Dkt.701).

Meanwhile, CSX had filed an amended complaint in that suit alleging civil RICO and common-law fraud claims against Dr. Harron and three Peirce Firm principals—Peirce, Raimond, and Mark Coulter—that were unrelated to the May/Jayne Incident.  (Dkt.208).  CSX alleged that the defendants "orchestrated a scheme to inundate CSXT and other entities with thousands of asbestos cases without regard to their merit."[9]  (*Id.* at ¶1).

The District Court dismissed the RICO claims and most of the common-law claims as time-barred, and later granted summary judgment for the defendants on the remaining fraud claim related to the FELA suit filed on behalf of CSX worker Earl Baylor.  (Dkt.264, 265, 785).  CSX appealed and, in 2010, this Court affirmed the verdict on the May/Jayne Incident, vacated the judgment dismissing RICO and fraud claims as time-barred, vacated the grant of summary judgment on the Baylor claim, and reversed the district court's refusal to permit CSX to amend its complaint—which the district court had concluded would be futile based on its statute of limitations ruling.  *See CSX Transp.*, 406 F. App'x at 731-32, 736.

---

[9]    CSX later abandoned this "system of fraud" theory.  (Dkt.1557 at 1-3 (citing Dkt.960 at 68-69, 80)).

**G.    On remand, CSX amends again, alleging that Peirce and Raimond violated West Virginia's Rule 11 when they filed 11 specific FELA claims.**

On remand, CSX filed its Third Amended Complaint—the operative complaint here ("Complaint")—asserting civil RICO and common-law fraud claims, plus conspiracy claims.  (Dkt.853).  CSX alleged that Peirce and Raimond defrauded it by fabricating and prosecuting 11 specific FELA claims contained in 5 complaints that included several thousand FELA claims in all.  (*Id.* at ¶¶106, 113, 126, 130, 135, 147, 152).  Many of these claims were filed after Raimond retired. (Tr.263:10-12).

Specifically, CSX alleged that Peirce and Raimond misrepresented that "there existed a colorable good faith basis for the claims" when they certified those claims under Rule 11.  (*Id.* at ¶157).  CSX claimed that although it "disputed the subject claims, it reasonably relied on the Lawyer Defendants' representations that the claims had some good faith basis in fact" (*id.* at ¶164), which "caused CSXT to expend substantial money and resources to process, defend and/or settle the [11] deliberately fabricated claims."  (*Id.* at ¶165).

Peirce and Raimond moved to dismiss and, later, for summary judgment, but the District Court denied those motions.[10]  (Dkt.1050, 1436, 1561).

---

[10]   In its briefing on these motions, CSX confirmed that its theory of liability was that the Peirce Firm's Rule 11 certifications caused it to expend resources defending the 11 FELA claims.  (Dkt.906 at 6-10, 21; Dkt.1351 at 1, 25, 29-36).

- 14 -

**H.     At trial, CSX argues that Peirce and Raimond committed fraud when they violated Rule 11 in filing the 11 underlying FELA claims, which caused CSX to incur fees defending those 11 claims.**

In December 2012, the parties proceeded to a jury trial.  CSX's theory of fraud at trial—as alleged in its Complaint and prior briefing—was that the 11 underlying FELA claims were objectively baseless, that Peirce and Raimond lacked a good-faith basis for filing them, and that CSX was duped into expending legal-defense fees based on false Rule 11 certifications of the claims.  (Dkt.853 ¶¶147, 152, 157, 164-65; Dkt.1550 at 3, 14, 18-20, 22-24).

As noted above, a prima facie FELA claim requires proof of three elements—sufficient exposure to asbestos, sufficient latency period following asbestos exposure, and a positive B-read.  In order to carry its burden to prove its Rule 11-based theory of fraud, CSX therefore had to establish that the "[f]actual allegations" relating to any of these 3 elements were "'unsupported by any information obtained prior to filing." *Morris v. Wachovia Sec., Inc.*, 448 F.3d 268, 277 (4th Cir. 2006) (citation omitted).

Exposure and latency were undisputed for the 11 underlying FELA claimants.   (Tr.303:23-304:5,  304:24-25,  966:21-967:1,  1063:12-18,  1166:21-1167:9, 1200:9-14, 1204:2-10; DX63).  Thus, the key issues at trial were whether the positive B-reads for the 11 FELA claimants performed by Dr. Harron contained intentional misrepresentations of fact (as opposed to a subjective expert B-reading

- 15 -

to disagreement), and, if so, whether Peirce and Raimond knew or recklessly disregarded Dr. Harron's allegedly fraudulent readings when they filed the 11 claims.

The positive x-rays of the 11 FELA claimants showed minimal to minor scarring (1/0).[11]  (Tr.966:21-967:1; PX176, 200, 230, 253, 276, 300, 324, 350, 373, 396, 418; DX38-C).  And each positive x-ray for the 10 non-settled claims was also read positive by Dr. Breyer or Dr. Mezey.  (PX201, 231, 255, 277, 302, 325, 351, 374, 397, 419; DX38-C).

To challenge the validity of the positive readings for the 11 claimants, CSX relied at trial on the testimony of Dr. John Parker, "an expert in the fields of pulmonology, occupational lung disease, asbestosis, and B-reading." (Tr.713:6-13).  He testified that, based on a panel B-reading study he arranged, none of these claimants had a "consensus" B-reading positive for asbestosis and, as a result, the positive B-readings that formed the basis of these 11 claims were wrong and scientifically unreliable.  (Tr.834:3-16, 841:24-842:5; DX38C-D).  He

---

[11]  The 11 claimants had had a previous x-ray interpreted as negative by Dr. Harron.  (Tr.595:12-24, 646:3-8, 657:2-18, 1689:19-25; DX38-C).  Contrary to CSX's suggestion that persons were rescreened until they tested positive, only 2% of the persons the Peirce Firm screened who ultimately tested positive had previously tested negative.  (Tr. 1386:4-7).  Notably, asbestosis is a progressive disease.  (Tr.309:11-14, 323:7-15, 406:11-19, 596:19-598:7, 862:2-5, 975:25-978:4).  Thus, some people with negative x-rays may later have a positive x-ray once the disease has developed.  (*Id.*)

also testified—based solely on hearsay studies prepared by others—that Dr. Harron's positive-read rate was unreliable because only 2% of the country's railroad workers as a whole supposedly contracted asbestosis. (Tr.849:19-854:9). Dr. Parker's testimony obviously created the impression that the vast majority of the thousands of FELA claims filed by the Peirce Firm were baseless.

Yet one of Dr. Parker's handpicked B-readers found that 8 of the 11 FELA claimants' x-rays were either positive (1/0 or greater) or could seriously be considered positive (0/1). (Tr.941:5-949:23; DX38-D). Moreover, the consensus of Dr. Parker's selected B-readers was that at least one of the x-rays for 5 of the 11 claimants could seriously be considered positive (0/1). (*Id.*). And at least one member of Dr. Parker's panel found that 6 of the x-rays Dr. Harron marked negative could be interpreted as positive or seriously considered positive. (*Id.*).

Before trial, Peirce, Raimond, and Dr. Harron moved to exclude Dr. Parker's 2% testimony under *Daubert* and Federal Rule of Evidence 403. (Dkt.1383, 1393, 1394). They argued that the 2% opinion—which Peirce and Raimond had no knowledge of, and which did not relate to the 11 claimants specifically or even all of CSX's workers generally (Dkt.1394 at 1-12 and n.6)—would taint the proceedings and cause enormous prejudice by encouraging the jury to speculate that Dr. Harron was generally unreliable, the Peirce Firm was disreputable, and that, therefore, the 11 claims in question were baseless. (Dkt.1393 at 3-6;

- 17 -

Dkt.1394 at 13-23).  The District Court, without conducting a *Daubert* hearing or articulating its reasoning, declined to exclude Dr. Parker's testimony.  (Dkt.1557 at 20, 22).

Peirce, Raimond, and Dr. Harron also moved pre-trial to limit CSX's evidence to the 11 specific FELA claims on which its causes of action were based.  (Dkt.1375, 1387).  The District Court granted that motion.  (Dkt.1557 at 2-3).  Nevertheless, CSX repeatedly violated the District Court's order by referring at trial to "thousands" of supposedly fraudulent FELA claims filed by the Peirce Firm.[12]  (Tr.89:23-90:2, 324:10-329:1, 338:15-339:11, 394:23-395:10, 584:8-10, 594:4-595:5, 857:5-11, 892:12-21, 905:15-906:1, 922:4-19, 1002:10-1004:13; 1643:6-1644:2; 1826:19-24, 1830:1-1831:7).

On causation, CSX offered no evidence to show that it would have acted differently but for the allegedly fraudulent Rule 11 certifications or the inclusion of

_____

[12]  CSX also introduced a slew of irrelevant evidence, much of it over objection, about the licensing of an x-ray technician who performed screenings on some of the Peirce Firm's clients; whether Peirce and Raimond were "practicing law" in states where screenings occurred; how screenings were conducted; the number of states in which screenings were conducted; whether the x-rays were prescribed by a doctor; whether Dr. Harron was practicing medicine or had a doctor-patient relationship with those whose x-rays he read; whether clients were called before claims were filed; whether a B-read is a "diagnosis" of asbestosis; and other irrelevant and prejudicial information that was admitted at trial.  (Tr.1892:5-1893:1).  While this evidence almost certainly offended the jury and unfairly prejudiced Peirce and Raimond, none of it was relevant to Peirce and Raimond's purported Rule 11 violations, and none of it caused CSX's claimed damages of the fees and costs spent to defend the 11 FELA claims.

these 11 claims among the thousands of FELA claims filed by the Peirce Firm. In fact, no CSX witness testified during its case-in-chief at all. And by its own admission, CSX "had neither the ability nor the incentive to conduct an extensive examination of each claim." (Dkt.42, Case No. 09-2135, CSX Opening Br. at 8 (4th Cir. Jan. 11, 2010); *see also id.* at 1, 28; Dkt.906 at 8). CSX instead made a business decision to seek dismissal of the claims on venue grounds, rather than contest their individual merits. (Dkt.1350 at 8; Dkt.1541 at 80-81; Dkt.853¶¶111, 118, 128, 132).

## I. The jury awards CSX over $400,000 under RICO only—which the District Court trebles—and CSX moves for nearly $11 million in attorneys' fees.

Following  trial, the jury returned a verdict for CSX, awarding damages only on the RICO claims. (Dkt.1549). The jury awarded a total of $429,240.47 (*id.*), which "represent[ed] the amounts spent by CSX for the defense of the complaints in which the[] eleven [FELA] claims were asserted." (Dkt.1516). Those complaints also included several thousand more FELA claims not at issue here, but CSX asserted that all of those fees should be attributed to the 11 claims at issue. (Tr.959:3-12, 996:4-8, PX694). The District Court trebled the damages and entered an amended judgment for $1,287,721.41. (Dkt.1636).

During trial, Peirce, Raimond, and Dr. Harron moved for judgment as a matter of law on CSX's claims, which the District Court denied.

(Tr.1085:3-1100:18). Post-trial, they moved for judgment as a matter of law or a new trial (Dkt.1562-64), which the court also denied. (Dkt.1633). CSX has also moved for an award of nearly $11 million in attorneys' fees and costs—roughly 25 times the verdict and over 8.5 times the trebled judgment—in addition to any later-incurred fees and costs. (Dkt.1566). The District Court stayed CSX's fees motion pending appeal. (Dkt.1637).

## SUMMARY OF THE ARGUMENT

Lawyers have duties of candor to the courts in which they practice. West Virginia Rule of Civil Procedure 11, in particular, requires lawyers to certify that the claims and allegations they assert are made in good faith and have some basis in law and fact. A violation of Rule 11 calls forth the broad remedial powers of the West Virginia courts and the West Virginia bar, who, this Court has recognized, "are perfectly capable of handling [any] malfeasance in their own courts."[13]

But Rule 11 manifestly does *not* provide the basis for a private civil recovery. It is a rule of procedure administered solely by courts to regulate the conduct of lawyers who appear before them.[14] Even so, a private recovery predicated on Rule 11 is precisely what CSX was awarded here—a substantial

---

[13] *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 403 (4th Cir. 2001).

[14] *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 553 (1991); *Port Drum Co. v. Umphrey*, 852 F.2d 148, 150 (5th Cir. 1988).

damages award, trebled under the federal civil RICO statute, based on Peirce and Raimond's law firm's allegedly improper Rule 11 certification of 11 FELA asbestosis claims filed along with thousands of other such claims against CSX as part of multi-plaintiff complaints. CSX, a seasoned litigant, actually asserted that it was defrauded by the allegations and Rule 11 certifications in state-court complaints filed by its *adversaries'* law firm, into spending fees to defend the 11 claims.

The District Court permitted CSX's "arguably unprecedented" (CSX's words) RICO claims to go to the jury, which, CSX touts, issued what appears to be "the *only* civil racketeering verdict ever obtained against a lawyer or doctor based on fraudulent personal injury claims." (Dkt.1566 at 6). Given the fatal legal and factual deficiencies in CSX's claims, this Court should reverse that unprecedented and unsupported verdict.

I.    First, the verdict necessarily depends on Peirce and Raimond's purported Rule 11 violations when other lawyers in the firm filed the 11 FELA claims at issue. But there is no basis under Rule 11 for such a private recovery. To the contrary: Controlling precedent forecloses use of this procedural rule to make out the elements of substantive private causes of action or to support a civil damages award. Controlling law also bars CSX from making its required showing that it justifiably relied to its detriment on the Rule 11 certifications of allegations

in complaints. A litigant cannot, as a matter of law, justifiably rely on its *adversary's* allegations or Rule 11 certifications. As Judge Davis wondered in the prior appeal in this case, how can a "party represented by capable counsel … reasonably rely on the allegations made on behalf of its adversary"[15]—especially where, as here, that party is a sophisticated, well-represented, Fortune 500 corporation?

II. Second, even if its claims were not legally flawed, CSX failed in any event to prove them. CSX adduced no evidence that it justifiably relied to its detriment on the Rule 11 certifications of the 11 FELA claims at issue. It merely claimed that since it incurred fees in moving to dismiss (on venue grounds) complaints containing thousands of FELA claims, it must have incurred *all* of those fees as a result of the certifications of the tiny subset of 11 FELA claims. But that sort of speculation is no substitute for the concrete proof of causation required here. CSX likewise failed to prove that there was any Rule 11 violation at all because, at the time the Peirce Firm filed the 11 FELA claims, there was ample evidence for each element of those claims.

III. Finally, a new trial is warranted because CSX introduced highly prejudicial and irrelevant evidence. It offered the opinion of its expert, Dr. Parker, that only 2% of railroad workers in fact have asbestosis—as if that were relevant to

---

15   *CSX Transp.*, 406 F. App'x at 737 (Davis, J., concurring).

whether Peirce and Raimond determined in good faith that there was a basis to sue CSX on behalf of the 11 FELA claimants at issue here. And in violation of the District Court's pre-trial order, CSX repeatedly referred to "thousands" of allegedly baseless FELA claims filed by the Peirce Firm—even though there were only 11 claims at issue.

For each of these reasons, this Court should reverse.

## STANDARDS OF REVIEW

This Court reviews the denial of a motion for judgment as a matter of law and questions of law de novo. *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 164 (4th Cir. 2012). It reviews evidentiary rulings for abuse of discretion and reverses where the ruling "affects a party's substantial rights." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 310 (4th Cir. 2006). An evidentiary error affects substantial rights unless this Court can conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[]. . . ." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (*en banc*) (citations omitted), *abrogated on other grounds as recognized in Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004).

# ARGUMENT

A.  **CSX's liability theory—that improper Rule 11 certifications of 11 allegedly fraudulent FELA claims caused CSX's claimed damages—contains three fundamental legal flaws.**

In its own words, the liability theory CSX tried was "based" on the Peirce Firm's Rule 11 "certifications made upon filing the [11] claims at issue." (Dkt.1588 at 22) (emphasis omitted).  CSX claimed that "it reasonably relied on [the Peirce Firm's] representations that the claims had some good faith basis in fact and were brought in accordance with the West Virginia Rules of Civil Procedure, Professional Conduct [3.1], and other applicable law."  (Dkt.853¶¶164, 175; Dkt.906 at 6-7).  This allegedly "caused CSXT to expend substantial money and resources to process, defend and/or settle the deliberately fabricated claims." (Dkt.853¶¶ 165, 176; Dkt.906 at 6-7).  This is the theory CSX tried, and it was the theory on which the jury was instructed.  (Dkt.1588 at 5 (citing Dkt.1550 at 22-23); Dkt.1550 at 24).

CSX's liability theory contains three fundamental legal defects, each of which compels reversal.  Rule 11 has never been used to support private civil liability, nor can it; it is administered solely by courts to regulate the conduct of the lawyers in the cases before them.  Nor may a litigant—especially a sophisticated, experienced litigant such as CSX—justifiably rely on its adversary's allegations about medical evidence or its adversary's lawyer's attendant Rule 11 certifications. Finally, the civil RICO statute, which may not be used to transform "fraud disputes

… into federal RICO claims,"[16] does not authorize its "drastic"[17] remedies—the "equivalent of a thermonuclear device"[18]—based on the filing of lawsuits or related litigation activities. For each of these reasons, the jury's verdict is legally flawed and this Court should reverse.

### 1. Rule 11 cannot support a private civil recovery for fraud under RICO or the common law.

No appellate court has ever affirmed a fraud or RICO judgment on claims like CSX's that are based on Rule 11. This Court should not be the first to do so, and it should reject CSX's attempt to distort the rule far beyond its proper and intended scope.

Rule 11's purpose is "to regulate proceedings among parties already before the court in a particular case" and "to discourage groundless proceedings rather than to compensate wronged parties by means of affirmative relief." *Port Drum Co. v. Umphrey*, 852 F.2d 148, 150 (5th Cir. 1988); *see also Warner v. Wingfield*, 685 S.E.2d 250, 255-56 (W. Va. 2009).[19] Consistent with this settled view, the

---

16  *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

17  *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989).

18  *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991).

19  West Virginia's Rules of Civil Procedure are patterned after the Federal Rules. As a result, the West Virginia Supreme Court "give[s] substantial weight to federal cases, especially those of the United States Supreme Court, in determining the meaning and scope of our rules." *See Painter v. Peavy*, 451 S.E.2d 755, 758 n.6 (W. Va. 1994).

Supreme Court, in *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, held that Rule 11 does not create a federal common law of malicious prosecution because "[t]he main objective of the Rule is not to reward parties who are victimized by litigation[,]" noting that it was "confident that district courts will resist the temptation to use sanctions as substitutes for tort damages."[20]  498 U.S. 533, 553 (1991).

Thus, Rule 11 does not create "substantive rights" that give rise to a private right of action.  *Port Drum*, 852 F.2d at 150; *Bedi v. Grondin*, 51 F.3d 265, 1995 WL 139331, at *1 (4th Cir. Mar. 31, 1995) (unpublished) (per curiam) ("[Rule 11] does not create a private right of action, and a litigant may not use Rule 11 as a substitute for tort damages."); *Handeen v. Lemaire*, 112 F.3d 1339, 1345 n.8 (8th Cir. 1997) (affirming dismissal of RICO and state-law claims based on a "theory of recovery [plaintiff] struggled to forge from Rule 11" because "'there can be no independent cause of action instituted for Rule 11 sanctions'") (citations omitted). Rather, the rule contains its own enforcement provisions that courts, in their sole discretion, may use to punish violations.  *See* W. Va. R. 11(c).  And because the sanctions it authorizes are extreme, courts interpret and apply the rule with

---

[20]  This construction is consistent with the intent of Rule 11's drafters, who "expressly stated their intent not to create spin off litigation under Rule 11." *Lenoir v. Tannehill*, 660 F. Supp. 42, 44 (S.D. Miss. 1986) (citing Federal Rules of Civil Procedure, Rule 11, advisory committee note; 5 C. Wright, A. Miller & A. Kane, *Federal Practice and Procedure*, § 1334 (Supp. 1986)).

"restraint." *See Bartles v. Hinkle*, 472 S.E.2d 827, 835 (W. Va. 1996) ("[I]t is clear '[b]ecause of their very potency, ... [that Rule 11 sanction] powers must be exercised with restraint and discretion'") (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)); *Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988) ("Rule 11 is an extraordinary remedy, one to be exercised with extreme caution.").

Judge Davis recognized these settled features of Rule 11 in his concurrence in the first appeal in this case. He explained that the purpose of Rule 11 is not to support a private right of action for fraud, but "'to allow trial courts to sanction parties who do not meet minimum standards of conduct in a variety of circumstances.'" *CSX Transp.*, 406 F. App'x at 737 (quoting *Davis ex rel. Davis v. Wallace*, 565 S.E.2d 386, 389 (W. Va. 2002)). *See also Baltimore Scrap*, 237 F.3d at 403 (the proper remedy for a misrepresentation made in state court is through sanctions in the state-court system); *Green Leaf Nursery v. E.I. DuPont de Nemours*, 341 F.3d 1292, 1305 (11th Cir. 2003) ("Although . . . DuPont's alleged conduct in the Underlying Litigation[] may merit criminal sanctions, being held in contempt of court, bar admonitions, or even the trial court's setting aside of the judgment, the Plaintiffs chose to pursue a separate claim of fraud," which the court rejected).

This Court has been especially skeptical of attempts to seek a private recovery based on litigation conduct that is already regulated by ethical and procedural rules. In *Baltimore Scrap*, for example, the Court considered civil damage claims based on alleged fraud in a Maryland state-court lawsuit. The Court stressed that even if fraudulent misstatements had been made to the state court, "the proper remedy here is through Maryland law, whether it be through the sanctioning process of the state bar, … the state rules of Civil Procedure"—namely, Maryland's version of Rule 11—"or another similar process." 237 F.3d at 403. "The states[,]" this Court concluded, "are perfectly capable of handling malfeasance in their own courts." *Id.*; *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 174 (E.D.N.Y. 2010) ("[T]his court has full confidence that the New York State courts where the underlying litigation is currently pending are fully competent to address" litigation misconduct), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011).

These authorities foreclose CSX's fraud theory. That theory rises or falls on CSX's claim that Peirce and Raimond violated Rule 11 when other lawyers at their firm signed the complaints containing the 11 allegedly fraudulent FELA claims. Other than those signatures on those complaints, CSX did not identify a single alleged misrepresentation or omission that could have caused its awarded damages.

Indeed, CSX *stipulated* that its damages were the fees and costs it incurred as a result of the 5 complaints containing the 11 claims. (Dkt.1516; Tr.959:3-12; PX694). Affirming the judgment here thus would preserve exactly what controlling law forbids—an award of damages based on claimed Rule 11 violations.

An affirmance also would contravene Rule 11 by permitting a *jury* to decide the legal question whether a lawyer has violated Rule 11—an outcome directly at odds with the courts' singular role under Rule 11 as enforcers of proper litigation conduct. *See Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999) (noting that "the decision to impose sanctions is uniquely within the province of a district court"). Juries cannot supplant judges as enforcers of Rule 11. Nor should this Court approve CSX's blatant end-run around Rule 11 and the long-established common-law torts for remedying malicious litigation conduct— all in the transparent attempt to wield RICO's treble-damage and attorney-fee provisions to destroy Mr. Peirce, Mr. Raimond, and the Peirce Firm.[21]

---

[21] Indeed, there is no mystery why CSX chose its "unprecedented" RICO strategy, rather than pursue Rule 11 sanctions or a malicious prosecution or abuse of process tort suit: CSX could not, through those latter two avenues, have automatically obtained either treble damages or its attorneys' fees in this lawsuit, the kind of draconian penalties necessary to CSX's calculated goal of destroying Peirce, Raimond, and the Peirce Firm. As noted above, CSX is seeking nearly $11 million in fees and costs on a $429,000 verdict and a $1.2 million trebled judgment.

This Court should therefore reject CSX's dangerous invitation to transform every pleading into a potential tort or RICO claim against the lawyers who signed it and even those who did not. There is no basis in the text, history, or purpose of Rule 11 for this unprecedented application of the rule, and settled case law precludes it. Like the Maryland courts in *Baltimore Scrap*, the West Virginia courts and its bar "are perfectly capable of handling [alleged] malfeasance in their own courts." 237 F.3d at 403. The judgment should be reversed and the case dismissed.

**2.    CSX could not justifiably have relied on the allegations or certifications relating to the 11 underlying claims.**

CSX's claims fail for an independent reason:  neither the allegations nor the Rule 11 certifications relating to the 11 FELA claims could have caused CSX any damages because CSX could not, as a matter of law, justifiably have relied on those allegations or certifications. A contrary outcome conflicts squarely with the purpose and function of Rule 11, and depends on the absurd notion that a litigant can rely on his adversary's *allegations* made at the outset of a lawsuit.

**a.    CSX was required to prove that it justifiably relied on the allegedly flawed Rule 11 certifications of the specific 11 FELA claims at issue.**

The civil RICO statute creates a private right of action for those injured "by reason of" a pattern of "predicate acts." 18 U.S.C. §§ 1961(1), 1962, 1964(c). In order to prove the only "predicate acts" asserted here—mail and wire fraud under

- 30 -

18 U.S.C. §§ 1341 and 1343—CSX had to prove a "scheme to defraud," which requires a "show[ing] that the defendant failed to disclose material information or made material misrepresentations." *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012) (citing *United States v. Neder*, 527 U.S. 1, 25 (1999)).

Section 1964(c)'s "by reason of" clause imposes a causation requirement. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992). Where, as here, the alleged predicate acts are mail and wire fraud, a civil RICO plaintiff cannot establish the requisite causation without proof that "someone relied" on the defendant's misrepresentations or omissions. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008); *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001) ("[W]here a RICO plaintiff alleges predicate acts of mail and wire fraud as a proximate cause of the plaintiff's injury, the plaintiff also must have justifiably relied to his detriment on the defendant's material misrepresentation.") (internal quotation marks and citation omitted).

Reliance is essential because without it, there is no way to show that deception caused any harm. *See Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 807 (E.D. Pa. 2007) ("'It is a matter of basic logic that a misrepresentation cannot cause, much less proximately cause, injury, unless someone relies upon it.'") (quoting Br. *Amicus Curiae* U.S., *Bank of China, New York Branch v. NBM L.L.C.*, 2005 WL 2875061, at *8 (U.S. Oct. 31, 2005)); W. L. Prosser, *Law of Torts*

§ 108, at 714 (4th ed. 1971) ("The causal connection between the wrongful conduct and the resulting damage … takes in cases of misrepresentation the form of inducement of the plaintiff to act, or to refrain from acting, to his detriment … In order to be influenced by the representation, the plaintiff must of course have relied upon it, and believed it to be true.").

Under *Bridge*, in a mail-fraud civil RICO case, either "first-party" reliance (*i.e.*, reliance by the plaintiff itself) or "third-party" reliance (*i.e.*, reliance by someone other than the plaintiff that ultimately results in harm to the plaintiff) must be proved.  Here, because CSX has not claimed that its damages were caused by a third party's reliance on the alleged fraud, it must prove first-party reliance— that, as alleged in its Complaint, CSX "reasonably relied" to its detriment on the Rule 11 certifications.[22]  (Dkt.853¶¶164-65); *Bridge*, 553 U.S. at 658 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation"); *see also id.* at 658-59 ("[T]he complete absence of reliance may prevent the plaintiff from establishing proximate cause."); G. B.

---

[22]  Given how CSX styled its own claims, the need for CSX to prove justifiable reliance is all the more apparent.  *See Badella v. Deniro Mktg. LLC*, 2011 WL 5358400, at *6 (N.D. Cal. Nov. 4, 2011) ("'[T]he problem for Plaintiffs is that they do allege that they relied on Defendant's claimed misrepresentations and that it was this first-person reliance that caused them to sustain damages.  Thus, this case is unlike *Bridge* where third-party representations caused damage to the plaintiff.'") (quoting *Dungan v. Academy at Ivy Ridge*, 2008 WL 2827713, at *3 (N.D.N.Y. July 21, 2008)).

Joseph, *Civil RICO: A Definitive Guide* 115-16 (3d ed. 2010) (rationale that "if no third party is alleged to have relied on the misrepresentation or omission to the plaintiff's detriment, then the plaintiff must have relied to its own detriment, in order to have been injured 'by reason of' the mail fraud violation[,]" is "consistent with" *Bridge*).

In the District Court, CSX claimed that under *Bridge*, it did not need to prove causation through a showing of reliance on mail or wire fraud, and the District Court agreed and so charged the jury. (Dkt.1351 at 28-29; Dkt.1561 at 11-12). But that is based on a plain misreading of *Bridge*. There, bidders at a county tax-lien auction asserted RICO claims against their competitors, alleging that the competitors—who won the auction—committed mail fraud by submitting false bids to the county. *Bridge*, 553 U.S. at 642-44. The Supreme Court "granted certiorari … to resolve … whether first-party reliance is an element of a civil RICO claim predicated on mail fraud." *Id.* at 646. The Court held that "a showing of first-party reliance is not required" because proximate causation could be established through third-party reliance—by the county—on the competitors' false bids. *Id.* at 642, 656.

The Supreme Court manifestly did not, however, hold or even suggest that reliance would never be required to establish causation in a RICO mail fraud case. *See, e.g., Bridgewater v. Double Diamond-Delaware, Inc.*, 2011 WL 1671021, at

- 33 -

*11 (N.D. Tex. Apr. 29, 2011) ("*Bridge* does not establish the bright-line rule that plaintiffs asserting RICO claims based on mail fraud need not assert or establish their reliance on the fraud."). To the contrary, the Court stressed that in a RICO mail fraud case, the plaintiff ordinarily will have to prove that "*someone* relied on the defendant's misrepresentations." *Bridge*, 553 U.S. at 658 (citation omitted).

CSX therefore was required to prove that it justifiably relied to its detriment on the asserted predicate acts of mail and wire fraud to meet the "by reason of" requirement under the civil RICO statute.[23]

> **b.    CSX could not, as a matter of law, justifiably have relied on the certifications or the allegations relating to the specific 11 FELA claims.**

CSX's claims fail as a matter of law because controlling law precludes it from proving that it justifiably relied on the Peirce Firm's Rule 11 certifications of the specific 11 FELA claims or the allegations supporting those claims.[24]

---

[23]   Common law fraud in West Virginia likewise requires proof of justifiable reliance on a fraudulent misrepresentation or omission. *See Terra Firma Co. v. Morgan*, 674 S.E.2d 190, 195 (W. Va. 2008).

[24]   CSX claimed that various letters the Peirce Firm sent in connection with the FELA complaints also constituted predicate acts of mail fraud. But CSX offered no evidence to prove that those letters—independent of the 11 FELA claims— caused CSX's damages. To the contrary: CSX admitted that its claimed damages were the fees it incurred in defending the FELA lawsuits, which could only have been caused by the lawsuits themselves (and the allegations and Rule 11 certifications they contained). (Dkt.1516; PX694).

There can be no dispute that allegations in a complaint are not statements of fact whose truth is verified by attorneys—they represent what the claimant believes the evidence will support at trial after discovery. (Tr.1334:14-20; 1307:24-1311:17, 1321:10-1322:3). Judge Davis, concurring in this Court's earlier decision, was right to "ponder how a party represented by capable counsel might reasonably rely on the allegations made on behalf of its adversary…." *CSX Transp.*, 406 F. App'x at 737; *see also Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir. 2011) ("Parties involved in litigation know that they are locked in combat with an adversary and thus have every reason to be skeptical of each other's claims and representations."); *Jared & Donna Murayama 1997 Trust v. NISC Holdings, LLC*, 727 S.E.2d 80, 86-89 (Va. 2012) (same). CSX's position, Judge Davis observed, "appears to turn on its head the very adversarial regime that is one of the hallmarks of our system of civil justice." *CSX Transp.*, 406 F. App'x at 737; *see also Green Leaf Nursery*, 341 F.3d at 1304-05.

Rule 11 certifications stand on exactly the same footing. An attorney's signature, by virtue of Rule 11(b), "certifies *to the court*"—*not* to opposing litigants—"that the signer has read the document, has conducted a reasonable inquiry into the facts and law and is satisfied that the document is well-grounded in both, and is acting without any improper motive." *Warner*, 685 S.E.2d at 256 (citations omitted) (emphasis added). Specifically, the "signature sends a message

to the district court that this document is to be taken seriously," but it only "denotes merit," not incontrovertible fact. *Business Guides*, 498 U.S. at 546. For these reasons, Judge Davis previously stated that "CSX's claims for fraud on the basis of this rule appear plainly unfounded" because the sole purpose of Rule 11 is "to allow trial courts to sanction parties who do not meet minimum standards of conduct in a variety of circumstances." *CSX Transp.*, 406 F. App'x at 737 (citation omitted); *see also Warner*, 685 S.E.2d at 255.

As shown above, Rule 11 does not provide a private tort remedy, does not displace existing civil remedies for malicious prosecution, and cannot supply the substantive elements of a tort claim. This Court should not be the first to endorse CSX's extraordinary theory that a sophisticated corporate litigant can justifiably rely to its detriment on the Rule 11 signature in an adversary's complaint. *Cf. Green Leaf Nursery*, 341 F.3d at 1305 (holding that there cannot be reasonable reliance on a signed discovery response even though, under Rule 26, such a response certifies *to the adversary* that all responsive "information and documents" have been provided).

### 3.     Litigation activities are not "predicate acts" of mail or wire fraud.

CSX's RICO claims fail because of a further legal defect: they rest on conduct—the mailing of court documents relating to the 11 allegedly baseless FELA claims, and letters in connection with those claims—that is not a "predicate

act" of mail or wire fraud for purposes of the civil RICO statute.

As pleaded, CSX's civil RICO claims rest on a variety of litigation activities that it claims are "predicate acts":  a petition for certiorari to the U.S. Supreme Court, multiple FELA complaints, two motions, six letters sent either to a court or to CSX's counsel involving routine matters, and one letter related to expert opinions exchanged between Dr. Harron and a lawyer who is not a party here. (Dkt.853¶¶158-60, Ex.NNN-TTT).  At trial, CSX adduced the FELA complaints and the expert opinion letter, along with other correspondence related to the FELA complaints to prove its claims.  (*See*, *e.g.*, PX10, 45, 59, 183, 235, 355).  None of this conduct constitutes a "predicate act" of mail or wire fraud that satisfies the civil RICO statute.

This Court is properly "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice."  *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (internal quotation marks omitted).  "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity."  *Id.*  Thus, this Court has held, fraud disputes that are "not sufficiently outside the heartland of fraud cases" do not warrant "RICO treatment."  *Id.*

The Court's cautiousness should be especially heightened where, as here, the

asserted mail or wire fraud consists of quintessential petitioning activity: the filing and service of complaints and related correspondence. The filing of lawsuits is at the core of the First Amendment right to petition the courts for redress. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 531 (2002). Subjecting that constitutionally protected conduct to any civil liability—much less the severe penalties imposed under the civil RICO statute—threatens to chill it, and the zealous advocacy of counsel, both of which are essential to the civil justice system. RICO should not be interpreted to accomplish that constitutionally suspect result. *See Office of Senator Mark Dayton v. Hanson*, 550 U.S. 511, 514 (2007) (noting the "established practice of interpreting statutes to avoid constitutional difficulties") (citation omitted).

For these reasons, numerous courts have held that litigation conduct is not a predicate act of mail or wire fraud for purposes of a civil RICO action. *See Curtis & Assocs.*, 758 F. Supp. 2d at 174 ("[T]his court joins a long line of cases in finding, as a matter of law, that the 'litigation activities' pleaded in the Complaint cannot constitute predicate acts for the purposes of RICO.").[25] Thus, for example,

---

[25]  *See also Nolan v. Galaxy Scientific Corp.*, 269 F. Supp. 2d 635, 643 (E.D. Pa. 2003) ("This court is unwilling to expand RICO liability for mail fraud in such a dramatic fashion as to include litigation papers and pre-litigation statements of legal position."); *Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 393 (S.D.N.Y. 2000) ("This Court has soundly rejected the contention that such [litigation] conduct by attorneys can constitute mail or wire fraud."); *von Bulow v.*
Continued on following page

an attorney's pursuit of even a false claim on behalf of a client is not a predicate act. *Id.* at 160-65; *Auburn Med. Ctr., Inc. v. Andrus*, 9 F. Supp. 2d 1291, 1297 (M.D. Ala. 1998). Nor are attorney correspondence about pending litigation, or pre-litigation assertions of a legal position, predicate acts. *See Curtis & Assocs.*, 758 F. Supp. 2d at 169; *Nolan*, 269 F. Supp. 2d at 643; *D'Orange v. Feely*, 877 F. Supp. 152, 156-57 (S.D.N.Y. 1995).

These decisions square with Congress's intent in enacting the civil RICO and mail and wire fraud statutes. "Congress did not intend to effect a wholesale preemption of state civil law in its enactment of RICO.'" *Curtis & Assocs.*, 758 F. Supp. 2d at 174 (quoting *von Bulow v. von Bulow*, 657 F. Supp. 1134, 1143 (S.D.N.Y. 1987)). Yet civil RICO claims that identify only court documents and related letters as predicate acts of mail fraud, as here, are no more than "artfully pleaded claims for malicious prosecution[,]" and should not be permitted to displace that long-standing state-law tort. *Auburn Med. Ctr.*, 9 F. Supp. 2d at 1297; *see also Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162 (D. Conn. 2000). Nor did Congress intend "that the mail fraud statute sweep up correspondence between attorneys, dealing at arm's length on behalf of their parties, concerning an

---

Continued from previous page
*von Bulow*, 657 F. Supp. 1134, 1145 (S.D.N.Y. 1987) ("[A] complaint based on nothing more than a party's filing of unjustified suits cannot fulfill the requirement that a RICO plaintiff plead a predicate act.").

issue in pending litigation[,]" yet CSX's claims invoke just such a reading of that statute. *Spiegel v. Cont'l Ill. Nat. Bank*, 609 F. Supp. 1083, 1089 (N.D. Ill. 1985), *aff'd*, 790 F.2d 638 (7th Cir. 1986).

Further, allowing civil RICO's drastic penalties to be imposed based on litigation conduct would lead to the "absurd" result that "almost every state or federal action could lead to corollary federal RICO actions." *Curtis & Assocs.*, 758 F. Supp. 2d at 172-73 (citation omitted). As discussed above, however, allegations of baseless litigation can and should be left to the courts in those cases, or the bar, to regulate—or, at most, to state courts in malicious prosecution or abuse-of-process tort suits for damages; not to federal courts in civil RICO suits for treble damages and substantial attorneys' fees. *See Baltimore Scrap*, 237 F.3d at 403; *Curtis & Assocs.*, 758 F. Supp. 2d at 173-74; *Auburn Med. Ctr.*, 9 F. Supp. 2d at 1299 ("[I]f a lawsuit is filed in bad faith, the law of torts, rather than RICO, is best designed to prove a remedy."); *Spiegel*, 609 F. Supp. at 1089 ("Where, as here, the court in the first, pending case can fully protect the rights of the parties from abuse or unethical conduct, we see no reason to torture the limits of the mail fraud statute to allow such collateral [RICO] suits.").

The predicate acts of litigation conduct asserted by CSX cannot, as a matter

of law, support the judgment below.[26]  If they could, constitutionally protected petitioning—and the zealous advocacy of legal counsel that is so critical to that petitioning—would be severely constrained.  The Court should reject such a constitutionally suspect construction of RICO.

## B.    No reasonable jury could have found that CSX met its burden of proof on essential elements of its claims.

CSX's RICO and common-law fraud claims should never have been tried to the jury because they were legally defective for the reasons discussed above. Beyond those legal infirmities, CSX's claims should not have gone to the jury because there was insufficient evidence for a jury to conclude that:  (1) CSX incurred recoverable damages as a result of justifiable (or any) reliance on the Rule 11 certifications of the 11 specific claims here; or (2) Peirce and Raimond committed actionable fraud under RICO or the common law.

---

[26]  Relying on this Court's *criminal* mail fraud decision in *United States v. Murr*, 681 F.2d 246 (4th Cir. 1982), the District Court concluded that the filing of a lawsuit could constitute a predicate act of mail fraud. (Dkt.1050 at 26). But *Murr* is inapposite.  There, the Court held that the mailing of a lawsuit, along with the mailing of two false factual affidavits, was an indictable criminal mail fraud offense under the mail fraud statute.  The Court did not consider Rule 11 certifications or the distinct statutory construction inquiry that controls here— whether such conduct constitutes a "predicate act" under the civil RICO statute. The inquiries are—and must be—different because, unlike criminal mail fraud, the prosecution of which is moderated by government discretion, civil RICO is not inherently protected from abuse.  Moreover, the conviction in *Murr* was not premised solely on routine litigation filings or Rule 11 certifications—it also involved the submission of demonstrably false factual evidence to the court.  681 F.2d at 248.  *Murr* does not resolve the question presented here.

**1.    CSX failed to adduce any evidence that, in justifiable reliance on the allegations or Rule 11 certifications in the underlying FELA lawsuits, it incurred recoverable damages.**

While a party cannot justifiably rely on allegations or Rule 11 certifications in a complaint, the undisputed record confirms that CSX did not, in fact, rely to its detriment on the allegations or certifications in the 11 specific claims filed against it at issue here.

CSX was required to prove that it incurred legal fees and costs as a direct result of its justifiable reliance on the Rule 11 certifications of the 11 allegedly fraudulent claims.[27]   CSX's causation theory below was that but for the FELA complaints—with thousands of individual FELA claims that are unchallenged here—filed against it, CSX would not have incurred the fees and costs it recovered as damages.  But that theory left to pure speculation whether the *specific 11 FELA claims* at issue here, and the Rule 11 certifications of *those specific 11* claims, caused CSX's damages.  And "speculation cannot substitute for evidence" of causation, *Brewer v. Landrigan*, 131 S. Ct. 445 (2010) (mem.), especially in a civil RICO case that threatens "drastic" remedies.  *H.J., Inc.*, 492 U.S. at 233.

Indeed, not a single CSX witness testified that he or she was deceived by, or relied on, the allegations supporting the 11 FELA claims or the Rule 11

---

[27]  The damages the jury awarded did *not* include the $25,000 CSX spent to settle the claim of Mr. Collier.  (Dkt.1516; PX694 at 3).

certifications of those claims—as distinguished from the thousands of additional FELA claims alleged in the 5 complaints. Nor did CSX present any testimonial or documentary evidence of what it would have done if the 11 claims had not been included in the mass complaints that CSX opposed through venue motions, or if the complaints had not been certified under Rule 11.

In fact, the record shows affirmatively that CSX did *not* rely—justifiably or otherwise—on the Rule 11 certifications of the 11 FELA claims. CSX knew the Peirce Firm was using Dr. Harron for its FELA claims. Yet Bo Bobersky, CSX's Director of Occupational Disease Litigation, who had the "most contact with the Peirce Firm," stated that he did not "believe Dr. Harron's readings were accurate[.]" (Bobersky Tr. at 8, 64, 48, Dkt.1536). Nonetheless, CSX made a knowing business decision to "continue to make payment and make settlement on any number of claims [even] after [CSX] came to the belief that Dr. Harron's reads were not accurate." (*Id.* at 71). Because it disbelieved Dr. Harron's B-reads—B-reads on which CSX knew the 11 FELA claims against it were based—CSX simply could not have been fooled by the Rule 11 certifications of those claims or incurred any damages "by reason of" these Rule 11 certifications.

In the end, the record confirms that, absent Peirce and Raimond's alleged fraud relating to the specific 11 FELA claims, CSX still would have done exactly what it did: incur the same amount of fees and costs in preparing and filing the

- 43 -

*venue* motions relating to the complaints containing the thousands of FELA claims. CSX accordingly failed to prove the requisite causation. (Dkt.1550 at 15-16 ("If [CSX] would have incurred the alleged damages regardless of any RICO violation …, then those damages are not proximately caused by that defendant's RICO violation.")).

### 2. CSX failed to adduce sufficient evidence that the Rule 11 certifications of the 11 underlying claims were false.

As noted above, CSX's fraud and RICO claims turn on its assertion that the Rule 11 certifications relating to the 11 allegedly baseless FELA claims at issue were false. Accepting this legal theory for the sake of argument, CSX had the burden to prove that Peirce and Raimond falsely represented "that the [11] fraudulent [FELA] claims had some good faith basis in fact." (Dkt.1351 at 16-17). No reasonable jury could have concluded that CSX met that burden of proof.

Rule 11 requires that when a lawyer files a lawsuit, there is an objectively reasonable basis in law and fact for the claims and allegations asserted. *Morris*, 448 F.3d at 277. Factual allegations fail to satisfy the rule only "when they are 'unsupported by *any* information obtained prior to filing.'" *Id.* (citation omitted). CSX therefore was required to prove that, when the Peirce Firm filed the 11 FELA claims at issue, there was *no information* supporting the allegations that each of the 11 FELA claimants had "(1) a positive x-ray reading consistent with asbestosis, (2) occupational exposure to asbestosis while working for the defendant company,

and (3) a sufficient latency period between the alleged exposure and the onset of asbestosis." (Dkt.42, Case No. 09-2135, CSX Opening Br. at 39 (4th Cir. Jan. 11, 2010); Tr.278:3-7, 1039:11-21, 1306:8-1309:9, 1521:20-1522:5, 1570:5-7, 1584:20-1585:12).

Far from lacking any supporting information, however, 2 of these 3 elements—exposure and latency—were undisputed for each of the 11 claimants. (Tr.303:23-305:15, 966:21-967:1, 1063:12-18, 1166:21-1167:9, 1200:9-14, 1204:2-10, 1390:19-1391:5; DX63). CSX admittedly exposed its workers to products containing asbestos. (Tr.422:4-16, 1067:7-17, 1068:14-24, 1069:23-1070:3, 1181:4-7; DX63). The 11 claimants worked for CSX for an average of 25-30 years before 1986—sufficient exposure to file a FELA claim. (Tr.303:23-305:15, 1063:12-18; 1166:25-1167:9, 1204:2-9, 1217:11-19; DX63). And the undisputed evidence showed that the 11 claimants had a sufficiently long latency period between their exposure and their x-ray. (Tr.303:23-305:15, 406:13-19, 966:21-967:1, 1063:12-18, 1217:11-19, 1390:19-1391:5; DX38-C, 63).

The record also establishes that, while different B-readers could disagree over whether the 11 claimants' x-rays could be read as positive for asbestosis, each of those x-rays reasonably could have been read positive sufficient to meet Rule 11's "any information" standard and support the filing of a FELA claim. First, Dr. Harron read each claimant's x-rays positive. Second, after Dr. Harron's B-reads

were challenged by CSX in 2005, the Peirce Firm obtained a positive B-reading for each of the active FELA claimants from certified B-readers Dr. Breyer or Dr. Mezey before continuing to pursue or filing their claims. (Tr.1054:1-1059:9; PX201, 231, 255, 277, 302, 325, 351, 374, 397, 419; DX38-C).

Third, CSX's own evidence showed that the 11 claimants' x-rays could reasonably be read positive. According to a blind study conducted by CSX's expert, Dr. Parker, one of Dr. Parker's handpicked B-readers (Dr. Stark) found x-rays for 8 of the 11 claimants positive (1/0 or greater) or seriously considered finding them positive (0/1). (Tr.941:5-949:23; DX38-D). Moreover, the consensus of Dr. Parker's selected B-readers was that x-rays for 5 of the 11 claimants could seriously be considered positive (0/1). *Id.* And at least one member of Dr. Parker's panel found that 6 x-rays of several of the 11 claimants Dr. Harron marked negative could be interpreted as positive or seriously considered positive. *Id.* If CSX's own expert read an x-ray positive or seriously considered reading it positive, it cannot be a fraud to sign a Rule 11 certification related to that x-ray.

CSX's selected B-readers felt that the x-rays for 6 of the claimants were a consensus negative (0/0). (DX38-D). But all that shows is a dispute among

experts.  Disputed expert evidence—especially subjective expert B-reads[28]—is sufficient to satisfy Rule 11.  *See Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993) (a "conflict of opinion" between experts is not a sufficient "basis for Rule 11 sanctions"); *Schering Corp. v. Vitarine Pharm., Inc.*, 889 F.2d 490, 499 (3d Cir. 1989) (same).  Lawyers are not required to determine whether their expert's evidence is right or wrong on pain of Rule 11 sanctions, much less trebled RICO damages—especially where, as here, that expert evidence relates to a highly specialized, scientific discipline.  Yet that is precisely what CSX's position requires.

Indeed, if this Court affirms, it will fundamentally alter the decisionmaking process of lawyers in determining whether to file a lawsuit.  The threat of RICO's punitive measures will pressure lawyers to "prove" their cases before they file, even where, as here, they have evidence from a qualified expert that injuries exist.  This, of course, is not what Rule 11 requires.  To the contrary:  "The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to

---

[28]  As Dr. Parker acknowledged, B-reading is subjective (Tr.743:2-7), B-readers often disagree over how an x-ray should be interpreted and may even disagree with their own prior readings (Tr.725:3-5, 892:3-10), and it is difficult to distinguish between "borderline" positive (1/0) and negative (0/1) films such as these. (Tr.589:11-590:11, 592:1-13, 725:16-21).  Indeed, a person with a negative film could still have asbestosis, as determined through a biopsy.  (Tr.883:12-16).

develop vital evidence only by discovery." *Lawyer Disciplinary Bd. v. Neely*, 528 S.E.2d 468, 473 (W. Va. 1998). This undue pressure will, in turn, create a dilemma for lawyers in these circumstances who face an impending statute of limitations on the claims they are considering filing—either to file a claim not "proven" and face RICO liability, or not to file that claim and face malpractice liability once the applicable statute of limitations expires. To be sure, these consequences are not confined to "plaintiff's lawyers" or "asbestos plaintiff's lawyers"—they reach lawyers of all types who frequently face the question whether to bring a lawsuit for their client.

Unable to prove that Dr. Harron's positive readings were intentionally false, CSX fell back on Dr. Parker's testimony that the purported general prevalence rate of asbestosis among railroad workers is 2%. (Tr.849:19-854:9) But that testimony, even if it were admissible, would not come close to meeting CSX's burden of proving that Dr. Harron's positive readings were intentionally false and that Peirce and Raimond knew or recklessly disregarded as much. It does not follow from the suggestion that 2% of railroad workers have asbestosis that the 11 claimants here could not have had asbestosis, or that there was no good-faith basis to believe that they did when their claims were filed.

Nor did the purported prevalence rate prove that Peirce and Raimond knew of or recklessly disregarded allegedly false readings. There was no evidence that

Peirce or Raimond had ever heard of the studies Dr. Parker relied on.  (Dkt.1394 at 11-12 & n.6).  Without that knowledge, they could not, as a result of the asserted 2% rate, have lacked a good-faith basis in relying on Dr. Harron's readings.  The certifications were not false merely because other experts disputed them.

## C.    Alternately, this Court should order a new trial because the District Court improperly permitted CSX to present irrelevant and prejudicial testimony.

Even if CSX's claims were not legally and factually deficient, this Court should order a new trial because the District Court permitted CSX to present irrelevant and highly prejudicial testimony.  *See Taylor*, 193 F.3d at 235 (new trial warranted where Court cannot conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by" the improper evidence).

### 1.    Dr. Parker's testimony on the asbestosis prevalence rate was unreliable, irrelevant, and highly prejudicial.

At trial, Dr. Parker was permitted to testify, without foundation or scientific support and over Peirce, Raimond, and Dr. Harron's motions *in limine* (Dkt.1387, 1393, 1394), that only 2% of railroad workers contracted asbestosis. (Tr.849:19-854:9).  The District Court abused its discretion by permitting that testimony because it was based on inadmissible hearsay and was irrelevant to CSX's claims.  Furthermore, it was highly prejudicial because it would have led the jury to speculate that (a) the vast bulk of the thousands of claims filed by the

Peirce Firm over the years were baseless and (b) by implication, the 11 claimants in question could not have had x-rays evidencing asbestosis.

The admission of scientific opinions by a qualified expert under Rule 702 "is generally left to the sound discretion of the district court." *Dixon v. CSX Transp., Inc.*, 990 F.2d 1440, 1453 (4th Cir. 1993). But the Federal Rules of Evidence strictly limit the admissibility of purported scientific evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). An expert must be "qualified" and the scientific evidence must have "a reliable basis in the knowledge and expertise of [the relevant] discipline." Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation omitted). Additionally, "[e]xpert testimony, like all other evidence, must meet the requirement of Fed. R. Evid. 403 that its prejudicial effect not substantially outweigh its relevance." *Dixon*, 990 F.2d at 1452.

Here, Dr. Parker testified that 2% of railroad workers contract asbestosis and, as a result, that Dr. Harron—whose positive B-read rate was said to be 60% or higher—must have intentionally misread as positive the x-rays of the 11 claimants. (Tr.849:19-854:9, 855:14-858:21). But Dr. Parker was not qualified to offer the 2% prevalence opinion because he is a B-reader, not an epidemiologist or statistician. (Tr.897:25-898:22). His opinion was based solely on 3 hearsay

studies he read, and Dr. Parker himself has never performed a prevalence rate study of any kind. (Tr.851:6-10, 922:4-7).

In fact, Dr. Parker had "never" even "done any particular research into the exposure of railroad workers . . . to asbestos." (Tr.900:10-18). Just reading a few studies did not make Dr. Parker a qualified expert on their subject matter, and he should not have been permitted to merely regurgitate the studies. *See Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) ("[T]he expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever.") (citation omitted). Dr. Parker thus lacked a proper basis to offer his 2% prevalence opinion and it should have been excluded. *See, e.g., Redman*, 111 F.3d at 1179 (reversing judgment in part because metallurgical expert was unqualified to give opinion on whether a burglarized safe met industry design standards since he had never analyzed a safe, had no experience in safe design, and got his information from third parties).

Dr. Parker's prevalence-rate testimony also was unreliable. Neither he nor anyone else has conducted a prevalence study on *CSX's workers* or railroaders nationally. Dr. Parker's conclusion was based on 2 studies of a single site in Pennsylvania and a Japanese survey—none of which involved CSX workers.

- 51 -

(Tr.851:6-10; Tr.1105:21-1107:18 (testimony of Dr. Kadane, a statistics expert, that the studies Dr. Parker relied on are "very circumscribed in the populations that they studied," and that the prevalence rates within the studies were "pure guess")). "[E]xtrapolation of those results to the entire U.S. railroad population" is "so conjectural that it's not scientifically valid. . . ."  (Tr.1106:25-1107:10, 1117:2-10). CSX's in-house counsel, Templeton Fitch, agreed that any extrapolation is a bad fit:  "the authors [of the epidemiological studies] were trying to determine the incidence of a disease in a given population. . . . those studies didn't enter into our claims handling process.  We were dealing with FELA asbestosis claims of all different natures . . . which, to me, bear no relation to an epidemiological study." (Fitch Dep. at 121-23, Dkt.1538).   Because there was "simply too great an analytical gap between the data and the opinion proffered," connected "only by the *ipse dixit* of the expert,"  Dr. Parker's unreliable prevalence opinion should have been excluded.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Beyond this, Dr. Parker's prevalence opinion should have been excluded under Rule 403 because it was both irrelevant and highly prejudicial.  Whether a selected sample of railroad workers in Pennsylvania and Japan had asbestosis is irrelevant to whether 11 known CSX railroad workers had x-rays evidencing asbestosis.  In fact, even assuming that only 2% of U.S. railroaders contracted asbestosis, it would be pure speculation to conclude that the 11 claimants here

could not or would not have been part of that 2%. CSX's own in-house counsel recognized that "[w]e were getting a lot more cases than those [studies] opine you would see in a … given population." (Fitch Dep. at 121-23, Dkt.1538). "These studies[,]" Fitch stated flatly, "have no relation to FELA asbestos claims. . . ." (*Id.* at 47).

As discussed above, moreover, the prevalence opinion also was irrelevant to whether Peirce and Raimond knew that Dr. Harron's B-readings were false but relied on them nonetheless in filing the 11 FELA claims. That is because they indisputably had no knowledge of the supposed 2% prevalence rate or the studies from which Dr. Parker drew his opinion. (Dkt.1394 at 11-12).

At the same time, Dr. Parker's regurgitated prevalence opinion had a highly prejudicial impact on the jury's determination of whether these 11 claims were objectively baseless or filed in bad faith. Dr. Parker testified that Dr. Harron's readings were scientifically unreliable and intentionally false because his overall positive read rate—60%—was so much greater than the purported 2% asbestosis prevalence rate. This allowed CSX to argue, and the jury to conclude, that by extension, Dr. Harron's positive readings for the 11 claimants must also have been intentionally false—without regard to what the evidence as to those 11 actually showed. This improper propensity argument substantially prejudiced Peirce, Raimond, and Dr. Harron.

- 53 -

Because Dr. Parker's prevalence testimony was unreliable, irrelevant, and substantially prejudicial, this Court cannot conclude, with "fair assurance," that the jury's verdict "was not substantially swayed" by that testimony, *Taylor*, 193 F.3d at 235, and the District Court's failure to exclude it was error meriting reversal.

## 2. CSX, in violation of the District Court's order, repeatedly referenced unspecified, supposedly false, FELA claims filed by the Peirce Firm beyond the 11 claims at issue.

During trial, CSX repeatedly referred to supposedly baseless and even fraudulent FELA claims filed by the Peirce Firm other than the 11 claims at issue here, testimony that the District Court expressly barred prior to trial. These repeated, flagrant violations of the District Court's order prejudiced Peirce, Raimond, and Dr. Harron and compel a new trial. *See, e.g., Brown v. Royalty*, 535 F.2d 1024, 1028 (8th Cir. 1976) (holding "that a new trial must be held in the interest of fairness to all the parties" where defense counsel repeatedly and deliberately referred to evidence excluded by the district court).

Early in the case, CSX alleged the existence of a "system of fraud" that involved thousands of supposedly baseless FELA claims. (Dkt.208¶1). In its pre-trial *in limine* ruling, however, the District Court concluded that CSX had abandoned that theory and was precluded from offering evidence that FELA claims other than the 11 at issue were false. (Dkt.1557 at 1-3 (citing Dkt.960 at 68-69, 80)). The rationale for preclusion was apparent: If CSX were permitted to argue

that FELA claims other than these 11 were fraudulent, the jury would be distracted from focusing on the 11 claims, and would be led to assume that if thousands of claims were fraudulent, the 11 claims must have been, too.

Yet at trial, CSX defied the District Court's ruling and offered evidence to try to prove its abandoned theory, making repeated statements about the "thousands" of supposedly baseless FELA claims filed by the Peirce Firm. (Tr.89-90) (stating that the Peirce Firm "fabricated, made up, manufactured, created the illusion of thousands of asbestos cases. . . . And that's why we're here."); *see also* Tr.1826:19-24 (arguing that "to create an illusion, you got to have [Dr. Harron]. . . . You got to have positive reads. . . . And, boy, they came -- they came in boatloads, 60 to 70 percent rate, some days 100 in a row positive. We looked at just four of those days.  Hundreds in positive, positive, positive."); Tr.1643:6-1644:2 (reading from and publishing to the jury the Complaint allegation that Defendants "orchestrated a scheme to inundate CSXT and other entities with thousands of asbestosis claims"); Tr.594:4-595:5 (referring to 11,000 positive B-reads); Tr.338:15-339:11 (referring to Dr. Harron reading all positive on 284 days); Tr.394:23-395:10 (referring to "100 percent positive every day for 294 days"); Tr.584:8-10 (referring to 16,000 readings); Tr.1002:10-1004:13, 1830:1-1831:7 (arguing about the propriety of another FELA claim, despite being warned that related questions violated the court's *in limine* ruling)).

- 55 -

CSX's expert, Dr. Parker, also repeatedly violated the District Court's ruling. He opined that Dr. Harron was "scientifically wrong on these eleven and maybe 16,000 other cases he read for the law firm." (Tr.857:5-11). And despite being admonished (*id.*), he did it again (Tr.892:12-21), and again (Tr.905:15-906:1), and again (Tr.922:12-16).

This improper testimony, barred by the District Court's *in limine* order, was unacceptably prejudicial. Told over and over by CSX that the Peirce Firm manufactured and filed countless fraudulent claims, the jury was led to conclude that the 11 claims at issue here also were fraudulent. Because it was likely that CSX's repeated violations of the District Court's order substantially influenced the verdict, a new trial should be granted.[29] *Taylor*, 193 F.3d at 235; *McWhorter v. City of Birmingham*, 906 F.2d 674, 677 (11th Cir. 1990) (new trial warranted where trial counsel, during closing argument, referred to theory of liability that "had been eliminated from the case during pretrial conference"; such a "direct

---

[29] CSX tried to deflect its flagrant violations of the District Court's order by arguing that the District Court gave adequate curative instructions. (Dkt.1588 at 11-12). But the sheer volume and severe prejudicial impact of CSX's violations, which occurred at every phase of the trial, could not be cured by those instructions alone. *See O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977) ("[A]fter repeated exposure of a jury to prejudicial information . . . cautionary instructions will have little, if any, effect in eliminating prejudicial harm. . . ."); *Adams Labs., Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1224 (7th Cir. 1985) (ordering a new trial based on plaintiff's attorney's repeated statements in "direct contravention" of the court's in limine rulings that could not be cured by instructions).

violation of the district court's ruling . . . was highly improper") (citations omitted).

## CONCLUSION

The District Court's judgment should be reversed and judgment as a matter of law entered in Peirce, Raimond, and Dr. Harron's favor.  Alternately, the Court should grant a new trial given the irrelevant and highly prejudicial evidence CSX was permitted to introduce before the jury.

## REQUEST FOR ORAL ARGUMENT

Peirce, Raimond, and Dr. Harron respectfully request oral argument pursuant to Federal Rule of Appellate Procedure 34 and Local Rule 34(a).  This case involves what CSX itself has called an "arguably unprecedented" verdict raising novel and critically important legal issues concerning the use of lawyers' purported violations of Rule 11 as a basis for civil RICO liability.  The resolution of these issues could have a profound impact on the nature of civil litigation in this Circuit and throughout the country.  Additionally, the record in this case is voluminous, as a result of two trials, and the outcome on appeal will affect CSX's pending petition in the District Court for nearly $11 million in attorneys' fees. Accordingly, Peirce, Raimond, and Dr. Harron respectfully submit that oral argument will assist the Court.

Dated:  February 24, 2014

By:   *s/*  L. Steven Emmert

Jerald  Elton Jones
LAW FIRM OF WEST AND JONES
360 Washington Avenue
P.O. Box 2348
Clarksburg,  WV 26301
Tel.: (304) 624-5501

L. Steven Emmert
SYKES, BOURDON, AHERN & LEVY, P.C.
281 Independence Blvd.,
Building One, Fifth Floor
Virginia Beach, VA 23462
Tel: (757) 499-8971
Fax: (757) 456-5445

Walter P. DeForest, III
David J. Berardinelli
DEFOREST KOSCELNIK YOKITIS &
BERARDINELLI
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA 15219
Tel.: (412) 227-3100
Fax: (412) 227-3130

*Attorneys for Defendants-Appellants-Cross-Appellees*
*Robert N. Peirce, Jr., Louis A. Raimond, and Dr. Ray A. Harron, M.D.*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,952 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: February 24, 2014          By:  _s/_  L. Steven Emmert

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of February, 2014, I caused this Page Proof Brief of Appellants/Cross-Appellees to be filed electronically with the Clerk of the Court using the CM/ECF System, which will serve such filing electronically on all registered CM/ECF users.


By:  _s/_  L. Steven Emmert