Nos. 13-2235(L), 13-2252, and 13-2325

_____

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

CSX TRANSPORTATION, INCORPORATED,

Plaintiff-Appellee/Cross-Appellant,

v.

ROBERT N. PEIRCE, JR.; LOUIS A. RAIMOND; RAY A. HARRON, Dr.,

Defendants-Appellants/Cross-Appellees,

*[Caption Continued on Inside Cover]*

_____

Appeals from the United States District Court
for the Northern District of West Virginia
in Case No. 5:05-cv-00202-FPS-JES (Stamp, J.)

_____

**PAGE-PROOF PRINCIPAL/RESPONSE BRIEF
FOR APPELLEE/CROSS-APPELLANT**

_____

| | | |
|---|---|---|
| Marc E. Williams | Samuel L. Tarry, Jr. | Dan Himmelfarb |
| Robert L. Massie | Mitchell K. Morris | Scott M. Noveck |
| NELSON MULLINS RILEY | MCGUIREWOODS LLP | Jason R. LaFond |
|   & SCARBOROUGH LLP | One James Center | MAYER BROWN LLP |
| 949 Third Avenue | 901 E. Cary Street | 1999 K Street, N.W. |
| Suite 300 | Richmond, VA 23219 | Washington, DC 20006 |
| Huntington, WV 25701 | (804) 775-1000 | (202) 263-3000 |
| (304) 526-3501 | | |

*Attorneys for Plaintiff-Appellee / Cross-Appellant
CSX Transportation, Incorporated*

*[Caption Continued from Front Cover]*

ROBERT V. GILKISON; PEIRCE, RAIMOND & COULTER, PC, a/k/a
Robert Peirce & Associates, P.C., a Pennsylvania Professional
Corporation; JOHN DOE(S); MARK T. COULTER,

Defendants,

RICHARD CASSOFF, M.D.,

Party-in-Interest,

LUMBERMENS MUTUAL CASUALTY COMPANY,

Intervenor.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS**

No.  13-2235(L), 13-2252, 13-2325    Caption:  CSX Transportation, Inc. v. Peirce *et al.*

Pursuant to FRAP 26.1 and Local Rule 26.1,

CSX Transportation, Inc. who is appellee/cross-appellant makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?
                                                                ☐YES  ☒NO

2.    Does party/amicus have any parent corporations?          ☒YES  ☐NO

      If yes, identify all parent corporations, including grandparent and great-
      grandparent corporations:  CSX Corporation (parent company)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held
      corporation or other publicly held entity?               ☒YES  ☐NO

      If yes, identify all such owners:  CSX Corporation

4.    Is there any other publicly held corporation or other publicly held entity that has
      a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
                                                                ☐YES  ☒NO

      If yes, identify entity and nature of interest:  N/A

5.    Is party a trade association? (amici curiae do not complete this question)
                                                                ☐YES  ☒NO

      If yes, identify any publicly held member whose stock or equity value could be
      affected substantially by the outcome of the proceeding or whose claims the
      trade association is pursuing in a representative capacity, or state that there
      is no such member:  N/A

6.    Does this case arise out of a bankruptcy proceeding?      ☐YES  ☒NO

      If yes, identify any trustee and the members of any creditors' committee:
       N/A

Signature:  /s/ Dan Himmelfarb                    Date:  April 28, 2014

Counsel for:  CSX Transportation, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ........................................................... v

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ................................................ 3

STATEMENT OF ISSUES ........................................................ 3

STATEMENT OF THE CASE.................................................... 4

    A.    Factual Background ...................................................4

        1.    The manufacture of asbestosis claims ...........................5

            a.    *Illegal x-rays* ............................................5

            b.    *Fraudulent B-reads* .....................................6

            c.    *Fabricated exposure histories*............................14

        2.    The filing of the manufactured asbestosis claims .......16

    B.    Prior Proceedings ...................................................18

        1.    CSXT's lawsuit ...............................................18

        2.    The district court's dismissal of CSXT's lawsuit ........19

        3.    This Court's reinstatement of CSXT's lawsuit ...........20

    C.    Proceedings Below.................................................22

        1.    Pre-trial proceedings ........................................22

        2.    The trial.......................................................25

        3.    Post-trial proceedings........................................32

SUMMARY OF ARGUMENT ................................................... 33

STANDARDS OF REVIEW....................................................... 35

ARGUMENT ....................................................................... 37

I.    ON THEIR APPEAL, APPELLANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ............... 37

    A.    Appellants Are Not Entitled To Judgment As A Matter Of Law On The Ground That CSXT's Claims Are "Legally Flawed"................................................................37

ii

# TABLE OF CONTENTS
## (continued)

Page

    1.    The propositions that appellants challenge are law of the case ...................................................................38

    2.    Appellants' challenges have been forfeited.................41

    3.    Appellants' challenges lack merit ...............................42

        a.    *Fraud and RICO claims can be based on fraudulently filed lawsuits* ...................................43

        b.    *A defendant can justifiably rely on a representation that there is a good-faith basis for a lawsuit* ........................................................48

        c.    *Litigation conduct can be a predicate act under RICO* .........................................................53

        d.    *Affirmance will not chill legitimate litigation activities*..............................................................58

B.    Appellants Are Not Entitled To Judgment As A Matter Of Law On The Ground That There Was Insufficient Evidence....................................................................61

    1.    Appellants' challenges have been forfeited.................61

    2.    Appellants' challenges lack merit ...............................65

        a.    *There was sufficient evidence of falsity* ...............65

        b.    *Insofar as it was required, there was sufficient evidence of reliance* ............................71

        c.    *There was sufficient evidence of causation* .........73

C.    Appellants Are Not Entitled To A New Trial On The Ground That The District Court Abused Its Discretion In Two Of Its Evidentiary Rulings.......................................75

    1.    The district court did not abuse its discretion in admitting Dr. Parker's testimony ...............................76

    2.    The district court did not abuse its discretion in its ruling on "other FELA claims" .....................................80

# TABLE OF CONTENTS
## (continued)

**Page**

II.    ON ITS CONDITIONAL CROSS-APPEAL, CSXT IS
       ENTITLED TO HAVE ITS PUNITIVE-DAMAGES CLAIM
       SUBMITTED TO THE JURY IF A NEW TRIAL IS ORDERED ...... 84

STATEMENT REGARDING ORAL ARGUMENT ..................................... 86

CONCLUSION.................................................................................. 86

ADDENDUM..................................................................................... 87

CERTIFICATE OF COMPLIANCE............................................................ 92

CERTIFICATE OF SERVICE ................................................................. 93

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.,*
   472 F.3d 99 (4th Cir. 2006) ................................................................82

*Armada (Sing.) PTE Ltd. v. AMCOL Int'l Corp.,*
   2013 WL 5781845 (N.D. Ill. 2013) ....................................................45

*Baltimore Scrap Corp. v. David J. Joseph Co.,*
   237 F.3d 394 (4th Cir. 2001) .............................................................47

*Belk, Inc. v. Meyer Corp.,*
   679 F.3d 146 (4th Cir. 2012) ......................................................36, 64

*Biggs v. Eaglewood Mortg., LLC,*
   353 F. App'x 864 (4th Cir. 2009) .....................................................49

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639 (2008) ....................................................................49, 56

*Brinkley-Obu v. Hughes Training, Inc.,*
   36 F.3d 336 (4th Cir. 1994) ..............................................................65

*Bristol Steel & Iron Works v. Bethlehem Steel Corp.,*
   41 F.3d 182 (4th Cir. 1994) .........................................................76, 83

*Buckley v. Mukasey,*
   538 F.3d 306 (4th Cir. 2008) .............................................................68

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters.,*
   498 U.S. 533 (1991) ...........................................................................45

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) ...........................................................................57

*Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.,*
   51 F.3d 1229 (4th Cir. 1995) .............................................................41

*Chevron Corp. v. Donziger,*
   ___ F. Supp. 2d ___, 2014 WL 815553 (S.D.N.Y. 2014) ................56

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988) ....................................................................38, 39

*Clark v. Druckman*,
624 S.E.2d 864 (W. Va. 2005) ............................................................46

*Clinchfield R.R. v. Lynch*,
784 F.2d 545 (4th Cir. 1986)..............................................................78

*Corti v. Storage Tech. Corp.*,
304 F.3d 336 (4th Cir. 2002)..............................................................36

*Cowgill v. Raymark Indus.*,
832 F.2d 798 (3d Cir. 1987) ...............................................................38

*Creekmore v. Maryview Hosp.*,
662 F.3d 686 (4th Cir. 2011)..............................................................36

*CSX Transp., Inc. v. Gilkison*,
406 F. App'x 723 (4th Cir. 2010).................................................*passim*

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*,
758 F. Supp. 2d 153 (E.D.N.Y. 2010)..................................................57

*Daddona v. Gaudio*,
156 F. Supp. 2d 153 (D. Conn. 2000) .................................................57

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ..........................................................................80

*Doe v. Chao*,
511 F.3d 461 (4th Cir. 2007)..............................................................40

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981)............................................................57

*Feld Entm't Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
873 F. Supp. 2d 288 (D.D.C. 2012).....................................................45

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Fireman's Fund Ins. Co. v. Stites,*
  258 F.3d 1016 (9th Cir. 2001) ............................................................. 56

*First Union Commercial Corp. v. GATX Capital Corp.,*
  411 F.3d 551 (4th Cir. 2005) .............................................................. 49

*Fogel v. Chestnutt,*
  668 F.2d 100 (2d Cir. 1981) ............................................................... 40

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.,*
  341 F.3d 1292 (11th Cir. 2003) ......................................... 46, 47, 52, 53

*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989) ......................................................................... 55

*Handeen v. Lemaire,*
  112 F.3d 1339 (8th Cir. 1997) ................................................. 43, 46, 56

*Heathcoat v. Potts,*
  905 F.2d 367 (11th Cir. 1990) ............................................................ 40

*Helton v. AT&T Inc.,*
  709 F.3d 343 (4th Cir. 2013) .............................................................. 42

*Hinchman v. Gillette,*
  618 S.E.2d 387, 401 (W. Va. 2005) ..................................................... 44

*Hinkle v. City of Clarksburg,*
  81 F.3d 416 (4th Cir. 1996) ............................................................... 82

*In re Beach First Nat'l Bancshares, Inc.,*
  702 F.3d 772 (4th Cir. 2012) .............................................................. 35

*In re Silica Prods. Liab. Litig.,*
  398 F. Supp. 2d 563 (S.D. Tex. 2005) .................................................. 13

*Jannotta v. Subway Sandwich Shops, Inc.,*
  125 F.3d 503 (7th Cir. 1997) .............................................................. 85

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*JWCF, LP v. Farruggia,*
 752 S.E.2d 571 (W. Va. 2013) ...............................................84

*Koger v. Norfolk S. Ry.,*
 411 F. App'x 634 (4th Cir. 2011) ........................................82

*Leocal v. Ashcroft,*
 543 U.S. 1 (2004) ................................................................54

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,*
 431 F.3d 353 (9th Cir. 2005) .........................................55, 56

*Logsdon v. Graham Ford Co.,*
 376 N.E.2d 1333 (Ohio 1978) .............................................85

*Lowery v. Ala. Power Co.,*
 483 F.3d 1184 (11th Cir. 2007) ...........................................51

*Mallard v. Prudential Ins. Co.,*
 1996 WL 170126 (M.D. Ala. 1996) ......................................51

*Martin v. Cavalier Hotel Corp.,*
 48 F.3d 1343 (4th Cir. 1995) ...............................................76

*McDonough Power Equip., Inc. v. Greenwood,*
 464 U.S. 548 (1984) ............................................................75

*McWhorter v. City of Birmingham,*
 906 F.2d 674 (11th Cir. 1990) .............................................83

*Napoli v. United States,*
 32 F.3d 31 (2d Cir. 1994) ....................................................56

*Noel v. Artson,*
 641 F.3d 580 (4th Cir. 2011) ...............................................36

*Nw. Ind. Tel. Co. v. FCC,*
 872 F.2d 465 (D.C. Cir. 1989) .............................................40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Power v. Arlington Hosp. Ass'n,*
  42 F.3d 851 (4th Cir. 1994) ................................................................ 83

*Pritt v. Suzuki Motor Co.,*
  513 S.E.2d 161 (W. Va. 1998) ............................................................ 73

*Prof'l Real Estate Investors, Inc. v. Columbia Picture Indus.,*
  508 U.S. 49 (1993) ....................................................................... 21, 60

*Pullman v. Land O'Lakes, Inc.,*
  262 F.3d 759 (8th Cir. 2001) ............................................................. 81

*Raymark Indus. v. Stemple,*
  1990 WL 72588 (D. Kan. 1990) ......................................................... 51

*Redman v. John D. Brush & Co.,*
  111 F.3d 1174 (4th Cir. 1997) ........................................................... 78

*Reves v. Ernst & Young,*
  507 U.S. 170 (1993) ..................................................................... 60, 61

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ......................................................................... 55

*Snyder v. Phelps,*
  580 F.3d 206 (4th Cir. 2009), *aff'd*, 131 S. Ct. 1207 (2011) ............... 58

*State Farm Mut. Auto. Ins. Co. v. Makris,*
  2003 WL 924615 (E.D. Pa. 2003) ...................................................... 45

*Steffes v. Stepan Co.,*
  144 F.3d 1070 (7th Cir. 1998) ........................................................... 46

*Stewart v. Dutra Constr. Co.,*
  418 F.3d 32 (1st Cir. 2005) .............................................................. 40

*Taylor v. Bettis,*
  ___ F. Supp. 2d ___, 2013 WL 5460755 (E.D.N.C. 2013) .................. 60

ix

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Taylor v. Va. Union Univ.*,
193 F.3d 219 (4th Cir. 1999)...............................................................83

*United States v. Eisen*,
974 F.2d 246 (2d Cir. 1992) ........................................................45, 56

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) ................................................................78

*United States v. Murr*,
681 F.2d 246 (4th Cir. 1982)..................................................53, 54, 55

*United States v. Pritt*,
238 F.3d 417 (table), 2000 WL 1699833 (4th Cir. 2000)....................54

*Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*,
546 U.S. 394 (2006) ......................................................................61, 64

*Van Alstyne v. Elec. Scriptorium, Ltd.*,
560 F.3d 199 (4th Cir. 2009)...............................................................41

*Varghese v. Honeywell Int'l, Inc.*,
424 F.3d 411 (4th Cir. 2005) ........................................................35, 41

*Velazquez v. Figueroa-Gomez*,
996 F.2d 425 (1st Cir. 1993) ...............................................................63

*Von Bulow v. Von Bulow*,
657 F. Supp. 1134 (S.D.N.Y. 1987) .....................................................57

*Walston v. Sch. Bd. of City of Suffolk*,
566 F.2d 1201 (4th Cir. 1977).............................................................39

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .............................................................................62

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes and Rules**

15 U.S.C. § 15(a) ........................................................................60

18 U.S.C. § 1512 ........................................................................55

18 U.S.C. § 1961(1)(B) ...............................................................56

18 U.S.C. § 1964(c) ...............................................................31, 74

28 U.S.C. § 1291 ..........................................................................3

28 U.S.C. § 1331 ..........................................................................3

28 U.S.C. § 1332 ..........................................................................3

28 U.S.C. § 1367(a) ......................................................................3

Fed. R. App. P. 34(a)(2)(C) ........................................................86

Fed. R. Civ. P. 11 ..................................................................45, 46

Fed. R. Civ. P. 50 ............................................................33, 41, 64

Fed. R. Civ. P. 50(a) ...................................................................30

Fed. R. Civ. P. 50(a)(2) ...............................................................64

Fed. R. Civ. P. 50(b) ..............................................................*passim*

Fed. R. Civ. P. 59 ........................................................................32

Fed. R. Evid. 703 ..................................................................34, 78

W. Va. R. Civ. P. 11 ...............................................................*passim*

W. Va. R. Civ. P. 11(a) ................................................................73

W. Va. R. Civ. P. 11(b) ...........................................................20, 74

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Other Authorities**

Fed. Judicial Ctr.,
  *Reference Manual on Scientific Evidence* (3d ed. 2011) ....................77

Restatement (Second) of Torts (1977) ....................................................52

# INTRODUCTION

In July 2007, appellee CSX Transportation, Inc. ("CSXT") sued appellants for manufacturing and filing fraudulent asbestosis claims. The district court dismissed the suit, but this Court determined that CSXT's RICO and common-law claims should go forward and that CSXT should be permitted to amend its complaint.

On remand, appellants moved to dismiss the amended complaint. The district court denied the motion. After months of intensive discovery, appellants moved for summary judgment. The district court denied the motions. The case was then tried to a jury, which returned a verdict for CSXT after just over two hours of deliberation.

Now, nearly seven years after CSXT sued, appellants claim—for the first time—that CSXT's basic legal theory is "flawed" and that, for this reason, the suit should never have been permitted to proceed. That remarkable notion was necessarily rejected by this Court in the prior appeal, when it held that a jury could find that the defendants "lacked a good faith basis to file an asbestos injury claim," that they "committed fraud by filing the lawsuit," and that CSXT "relied to its detriment on the defendants' alleged fraud." *CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 734 (4th Cir. 2010) (per curiam). The viability of CSXT's

legal theory is therefore law of the case.  But even if it is not, appellants'
challenge has been forfeited, because it was not raised below.  And apart
from being precluded and forfeited, the challenge fails on the merits for
a multiplicity of reasons, including that its first two prongs rest on
mischaracterizations of CSXT's legal theory and the third is foreclosed
by this Court's precedent.

In addition to attacking the verdict on legal grounds, appellants
challenge it on factual grounds, arguing that the evidence did not
permit a reasonable jury to find for CSXT on three elements of its
claims.  This challenge, too, has been forfeited, because it was not
pressed below.  It is also meritless.  The evidence of appellants'
fraudulent claims-manufacturing and -filing scheme was not only
sufficient but overwhelming.

Appellants also challenge the admission of certain evidence.  The
district court made scores of evidentiary rulings.  Some favored CSXT;
many favored appellants.  Appellants challenge only two on appeal.  But
far from constituting the sort of prejudicial abuse of discretion that
could warrant a new trial, the rulings were clearly correct.

The judgment of the district court should therefore be affirmed. If this Court orders a new trial, however, it should sustain the conditional cross-appeal and direct the district court to submit CSXT's punitive-damages claim to the jury. Despite vast evidence of a systematic, widespread, and years-long fraud, the district court inexplicably ruled that no reasonable jury could find that this was "gross fraud." A reasonable jury plainly could so find.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367(a). It entered judgment on December 21, 2012, Dkt.1551, and denied appellants' post-trial motions and entered an amended judgment on September 25, 2013, Dkt.1633-1636. Appellants filed notices of appeal on October 3 and 11, 2013, and CSXT filed a notice of cross-appeal on October 25. Dkt.1639, 1649, 1655. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether appellants' challenges to CSXT's theory of liability (a) are foreclosed by the law-of-the-case doctrine; (b) have been forfeited; and (c) fail on the merits.

3

2.     Whether appellants' challenges to the sufficiency of the evidence (a) have been forfeited and (b) fail on the merits.

3.     Whether the district court acted within its discretion in deciding that appellants are not entitled to a new trial based on (a) its admission of testimony from Dr. John Parker or (b) its ruling on "other FELA claims."

4.     Whether, if a new trial is ordered, CSXT's punitive-damages claim should be submitted to the jury.

## STATEMENT OF THE CASE

### A.    Factual Background

This case involves a scheme by defendants-appellants Robert Peirce and Louis Raymond (the "lawyer defendants"), who were principals of the law firm of Peirce, Raimond & Coulter P.C. (the "Peirce firm" or "firm"), to manufacture fraudulent asbestosis claims and then file them in mass lawsuits to extract settlements from plaintiff-appellee CSXT. The lawyer defendants carried out this scheme by arranging for unprescribed, low-quality x-rays to be taken in mass screenings by an unlicensed x-ray technician; by having a since-discredited doctor, defendant-appellant Ray Harron, claim to find evidence of asbestosis in the x-rays at an impossibly high rate; by suggesting and in at least one

4

instance fabricating answers on potential claimants' exposure-history questionnaires; and by then inundating CSXT with thousands of claims that they falsely represented to have a good-faith basis in fact.

### 1. The manufacture of asbestosis claims

#### a. *Illegal x-rays*

Beginning in 1990, the lawyer defendants arranged mass screenings outside CSXT worksites across the country, soliciting thousands of otherwise-healthy railroad employees to undergo chest x-rays and provide information that might be used to file lawsuits against CSXT. Tr.252-55, 303, 311; *see also* Tr.207, 212. These screenings were conducted by Peirce firm personnel. Tr.269, 388-89. When a CSXT employee arrived for a "free screening," the lawyer defendants required the employee to sign a document giving the Peirce firm power of attorney, which entitled it to file suit on the employee's behalf without further authorization from or consultation with the employee. Tr.254, 975, 1011-13.

The lawyer defendants hired James Corbitt to take the x-rays. He drove to CSXT worksites in 20 states and took thousands of x-rays using a machine rigged up in the back of a truck. Tr.162-63, 173-74,

181-82, 189, 192, 1378. In most of those states, Corbitt had no license to practice as an x-ray technician. Tr.169-70.

Although earnest efforts to diagnose asbestosis—or to rule it out—call for high-quality x-rays, Tr.190-91, 596, 751, 754, the x-rays Corbitt produced for the lawyer defendants were frequently of low quality, Tr.179, 181-82. Corbitt himself acknowledged that a primary purpose of state licensing requirements is to prevent "junk x-rays, bad x-rays," Tr.171, and he admitted that he frequently failed to comply with those requirements, Tr.170-71, 173.

Beginning in 1995, virtually all of Corbitt's work was for the lawyer defendants. Tr. 162, 192. They paid Corbitt $1.8 million to retain his exclusive services during this time. Tr.194.

### b.  *Fraudulent B-reads*

**i.**  Most of the claimants on whose behalf the lawyer defendants sued were never diagnosed with asbestosis. Tr.521-25, 542, 562, 582-83, 855, 965-66, 1307-08. Instead, the claims were based on x-ray interpretations called "B-reads," which are issued by specially certified doctors called "B-readers," according to an international classification system.

6

B-readers examine x-rays for characteristic opacities that indicate scarring, and then record their findings by reporting a pair of numbers on a standard form known as an "ILO form." PX572; Tr.723-24. The first number reflects the "major category," the second any adjacent category that the reader "seriously considered." PX572.4; Tr.727-28, 929-30. Category 0 is a "normal" or "negative" x-ray with no opacities or too few to be considered abnormal; categories 1, 2, and 3 indicate mild, moderate, and severe abnormality. PX572.4; Tr.723-24, 727-28. To be considered "positive"—and thus support a legal claim for asbestos-related injury—the reading must be 1/0, 1/1, or higher. Tr.557, 593, 885.

**ii.** Prior to 1995, the Peirce firm's x-rays were read by several different B-readers. In 1994, the lawyer defendants retained Harron as one of them. PX59; Tr.543. The lawyer defendants tracked the positive read rates of various B-readers, Tr.302-03, 304-05, 307-08, 329, 444, and quickly identified Harron as "a very, very liberal reader." PX156; Tr.334-35, 337, 339; *see also* PX119; Tr.394. In fact, the lawyer defendants determined that Harron was issuing positive B-reads at "3 to 4 times the positive ratios over" other B-readers. PX120; Tr.1039-40.

In some instances, the lawyer defendants sent x-rays that had been read as negative by other doctors to be re-read by Harron, who then issued a positive B-read.  PX115.1, 2, 4, 7-13.

Knowing all of this, the lawyer defendants agreed with Harron in 1995 that he would become their exclusive B-reader.  Tr.293, 1042.  Harron gave up private practice and shifted almost exclusively to expert-witness work.  Tr.162, 558.  He initially charged $2 per B-read, but quickly ratcheted up his rate to $40.  Tr.637.  The lawyer defendants paid Harron more than $600,000 to read around 16,000 x-rays.  Tr.1071, 1398.

According to Raimond, Harron "wasn't providing a medical service" but "was basically consulting in terms of our office ***.  [H]e wasn't an advocate for the patient.  He wasn't the doctor of those people ***.  He was doing surveillance work."  Tr.296-97; *see also* Tr.300.  Harron agreed that his B-reading was not "practicing medicine" but rather "doing expert witness work" for the lawyer defendants.  Tr. 520.  He regarded the subjects of the x-rays, not as "patients," but as "[p]otential litigant[s]."  Tr.568-69, 582.

Because B-reads are used to identify signs of *all* kinds of pneumoconiosis, not just asbestosis, a B-reader is not supposed to be told what result is sought. Tr.553-54, 660-61, 833. Instead of the standard ILO form, however, the lawyer defendants supplied Harron with a modified form with boxes to indicate whether his results were "consistent with asbestosis" or "not consistent with asbestosis." Tr.832-33; *see also* PX59; Tr.283-84, 288-89, 547, 556.

The lawyer defendants also asked Harron to assume that all the x-ray subjects had been exposed to asbestos, and Harron knew that his B-reads would be used to bring a legal claim for "some type of benefit" or "some kind of compensation." Tr.283-86, 346, 555-57, 570, 582. Harron thus was well aware that the lawyer defendants had a financial stake in the outcome of his B-reads. Tr.555.

**iii.** Consistent with the lawyer defendants' hopes (and their financial interests, Tr.339, 1010), Harron reported finding evidence of asbestosis at impossibly high rates. The jury was told that Harron made a positive B-read more than 65% of the time. Tr.624-25. And a recent review that was not before the jury determined that Harron had

issued a positive read for nearly *75%* of all x-rays from the lawyer defendants. Tr.620-21, 624.

By contrast, "the most scientifically credible published studies on the matter" have concluded that the incidence of asbestosis among railroad workers is around 2%. Tr.849-55, 904, 921; *see* PX571, 575-577. There is obviously a "[b]ig difference between 2 percent and 60 percent." Tr.917. Indeed, if Harron had actually seen evidence of asbestosis in 65% of the x-rays (let alone 75%), it would have reflected "an epidemic of unheard of proportions in this population." Tr.855-56.

As a practical matter, Harron's positive read rate for the lawyer defendants was even *higher* than 65-75%:

- On many days, Harron reported that *100%* of the x-rays he viewed were positive. *E.g.*, Tr.330-33, 586-88. In the first six months of 2001, Harron read 1,033 x-rays and purported to find 1,001 positive. Tr.328-29. In fact, Harron's readings were "100 percent positive every day for 294 days," Tr.394, though the district court did not allow the jury to hear this, Tr.396. Harron acknowledged that this was "unusual." Tr.585; *accord* Tr.588.

- Many of the x-rays that Harron reported as "negative" were actually of such poor quality that they were effectively unreadable. Tr.454-60, 666-69. Reporting hundreds or thousands of unreadable x-rays as negative concealed his true positive rate.

- Many employees attended multiple screenings, each time increasing the odds that at least one x-ray would receive a positive B-read (especially since Harron's reads were arbitrary). Tr.398-99; *see, e.g.*, Lincoln.Dep.9; Peterson.Dep.11. Neither the lawyer defendants nor Harron checked positive B-reads against an employee's past x-rays—even though the Peirce firm retained the records—to confirm that result. Daley.2009.Dep.4; Daley.2012.Dep.1, 3-4; Tr.1335-36.

When Harron issued a positive B-read for the lawyer defendants, he did nothing to inform the patient. In fact, he has vigorously denied any doctor-patient relationship. Tr. 516. Harron has maintained that "my duty was not to the individual there; it was to the company"—or law firm—"who sent the person in" (and was paying his fees). Tr.517.

11

Harron and the lawyer defendants jointly understood that the purpose of his B-reads was to enable the lawyer defendants to bring legal claims. Tr.555-57, 570, 582.

**iv.** For many years, CSXT was unaware of the impossible rate at which Harron was issuing positive B-reads. The lawyer defendants "never told [CSXT] the read rate" and never sent it "negative x-ray findings." Tr.399, 446. In fact, the first time CSXT obtained negative x-rays was in discovery in this case. Dkt.841-66. Because CSXT received a B-read only when an employee filed suit, and thus saw only positive reads, it had no way to know that there were few instances in which Harron did *not* make a positive B-read. Tr.445-46. The lawyer defendants were aware that CSXT would have no reason to question Harron's readings. Tr.300-01.

In 2005, Harron's fraudulent practices were exposed in proceedings before Judge Janis Jack in the Southern District of Texas. Although the lawyer defendants received reports that a hearing in that case had raised "serious issues with regard to Dr. Harron's credibility," they did not immediately cease relying on him. Tr.675, 1042-45. Instead, they redoubled their effort to mediate and settle as many

12

claims as possible before Judge Jack could issue a written opinion exposing Harron as a fraud. Tr. 1045-46; *see* PX12.

Judge Jack released her opinion in June 2005, meticulously documenting a wide-ranging scheme in which "diagnoses were driven by neither health nor justice: they were manufactured for money" and "the lawyers, doctors, and screening companies were all willing participants." *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 635 (S.D. Tex. 2005). Following that decision, Harron's B-reads were no longer accepted in litigation and Harron ended his B-reading practice. Tr. 674, 1047; *see also* PX355; Tr. 1050-55.

**v.** After Harron was discredited, the Peirce firm attempted to salvage its cases by sending x-rays to be "re-read" by other B-readers. The bulk of them were re-read by Donald Breyer, Tr.1054-55, who performed B-reads almost exclusively for plaintiffs' lawyers in asbestos litigation, Tr.1263; *see also* Tr.1237. Someone from the firm called Breyer in December 2005, Tr.1258, and told him that "we have 2,000 films we need to have read in three weeks and we'll pay you whatever you want," Tr.1259; *cf.* Tr.1433, 1484-85.

Breyer responded that he "kn[ew] the story of Janis Jack and Ray Harron" and said that he was doubling his price. Tr.1260-61. The Peirce firm agreed to pay Breyer $200,000 for those three weeks of work, and paid him another $118,000 later that year. Tr.1260, 1267-68. The firm paid Breyer more than $491,000 the following year, and another $222,000 the year after that. Tr.1268.

Breyer did not, however, perform an *independent* B-read. He was told that all the x-rays had previously been read as positive by Harron and was provided with copies of Harron's B-read results. Tr.836-38, 1254. Unsurprisingly, Breyer "confirmed" Harron's reading virtually every time. Tr.838, 1269, 1453-54. In some instances, Breyer even reported x-rays as high-quality and issued positive B-reads when other B-readers had reported that the x-rays were unreadable. Tr.1255-57. Like Harron, Breyer "very substantially overread the presence of profusion abnormality," and his B-reads were "not scientifically credible." Tr.842.

### c.    *Fabricated exposure histories*

To file an asbestosis claim, a plaintiff must possess not only supporting medical evidence, but also evidence of work-related asbestos

exposure. To create this evidence, Peirce firm personnel guided each employee through an "asbestos questionnaire." PX209. To ensure that it received the desired answers, the firm provided several completed "sample questionnaire[s]" with "sample answers" illustrating how to report workplace exposure to asbestos. *Id.*; Tr.351-52.

In at least one instance, the firm was caught fabricating exposure-history evidence. On the asbestos questionnaire for Earl Baylor, the "Claimed Exposures" included the handwritten words "Asbestos rope, cement, Asbestos valve packing," but this handwriting differs from that on the rest of the form. *Gilkison*, 406 F. App'x at 733; *see* PX333; Tr.1483. Baylor testified that the handwriting was not his; that he had never had any contact with those products; and that he had never had any conversation with anyone at the Peirce firm about the questionnaire in general or asbestos exposure in particular. *Id.*; Baylor.Dep.3-5. Another witness identified the handwriting as that of Shannon Zeto, a legal assistant at the firm. Daley.2012.Dep.8.

The lawyer defendants had reason to doubt the exposure histories of other claimants as well. For example, many of the claimants were trackmen, Tr.341, and the lawyer defendants were aware that

15

trackmen, who work outside, have "very slim" exposure to asbestos, PX115.5, 11; Tr.341, 345. Nevertheless, the lawyer defendants filed numerous claims on behalf of employees who worked predominantly or exclusively as trackmen. *Id.*

### 2. The filing of the manufactured asbestosis claims

Every several months, a Peirce firm paralegal, Danielle Daley, compiled a list of all potential claimants who (1) had received a positive B-read from Harron, (2) had completed an asbestos questionnaire, and (3) were facing the imminent expiration of a claim under the applicable statute of limitations. Daley.2012.Dep.2; Tr.989, 1005. Acting under the supervision of Raimond and Peirce, Daley.2012.Dep.1-2, Daley inserted these names into a form complaint with boilerplate language. Then a Peirce firm attorney, acting at Peirce's direction, signed the complaint and filed it in court. Tr.963-64. Each of the mass complaints contained hundreds or even thousands of individual claims. *E.g.*, Tr.994.

No one at the Peirce firm made any effort to review the firm's own file for each plaintiff before filing these complaints, even though its files often contained medical records that might rule out asbestosis.

16

Daley.2009.Dep.4; Daley.2012.Dep.1, 3-4; Tr.1335-36. Indeed, a Peirce firm attorney admitted that, even if "there [were] medical records in an individual person's file from multiple doctors indicating that they do not have asbestosis," that "wouldn't matter" and the firm would still file the claim. Tr.1338; *accord* Tr.1339. A medical record in Baylor's file ruled out asbestosis. Tr.743, 748-50, 983, 1059-61; Cassoff.Dep.5; Knox.Dep.6-10, 18; PX327.

At least 11 of the claimants on whose behalf the lawyer defendants filed asbestosis claims, including Baylor, had one or more x-rays read as negative by Harron, and then shortly thereafter had another x-ray read as positive by him, despite there being no objective change in the claimant's medical condition. Tr.933; *see, e.g.*, Tr.408 (x-rays taken two months apart); Tr.596 (x-rays taken six weeks apart). After Harron was publicly discredited, the Peirce firm sent the x-rays that Harron read as positive to Breyer (or occasionally another doctor) for confirmation, but did not provide that doctor with any negative x-rays from the same period. Tr.1254. In each instance, the firm filed suit based on the single positive B-read from Harron, even though its

files contained records of the negative B-reads demonstrating that Harron's positive B-read was unreliable.

## B.    Prior Proceedings

### 1.    CSXT's lawsuit

CSXT commenced this action in 2005.   The initial complaint alleged a fraudulent scheme in which a CSXT employee who had asbestosis, Danny Jayne, sat for an x-ray under the name of another employee, Ricky May, who did not.  Represented by the Peirce firm, May used Jayne's positive x-ray to bring claims against CSXT and other defendants.   The x-ray-swapping claims were filed against Robert Gilkison, a Peirce firm employee who had arranged and attended the screening at which Jayne impersonated May, and the firm. *Gilkison*, 406 F. App'x at 734-35.

In the course of discovery, CSXT learned that the lawyer defendants and Harron were engaged in another, far broader scheme to manufacture thousands of fraudulent asbestosis claims.  CSXT then filed an amended complaint, which asserted, in addition to the original May-Jayne claims against Gilkison and the Peirce firm, RICO and common-law fraud claims against the lawyer defendants and the third principal of the Peirce firm, Mark Coulter; RICO conspiracy and

common-law conspiracy claims against the lawyer defendants, Coulter, and Harron; and a claim for punitive damages against those four defendants. Dkt.208. The theory set forth in the amended complaint was that these defendants engaged in "a scheme to inundate CSXT *** with thousands of asbestosis cases without regard to their merit" by "orchestrat[ing] an asbestosis screening process deliberately intended to result in false positive diagnoses and then knowingly prosecut[ing] claims against CSXT with no basis in fact." Dkt.208.1-2.

## 2. The district court's dismissal of CSXT's lawsuit

The district court dismissed all but one portion of CSXT's common-law claims as untimely. Dkt.264.10-11; Dkt.265.6-7. It dismissed the RICO claims on the same basis, reasoning that RICO requires proof of at least two predicate acts and that only one predicate act was within the limitations period. Dkt.264.6-10; Dkt.265.2-6. The court subsequently denied CSXT's motion for leave to file a proposed second amended complaint. Dkt.284. The May-Jayne claims went to trial, and the jury returned a verdict for Gilkison and the Peirce firm. Dkt.701. The district court then granted summary judgment against CSXT on the portion of the common-law counts that had survived the

19

motion to dismiss, which related to the asbestosis claim filed on behalf of Baylor.  Dkt.785.

### 3.    This Court's reinstatement of CSXT's lawsuit

On appeal, this Court affirmed the jury's verdict against CSXT on the May-Jayne claims but otherwise vacated the district court's judgment and remanded the case for further proceedings.  The Court concluded that the district court should not have dismissed the RICO counts and portions of the common-law counts; should not have denied CSXT's motion for leave to amend; and should not have granted summary judgment on the Baylor claim.  *Gilkison*, 406 F. App'x 723.  In reversing summary judgment, the Court determined that CSXT's theory of liability was factually and legally viable.  *Id.* at 732-34.

By filing suit, the lawyer defendants had represented, "after an inquiry reasonable under the circumstances," that the complaint was not being filed "for any improper purpose" and that "the allegations and other factual contentions" in the complaint "have evidentiary support." W. Va. R. Civ. P. 11(b).  As far as the mass complaint containing the Baylor claim was concerned, CSXT argued that there was sufficient evidence for a jury to find that representation fraudulent.  This Court

agreed, holding that "a reasonable jury could find that the lawyer defendants *** lacked a good faith basis to file an asbestos injury claim" and that, "[c]onsequently, a jury could find that the lawyer defendants committed fraud by filing the lawsuit." 406 F. App'x at 734. The Court specifically rejected the argument that CSXT could not have justifiably relied on the representation that there was a good-faith basis for the suit. "Obviously," the Court said, "CSX would have 'relied' on the representation by filing the Baylor claim that all elements of the cause of action were met." *Id.* And, "[c]onsequently, a reasonable jury could find CSX relied to its detriment on the defendants' alleged fraud as the basis of the Baylor claim." *Id.*

The Court also rejected the defendants' argument that their litigation conduct was protected petitioning activity that could not support a claim of fraud. Litigation activity is not protected, the Court explained, if the litigation is a "sham," *id.* at 734 n.7; *see Prof'l Real Estate Investors, Inc. v. Columbia Picture Indus.*, 508 U.S. 49, 60-61 (1993), and "the record has sufficient evidence to support that finding," 406 F. App'x at 734 n.7.

### C.    Proceedings Below

#### 1.    Pre-trial proceedings

Following remand, the district court granted CSXT leave to file a third amended complaint. *See* Dkt.841-1. The lawyer defendants filed counterclaims, alleging fraud by CSXT relating to a release that Baylor had executed in a prior case. Dkt.852; *cf. Gilkison*, 406 F. App'x at 734 n.7. CSXT later agreed to dismiss its claims against Coulter and to proceed only against Peirce, Raimond, and Harron. Dkt.1332,1335.

As the lawyer defendants have previously acknowledged, "the substance" of CSXT's third amended complaint is "the same" as the first amended complaint that was previously before this Court, Dkt.1663.7; it merely revised the factual allegations. While CSXT's common-law counts addressed "the eleven fabricated personal injury claims" filed on behalf of employees whose x-rays Harron read first as negative and then as positive, the RICO counts challenged the broader claims-manufacturing and -filing scheme and alleged that each mass lawsuit was "a predicate act of racketeering." Dkt.841-1.35-36. It is thus not correct, as appellants maintain, that the "thousands of [other] individual FELA claims" resulting from the scheme were "unchallenged." Br.42.

22

Appellants moved to dismiss the third amended complaint, arguing, among other things, that schemes to defraud involving the mailing of pleadings and related documents cannot constitute "predicate acts" under RICO. Dkt.888. This argument was the only challenge to any aspect of CSXT's theory of liability that appellants raised in the district court during the post-remand proceedings. The court denied the motion to dismiss. Dkt.1050. Appellants later filed motions for summary judgment, which accepted CSXT's theory of liability but challenged the sufficiency of the evidence in the summary judgment record. Dkt.1327,1329. The district court denied these motions as well. Dkt.1436, 1561.

The district court then issued rulings on dozens of evidentiary issues—some favoring CSXT, but a great many favoring appellants. The court granted, for example, the lawyer defendants' motions to exclude evidence of criminal proceedings against Corbitt; of state disciplinary actions against Harron; of the voluntary dismissal of the asbestosis claims after the state court required certification that the claims were well-founded in fact; and of the state court's finding that

Peirce had made inaccurate statements to his clients. Dkt.1557.4-5, 7-11, 25-27.

As most relevant here, the district court issued a pre-trial ruling on the admissibility of evidence of "other FELA claims." To illustrate the fraudulent claims-manufacturing scheme for its RICO claims, and as the basis for its fraud claims, CSXT intended to present evidence concerning the 11 specific asbestosis claimants whose x-rays were read as negative and then positive. The district court granted the lawyer defendants' request to preclude CSXT from offering evidence or argument that "any claims, other than the[se] eleven[,] *** were allegedly fraudulent." Dkt.1557.2.

That ruling relied on what the court believed to be an acknowledgment by CSXT that "these eleven specific claims *** are the only claims from which [CSXT] can attempt to prove fraud." *Id.* But the ruling made no mention of CSXT's RICO claims. Later, in denying the lawyer defendants' request to limit CSXT's RICO-damages evidence to the damages specifically related to these 11 claims, the court clarified that, although the aforementioned "admission limited [CSXT's] claims for *fraud* ***, it may have left open the opportunity to assert claims

24

under RICO and damages that might possibly arise from proof of predicate acts." Dkt.1557.14 (emphasis added); *see also* Tr.326-27 ("I'm not sure that [earlier] ruling, frankly, dealt with the RICO claim."). At trial, the district court further "expanded that ruling a little bit because *** there should be some evidence as to pattern and practice, which would *** also go to motive and intent, which would also work into [the] motion in limine ruling." Tr.627; *see also* Tr.624 (discussing "the ruling that I've made to expand that somewhat on pattern and practice").

### 2.    The trial

**a.**    The district court held an eight-day jury trial in December 2012. The jury heard live testimony from Corbitt, Harron, Breyer, Peirce, and Raimond, among others, and viewed videotaped deposition testimony from numerous other witnesses.

CSXT's evidence included expert testimony from Dr. John Parker, a former head of the B-reader examination program and an expert in pulmonology, occupational lung disease, asbestosis, and B-reading. Tr.686-713. Appellants had moved to preclude Dr. Parker's testimony, but the district denied the motion. Dkt.1557.

Dr. Parker conducted a blinded study in which three expert B-readers re-read the x-rays for the 11 illustrative claimants, and the consensus of those experts was then compared with the B-reads by Harron and the confirmatory B-reads by Breyer. Tr.805-46. Dr. Parker's expert panel "tend[ed] to overread a touch," Tr.819, but still rejected every one of Harron and Breyer's positive B-reads, as the chart below reflects:

| Claimant | X-Ray Date | Harron | Breyer | Blinded Study (Consensus) |
|---|---|---|---|---|
| **Nelson Andrews** | 8/25/2000 | 0/0 (negative) | --- | 0/0 (negative) |
| | 2/25/2003 | 0/0 (negative) | --- | 0/0 (negative) |
| | 2/28/2004 | 1/0 (positive) | 1/0 (positive) | 0/1 (negative) |
| **Earl Baylor** | 8/4/1999 | 0/0 (negative) | --- | 0/0 (negative) |
| | 5/23/2002 | (x-ray unreadable) | --- | (x-ray unreadable) |
| | 6/11/2003 | 1/0 (positive) | 1/0 (positive) | 0/1 (negative) |
| **Morris Collier** | 4/27/2000 | 0/0 (negative) | --- | 0/0 (negative) |
| | 7/11/2001 | 1/0 (positive) | --- | 0/0 (negative) |
| **Hubert Harrison** | 9/24/2000 | 0/0 (negative) | --- | 0/0 (negative) |
| | 10/13/2003 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |

26

| Claimant | X-Ray Date | Harron | Breyer | Blinded Study (Consensus) |
|---|---|---|---|---|
| Miledge Hill | 7/31/2001 | 0/0 (negative) | --- | 0/0 (negative) |
| | 2/25/2003 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |
| Herman Lincoln | 7/31/1999 | 0/0 (negative) | --- | 0/0 (negative) |
| | 5/12/2001 | 0/0 (negative) | --- | 0/0 (negative) |
| | 2/21/2004 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |
| James Peterson | 8/25/2000 | 0/0 (negative) | --- | 0/0 (negative) |
| | 2/25/2003 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |
| Louis Schabow | 7/11/2001 | 0/0 (negative) | --- | 0/1 (negative) |
| | 3/26/2002 | 1/0 (positive) | 1/0 (positive) | 0/1 (negative) |
| Aubrey Shelton | 6/26/2001 | 0/0 (negative) | --- | 0/1 (negative) |
| | 10/3/3003 | 1/0 (positive) | ---[1] | 0/1 (negative) |
| Donald Wiley | 4/12/2000 | 0/0 (negative) | --- | 0/0 (negative) |
| | 6/24/2002 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |

---

[1] Shelton's "positive" x-ray was not re-read by Breyer, but it was re-read as 1/0 by Robert Mezey, another of the lawyer defendants' confirmatory B-readers. PX301.

| Claimant | X-Ray Date | Harron | Breyer | Blinded Study (Consensus) |
|----------|------------|--------|--------|---------------------------|
| **Archie Wilkins** | 4/12/2000 | 0/0 (negative) | --- | 0/1 (negative) |
| | 5/20/2002 | 0/0 (negative) | --- | 0/0 (negative) |
| | 6/2/2003 | 1/0 (positive) | 1/0 (positive) | 0/0 (negative) |

PX5, 175-176, 199-201, 229-231, 252-253, 255, 275-276, 299-300, 302, 322-325, 348-351, 371-374, 395-397, 416-419.

As far as the B-reads were concerned, Dr. Parker testified as follows:

- Harron's B-reads, on their face, are both "inaccurate and unreliable." Tr.834. His 65% (or higher) read rate is "[s]cientifically implausible" and has "never [been] documented" in any comparable population. Tr.853. If Harron's readings were believed, it would mean that there was "an epidemic of unheard of proportions" that should be "report[ed] *** to the public health authorities." Tr.855-56. As for the days that Harron read every single x-ray positive, "I've never had a day like that and I can't imagine a day like

that could exist unless someone purposely enriched the films to be all abnormal. *** [T]hat is just not possible." Tr.856.

- Harron's ILO forms, which reported high levels of asbestosis but not of pleural plaques, are "scientific evidence that [his] readings are invalid and scientifically wrong." Tr.857; *see also* Tr.757-58. Given Harron's asbestosis read rates, he should be seeing "ten times as much" pleural disease as he was reporting. Tr.873; *see* Tr.757-58, 835. And Harron rarely read an x-ray as 0/1, which falls short of supporting a legal claim, whereas he claimed to read an abnormally high number of x-rays as 1/0, which is just above the threshold for bringing a claim. Tr.664-65, 834, 873; *cf.* Tr.733, 742.

- Breyer's readings were equally "unreliable" and "not scientifically credible." Tr.842. Breyer "very substantially overread the presence of profusion abnormality," *id.*, and his work was improperly biased by information provided to him in advance, Tr.838.

Dr. Parker ultimately concluded that "[t]he readings performed by Dr. Harron and Dr. Breyer do not reach scientific credibility." Tr. 845.

Dr. Parker emphasized that the impossible results they reported cannot be attributed to mere "mistake," "incompetence," or "lack of skill." Tr.857.  Instead, "[t]here must be intent or extreme bias. *** I think this was quite purposeful.  It was intended to be overreading."  Tr.857-58.

**b.**  At the close of CSXT's case, and again at the close of the evidence, appellants moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law.  Appellants challenged only the sufficiency of the evidence, arguing that CSXT had failed to prove falsity, justifiable reliance, the lawyer defendants' personal responsibility, a conspiracy, or "gross fraud," a prerequisite to punitive damages.  Tr.1085-93, 1721.  Appellants did not challenge CSXT's theory of liability in their Rule 50(a) motion.  The district court granted judgment as a matter of law to appellants on CSXT's punitive-damages claim, ruling that there was insufficient evidence of gross fraud, but denied the motion as to the RICO and common-law claims.  Tr.1099-1100, 1722.

In its detailed charge, the district court instructed the jury that, to prove the RICO claims, CSXT "must show that any injury was by

reason of the defendants' conduct" but is "not required to show that it relied on any of the defendants' misrepresentations."    Tr.1903; Dkt.1550.7; *see* 18 U.S.C. § 1964(c).  Appellants did not object to the instruction on reliance. Tr.1753-54.

After just over two hours of deliberation, the jury returned a verdict for CSXT on all its RICO and common-law claims.  Dkt.1549; Tr.1937-47.  The jury also found for CSXT on the lawyer defendants' counterclaims.  *Id.*  It awarded CSXT $439,240.47 in damages for the RICO violations, *id.*, the amount the parties had stipulated to as "the reasonable and necessary fees and expenses incurred by CSX in the defense of the [11 illustrative] asbestos claims," Dkt.1516; Tr.959, but awarded no damages on the common-law claims, Dkt.1549; Tr.1937-47. The district court subsequently trebled the damages, under 18 U.S.C. § 1964(c), to $1,287,721.41.  Dkt.1635.[2]

---

[2] CSXT also sought attorneys' fees under 18 U.S.C. § 1964(c), Dkt.1566, but the district court stayed that motion pending the resolution of this appeal, Dkt.1637.

### 3. Post-trial proceedings

Following the verdict, the lawyer defendants filed a renewed motion for judgment as a matter of law under Rule 50(b) and for a new trial under Rule 59. Dkt.1563-1564.

Although the Rule 50(b) motion nominally challenged the sufficiency of the evidence, in fact it argued only that the district court should have excluded certain evidence and that, without that evidence, there was an insufficient evidentiary basis for the verdict. Dkt.1563.1; Dkt.1564.6, 12-30. The motion did not argue that the evidence that was *actually* admitted and considered by the jury was insufficient as to any particular element of any claim. The district court denied the motion, observing that "the lawyer defendants do not explain exactly which elements CSX did not support with proper evidence" and that "the jury was presented with a great deal of evidence during the two-week long trial that supported the jury's findings on the RICO, fraud, and conspiracy claims." Dkt.1633.4.

As relevant here, appellants' Rule 59 motion argued that (1) CSXT violated the district court's order precluding it from offering evidence or argument that asbestosis claims other than the 11 illustrative ones

were fraudulent and (2) the court improperly admitted testimony from Dr. Parker about the prevalence of asbestosis in railroad workers. Dkt.1564.15-17, 28. The district court denied the request for a new trial, holding that CSXT had not committed any violation of its order that would warrant a new trial and reaffirming its prior ruling that Dr. Parker's testimony was properly admitted. Dkt.1633.7-9, 17-19.[3]

## SUMMARY OF ARGUMENT

**I. A.** Appellants' challenge to CSXT's theory of liability—that appellants manufactured asbestosis claims and falsely represented that there was a good-faith basis for them, causing CSXT to incur costs to defend the lawsuits—is foreclosed by this Court's decision in the prior appeal, which accepted that theory of liability, *Gilkison*, 406 F. App'x at 726-27, 734 & n.7, and is now law of the case. The challenge has also been forfeited, because appellants failed to raise it in a Rule 50 motion, as required by this Court's precedent, and generally failed to dispute CSXT's theory of liability at any stage of the district court proceedings. Finally, appellants' challenge lacks merit. Nothing precludes a fraud or

---

[3] The district court also denied Harron's post-trial motions, Dkt.1634, which adopted the lawyer defendants' arguments and raised other claims that have not been renewed on appeal, Dkt.1562.

RICO claim based on fraudulently filed lawsuits; a party can justifiably rely on an adversary's representation that there is a good-faith basis for a lawsuit; and litigation conduct can be a predicate act under RICO.

**B.** Like their challenges to CSXT's legal theory, appellants' challenges to the sufficiency of the evidence have been forfeited, because appellants failed to raise them below. The challenges also fail on the merits. A reasonable jury could easily find that the lawyer defendants did not have a good-faith basis for their claims, and thus that their representations that they did were false; that CSXT justifiably relied on these representations in defending the lawsuits; and that appellants' fraud and racketeering caused CSXT to incur the legal fees the jury awarded as damages.

**C.** The evidentiary rulings that appellants challenge do not amount to an abuse of discretion, much less one that entitles them to a new trial. Dr. Parker's testimony about peer-reviewed epidemiological studies that supported his expert opinion was both relevant and authorized by Federal Rule of Evidence 703, and thus the district court did not abuse its discretion in allowing it. As for appellants' claim that CSXT violated the district court's order regarding "other FELA claims,"

appellants mischaracterize the order, the district court correctly found that there was no substantial violation of its order, and appellants cannot show that they were prejudiced by any violation of it.

**II.** If this Court does order a new trial, it should sustain CSXT's conditional cross-appeal and direct that CSXT's punitive-damages claim be submitted to the jury. Under West Virginia law, a jury may assess punitive damages for "gross fraud," and the evidence of appellants' elaborate and pervasive fraud scheme would easily permit a reasonable jury to find gross fraud.

## STANDARDS OF REVIEW

A preserved challenge to the viability of a legal theory presents a question of law and is therefore subject to *de novo* review. *E.g., In re Beach First Nat'l Bancshares, Inc.*, 702 F.3d 772, 776 (4th Cir. 2012). An unpreserved challenge is unreviewable. *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 420-23 (4th Cir. 2005).

A preserved claim addressed to the sufficiency of the evidence is subject to *de novo* review vis-à-vis the district court but deferential review vis-à-vis the jury. That means that the court of appeals applies the same standard as the district court but the standard is whether, viewing the evidence in the light most favorable to the nonmoving party

and drawing all reasonable inferences in its favor, a rational jury could find for the nonmoving party. *E.g., Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341 (4th Cir. 2002). An unpreserved challenge to the sufficiency of the evidence is unreviewable. *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 154-60 (4th Cir. 2012).

A district court's evidentiary rulings "are reviewed under the narrow abuse of discretion standard," *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 690 (4th Cir. 2011) (internal quotation marks omitted), which means that this Court "will only overturn an evidentiary ruling that is arbitrary and irrational," *Noel v. Artson*, 641 F.3d 580, 591 (4th Cir. 2011) (internal quotation marks omitted). Even then, this Court will "not *** set aside *** a judgment on the grounds that evidence was erroneously admitted unless justice so requires or a party's substantial rights are affected." *Creekmore*, 662 F.3d at 693.

**ARGUMENT**

I. **ON THEIR APPEAL, APPELLANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL**

A. **Appellants Are Not Entitled To Judgment As A Matter Of Law On The Ground That CSXT's Claims Are "Legally Flawed"**

Appellants begin by challenging CSXT's theory of liability. According to them, (1) a false representation that a lawyer has a good-faith basis for the allegations in a complaint cannot support a fraud or RICO claim; (2) a defendant cannot justifiably rely on such a representation; and (3) litigation conduct cannot serve as a RICO predicate act. Br.24-41. These challenges fail for three independent reasons. First, the propositions that appellants challenge were approved by this Court in the prior appeal and thus are law of the case. Second, the challenges were not raised below and thus have been forfeited. Third, no principle of law precludes RICO or fraud claims for a fraudulent scheme perpetrated in part through litigation, and thus the challenges lack merit.

37

## 1. The propositions that appellants challenge are law of the case

Appellants' challenges to CSXT's theory of liability are foreclosed by this Court's decision in the prior appeal. The law-of-the-case doctrine precludes the challenges for two separate reasons.

*First*, in reversing summary judgment against CSXT on the Baylor fraud claim, this Court held that "a reasonable jury could find" that "the lawyer defendants *** lacked a good faith basis to file an asbestos injury claim" and that "CSX relied to its detriment on the defendants' alleged fraud." *Gilkison*, 406 F. App'x at 734. Indeed, the Court thought it "[o]bvious[]" that "CSX would have 'relied' on the representation by filing the Baylor claim that all elements of the cause of action were met as CSX would have had no reason to know of the alleged act of fraud." *Id.*

"[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (internal quotation marks omitted). This doctrine applies, not only to issues decided explicitly, but also to those that were "necessary predicate[s] of the court's conclusion." *Cowgill v. Raymark Indus.*, 832

38

F.2d 798, 802 (3d Cir. 1987); *accord Walston v. Sch. Bd. of City of Suffolk*, 566 F.2d 1201, 1205 (4th Cir. 1977) (applying doctrine to decision made "sub silentio" in prior appeal). Here, the validity of the theory of liability that appellants now seek to challenge—that CSXT justifiably relied upon the lawyer defendants' false representations that they had a good-faith basis for their asbestosis claims—was decided upon in the prior appeal. At the very least, it was a necessary predicate of the Court's conclusion. It is thus rather remarkable for appellants to say that "[t]his Court should not be the first to endorse CSX's *** theory," Br.36, because the Court has already done so.

The law-of-the-case doctrine "promotes the finality and efficiency of the judicial process," *Christianson*, 486 U.S. at 816, and this case well illustrates the need for it. Following this Court's decision in the prior appeal, the parties invested two years and immeasurable resources preparing for and conducting a trial in accordance with this Court's instructions. The district court empanelled a jury for an eight-day trial, and the parties summoned witnesses from across the country, all in reliance on this Court's decision. It would be a travesty if appellants were permitted to challenge the very foundation of CSXT's case now.

39

*Second*, even if the viability of CSXT's theory of liability had not been settled by this Court in the prior appeal, appellants' challenges would still be foreclosed, since appellants did not raise them in the prior appeal and "any issue that could have been but was not raised on appeal" is "waived and thus not remanded." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) (internal quotation marks omitted). This rule is an aspect of the law-of-the-case doctrine because "[i]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (Friendly, J.); *accord Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989) (contrary rule would be "bizarre"). The rule applies, not only when the appellant in the second appeal was the appellant in the first appeal, but also when—as here—the appellant in the second appeal was the *appellee* in the first one. *See, e.g., Stewart v. Dutra Constr. Co.*, 418 F.3d 32, 35-36 (1st Cir. 2005); *Heathcoat v. Potts*, 905 F.2d 367, 370-71 (11th Cir. 1990) (per curiam). There is particular reason to apply the rule when—again, as here—the challenge that was not raised in the first appeal goes to the very foundation of the case. *See, e.g., Fogel*, 668 F.2d

40

at 108-09 (because defendant, who was appellee in first appeal, did not challenge existence of private right of action, it could not do so in second appeal, in which defendant was appellant).

## 2. Appellants' challenges have been forfeited

Even if appellants' challenges to CSXT's theory of liability were still available after this Court's decision in the prior appeal, they are not available now. In two independent respects, appellants have forfeited their challenges by failing to raise them below.

*First*, appellants failed to raise any of their challenges to CSXT's theory of liability in a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, either before or after the jury's verdict. Tr.1085-1100, 1721-37; Dkt.1562-1564. The rule in this Circuit is that legal challenges of this kind, no less than challenges to the sufficiency of the evidence, must be raised in a Rule 50 motion to be preserved for appeal. *Varghese*, 424 F.3d at 423; *accord Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 204 n.3 (4th Cir. 2009); *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236-37 (4th Cir. 1995).

*Second*, even if that were *not* the rule in this Circuit, two of the three challenges to CSXT's theory of liability would *still* have been forfeited, because appellants failed to raise them at *any* point in the proceedings below. The only challenge raised in this Court that appellants raised in the district court was their claim, asserted in their post-remand motion to dismiss the third amended complaint, that litigation conduct cannot constitute a RICO predicate. Dkt.888.13-16. Appellants never argued, as a categorical matter, that a false representation of a good-faith basis for a lawsuit can never support a RICO or fraud claim or that a litigation adversary can never justifiably rely on such a representation. When an appellant "fail[s] to raise [an] argument before the district court, it is waived on appeal." *Helton v. AT&T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013).

### 3. Appellants' challenges lack merit

Appellants' attack on CSXT's theory of liability is not only precluded and untimely but also meritless. Appellants' challenge amounts to a plea to exempt lawyers from laws prohibiting fraud, so long as their ends are verdicts or settlements. But "[a]n attorney's license is not an invitation to engage in racketeering, and a lawyer no

less than anyone else is bound by generally applicable legislative enactments." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997). Courts and juries should "not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in" fraud and racketeering. *Id.* The jury was properly permitted to find that appellants crossed this line and to hold them liable for doing so.

### a. *Fraud and RICO claims can be based on fraudulently filed lawsuits*

Appellants first challenge CSXT's theory of liability on the ground that fraud and RICO claims may not be "based on Rule 11." Br.25. Appellants' principal argument in this connection is that Rule 11 does not create a private right of action. Br.25-30. But CSXT has never taken the position that it does. Unlike in the cases cited by appellants, Br.26, CSXT did not attempt to bring a claim for a violation of Rule 11 and did not seek remedies under Rule 11. CSXT's theory is and always has been that appellants committed common-law fraud by making fraudulent representations and violated RICO by conducting the affairs of an enterprise through a pattern of mail and wire fraud. The only role that Rule 11 plays in this case is that it defines the nature of the

representation that is made when a suit is filed—namely, that the lawyer "has conducted a reasonable inquiry into the facts and the law[,] *** is satisfied that the [complaint] is well grounded in both, and is acting without any improper motive." *Hinchman v. Gillette*, 618 S.E.2d 387, 401 (W. Va. 2005) (Davis, J., concurring) (internal quotation marks omitted).

Appellants do not deny that the certifications that there was a good-faith basis for the asbestosis claims constitute *representations*. And they provide no legitimate reason for treating these representations differently than others. There is none.

Representations of this kind can give rise to common-law fraud or a violation of RICO if they are false and the other elements of the cause of action are satisfied, as the jury found here. Neither West Virginia's common law of fraud nor the federal RICO statute excludes this type of misrepresentation from its reach. This Court recognized as much in the prior appeal, when it held that the lawyer defendants' "filing" of an asbestosis claim is a "representation" as to the basis for the claim that can be false, that "[o]bviously" can be relied upon, and that can

therefore support a claim of "fraud." *Gilkison*, 406 F. App'x at 734.

Other decisions have authorized RICO claims in similar circumstances.[4]

Appellants are thus wrong to argue that CSXT is attempting to use Rule 11 as a sword to recover from appellants. And to the extent that *appellants* are seeking to use Rule 11 as a *shield* from liability, that effort should be rejected as well.

Sanctions under Rule 11 are not a "substitute[] for tort damages." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 553 (1991). Thus, although West Virginia's Rule 11 may not create a cause of action, it does not *immunize* lawyers from liability for litigation misconduct, including the filing of fraudulent claims. Indeed, the West Virginia Supreme Court of Appeals has explicitly endorsed "claims of

---

[4]  *See, e.g.*, *United States v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992) ("[A] number of the mail fraud predicates *** alleged *** misrepresentations in pleadings *** made in the hope of fraudulently inducing a settlement ***."); *Feld Entm't Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 302 (D.D.C. 2012) (allowing RICO claim to proceed based on allegation that "plaintiffs and their counsel *** knew that the factual assertions underlying [their] claims *** were false"); *Armada (Sing.) PTE Ltd. v. AMCOL Int'l Corp.*, 2013 WL 5781845, at *6 (N.D. Ill. 2013) (allowing RICO claim to proceed based on "alleged efforts to defraud [the plaintiff] through unsupported positions made in prior court filings"); *State Farm Mut. Auto. Ins. Co. v. Makris*, 2003 WL 924615, at *2 (E.D. Pa. 2003) (allowing RICO claim to proceed based on "fil[ing of] a civil complaint *** which contained false sworn verifications").

45

*** fraud" arising from "an attorney's conduct in the litigation process," even in the face of a general litigation privilege and the availability of sanctions under Rule 11. *Clark v. Druckman*, 624 S.E.2d 864, 871-72 (W. Va. 2005).[5] And even if a state rule of civil procedure, or common-law litigation privilege, could somehow foreclose a *state-law* fraud claim, it could not preclude a *federal* remedy for repeated fraudulent activity under RICO. *See, e.g.*, *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998) ("A state *** litigation privilege *** cannot defeat a federal cause of action.").

The idea that the unavailability of a private right of action under Rule 11 makes a RICO remedy unavailable for litigation misconduct was rejected by the Eighth Circuit in *Handeen*. Contrary to appellants' assertion that the court in that case "affirm[ed] dismissal of RICO *** claims," Br.26, *Handeen* in fact affirmed dismissal of a claim against lawyers under Federal Rule of Civil Procedure 11 but *reversed* dismissal

---

[5]    That decision serves to distinguish this case from *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1305 (11th Cir. 2003), on which appellants rely, Br.27. The dismissal there was predicated on Florida's litigation privilege, which, unlike West Virginia's, contains no exception for fraud.

of a *RICO* claim based on their litigation conduct. 112 F.3d at 1343-45 & n.8.

Appellants' reliance on *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394 (4th Cir. 2001), Br.27-30, is equally misplaced. This Court was not asked in that case to consider whether "private recovery [may be] based on litigation conduct," as appellants maintain. Br.28. Instead it considered, in the context of an antitrust claim, whether to recognize a fraud exception to the *Noerr-Pennington* doctrine for "alleged misstatements [that] were *** not material" to the prior litigation. *Baltimore Scrap*, 237 F.3d at 403. Appellants do not press a *Noerr-Pennington* defense on appeal here. Unlike the immaterial misrepresentations in *Baltimore Scrap*, moreover, the lawyer defendants' fraud and racketeering activity "deprive[d] the[ir] litigation" against CSXT "of legitimacy." *Id.* And although "[f]ederal *antitrust* law" may "not [be] the proper vehicle to punish an attorney's misconduct in state court," *id.* (emphasis added), RICO and state-law fraud claims demonstrably are. As this Court recognized in *Baltimore Scrap* itself, those for whom the misrepresentations may have been material "can of course sue the defendants for fraud." *Id.* at 402.

47

**b.** ***A defendant can justifiably rely on a representation that there is a good-faith basis for a lawsuit***

Appellants next challenge CSXT's theory of liability on the ground that a defendant can never justifiably rely on an attorney's representation that there is a good-faith basis for the allegations in the complaint. That challenge is meritless because (i) reliance is not an element of RICO and (ii) a defendant in civil litigation *can* rely on such a representation and thus can establish common-law fraud if the representation is false and the other elements of fraud are satisfied.

**i.** As far as the RICO counts are concerned, appellants' contention—that a defendant in CSXT's position can never establish reliance—fails because it rests on a mistaken premise: that reliance is an element of a civil RICO claim. It is not.

Appellants' argument to the contrary, Br.30-34, has been forfeited, because the district court instructed the jury that CSXT need not prove reliance to recover under RICO and appellants did not object to the instruction. Tr.1752, 1903; Dkt.1550.7. "By agreeing to an instruction which specifically authorized the verdict" without proof of reliance, appellants "waived [their] right to argue on appeal that the jury was

required" to find reliance. *First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 557 (4th Cir. 2005).

In any event, the argument that the RICO claims required proof of reliance is baseless. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 661 (2008), squarely holds that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." According to appellants, *Bridge* does not eliminate the element of reliance in all cases, but holds instead that "first-party" reliance is unnecessary only when "third-party" reliance is present. Br.32-34. That reading is foreclosed by this Court's sole post-*Bridge* decision on the subject, which expressly rejected the view that "*Bridge*'s holding was limited to cases of third-party reliance." *Biggs v. Eaglewood Mortg., LLC*, 353 F. App'x 864, 867 (4th Cir. 2009) (per curiam).

**ii.** As far as the common-law counts are concerned (and even assuming that reliance is an element of RICO), appellants are mistaken in contending that a defendant cannot justifiably rely on a representation that a lawsuit has a good-faith basis. As this Court

49

explained in the prior appeal, "[o]bviously, CSX would have 'relied' on the representation by filing [an asbestosis] claim that all elements of the cause of action were met" and that the claim had a good-faith basis. *Gilkison*, 406 F. App'x at 734. "Consequently, a reasonable jury could find CSX relied to its detriment on the defendants' alleged fraud" when it was forced to defend the claims. *Id.* Peirce himself conceded as much at trial, testifying that CSXT was "entitled to believe" that there was a good-faith basis for the claims. Tr.964.

In taking the contrary position now, appellants advance an argument that depends upon an erroneous view of CSXT's theory. Just as they mischaracterize our *claims* (as being brought under Rule 11), they mischaracterize our theory of reliance. Our theory is not that CSXT relied on the "allegations in [the lawyer defendants'] complaint," Br.35, but that we relied on their representation that there was a good-faith basis for those claims, *e.g.*, Dkt.841-1.34-39. The authorities on which appellants rely, Br.35, therefore, are not inconsistent with our theory.

Appellants are also wrong to assert that "Rule 11 certifications stand on exactly the same footing" as the allegations in a complaint.

50

Br.35.  It may be that a defendant in civil litigation cannot justifiably rely on the truth of the plaintiff's allegations of wrongdoing.  It may also be that a representation that such allegations have a good-faith basis is not a representation that they constitute "incontrovertible fact." Br.36.  But a defendant is still entitled to assume, without further inquiry, that the plaintiff's lawyers have complied with their obligations under Rule 11, that there is at the very least a good-faith basis for the lawsuit (even if it turns out to be unfounded), and that counsel's representation that there is such a basis is true.  As other courts have recognized, it is on that assumption that a defendant proceeds to defend the suit.[6]

Appellants' only other argument—that the representations required by Rule 11 are made to the court, "*not* to opposing litigants,"

---

[6]  *See, e.g.*, *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007) ("we assume that this representation [pursuant to Rule 11] is made in good faith"); *Mallard v. Prudential Ins. Co.*, 1996 WL 170126, at *2 (M.D. Ala. 1996) ("If Rule 11 serves any purpose at all, it at the very least allows defense attorneys to assume that there is *some* veracity to the facts alleged in the complaint."); *Raymark Indus. v. Stemple*, 1990 WL 72588, at *2 (D. Kan. 1990) ("[Plaintiff] and this court reasonably assumed, given the defendant attorneys' professional responsibilities and Rule 11 compliance, that they would only submit claims of at least some merit, but surely would not recklessly acquiesce in the filing of a constant, steady flow of faulty [asbestosis] claims.").

51

Br.35—cannot withstand scrutiny. Such representations are made not only to the court—with which the complaint is filed, and which will adjudicate the lawsuit—but also to the defendant—on which the complaint is served, and which will defend the suit. Even if the representations are technically directed to the court, however, a defendant obviously is *aware* of the representation, plaintiff's counsel knows that the defendant is aware of it, and the defendant takes action—defending the lawsuit—in justifiable reliance on its truth. That is sufficient to dispose of appellants' argument. *See* Restatement (Second) of Torts § 533 (1977) ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.").

Appellants' reliance on *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003), Br.35-36, is misplaced,

because that case is the exception that proves the rule that appellants challenge.  In affirming the district court's dismissal of fraud and RICO claims arising from alleged misrepresentations during discussions to settle a fraud claim, *Green Leaf* relied on a "bright-line" Florida rule that "[w]hen negotiating or attempting to compromise an existing controversy *over fraud and dishonesty* it is unreasonable to rely on representations made by the allegedly dishonest parties."  341 F.3d at 1304 (emphasis added; internal quotation marks omitted); *see also id.* at 1306-07.  That exception would be unnecessary if a litigant could *never* justifiably rely on representations by an adversary.

### c. *Litigation conduct can be a predicate act under RICO*

Appellants' final challenge to CSXT's theory of liability is that "litigation activities" cannot be "a predicate act of mail or wire fraud for purposes of a civil RICO action."  Br.36-38.  That contention  is foreclosed by this Court's precedent, which makes clear that litigation conduct *can* form the basis for a mail- or wire-fraud conviction, and so necessarily can be a predicate act under RICO.

In *United States v. Murr*, 681 F.2d 246 (4th Cir. 1982), the Court affirmed a mail-fraud conviction based on the filing of a fraudulent

lawsuit. Like appellants, Murr had devised a scheme to defraud a civil defendant by filing a complaint containing false representations based in part on manufactured evidence. The Court had no trouble approving the "utilization of the mail fraud statute to prosecute the filing of a false" civil claim. *Id.* at 248. So long as "the accused *** use[d] the mail as an instrument of his" scheme to defraud, the Court said, the mail-fraud statute was properly invoked. *Id.*; *see also United States v. Pritt*, 238 F.3d 417 (table), 2000 WL 1699833, at *6-8 (4th Cir. 2000) (per curiam) (upholding mail-fraud conviction of defendant who filed suit claiming injuries he did not sustain).

Appellants seek to distinguish *Murr* on the grounds that (1) this case involves "civil RICO," not "criminal mail fraud," and (2) that case involved not only a "litigation filing[]" (the complaint) but also submission of "false *** evidence" (accompanying affidavits). Br.41n.26. Neither ground provides a basis for distinguishing *Murr*. As to the first, courts "must interpret [a] statute consistently, whether [they] encounter its application in a criminal or noncriminal context." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004). So if particular conduct supports a mail-fraud conviction, it necessarily supports a civil RICO claim (assuming the

other elements of RICO are satisfied).  As to the second, there is no indication whatever in *Murr* that the result depended upon the fact that the false complaint was accompanied by false affidavits; on the contrary, the decision makes clear that "intentionally filing a false [complaint] is *** within the [mail-fraud] statute." *Murr*, 681 F.2d at 248-49.  In any event, this case, too, involves false evidence—among other things, the fraudulent B-reads and exposure histories.

*Murr* aside, there is no support for appellants' assertion that "litigation conduct" should be treated differently than other activity under RICO.  "Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248-49 (1989), including those who seek to hide their misconduct behind the operation of "respected businesses" like law firms, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).  "In fact, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity" by identifying witness-tampering (in violation of 18 U.S.C. § 1512) as an act of racketeering. *Living Designs, Inc. v. E.I. Dupont de*

55

*Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005); *see* 18 U.S.C. § 1961(1)(B). The statutory elements of RICO were satisfied here, and that is the extent of the inquiry. Courts "are not at liberty to rewrite RICO" to exempt wrongdoers from liability, even in the name of what is claimed to be "good policy." *Bridge*, 553 U.S. at 660.

In light of this, it is hardly surprising that those who use litigation to further racketeering activity are routinely subjected to RICO liability.[7] Even the cases appellants cite, Br.38-39 & n.25, do not support their contention that there is a special, categorical exemption

---

[7] *See, e.g.*, *Living Designs*, 431 F.3d at 364 (rejecting district court's holding that "litigation conduct in a prior case *** cannot form the basis of a subsequent federal civil RICO claim"); *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1019 (9th Cir. 2001) (affirming RICO judgment against lawyer "for his role in an organization that defrauded the plaintiffs *** by controlling both sides of several major lawsuits in order to inflate legal fees"); *Handeen*, 112 F.3d at 1343-44 (reversing dismissal of RICO claim alleging that lawyers operated bankruptcy estate "to fraudulently obtain a discharge of [plaintiff]'s judgment by manipulating the bankruptcy system"); *Napoli v. United States*, 32 F.3d 31, 33 (2d Cir. 1994) (affirming RICO conviction of lawyers who "conducted the affairs of [a] law firm through a pattern of mail fraud and witness bribery by pursuing counterfeit claims") (internal quotation marks omitted); *Eisen*, 974 F.2d at 253 (affirming RICO conviction of lawyer whose "misrepresentations in pleadings and pretrial submissions were made in the hope of fraudulently inducing a settlement"); *Chevron Corp. v. Donziger*, ___ F. Supp. 2d ___, 2014 WL 815553 (S.D.N.Y. 2014) (finding attorney liable under RICO based on his control of litigation).

56

for "litigation activit[y]." On the contrary, many of those cases specifically leave open the possibility of RICO liability in a case, like this, in which the litigation is merely one aspect of the fraudulent scheme.[8]

Contrary to appellants' assertion, Br.37-38, holding attorneys liable for knowingly false representations raises no First Amendment concerns. "Misrepresentations[] *** in the adjudicatory process" cannot "seek[] refuge under the umbrella of 'political expression,'" *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), and are not a "legitimate exercise[] of the right to petition," *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981). The Supreme Court has established the bounds of First Amendment protection for litigation activity through the *Noerr-Pennington* doctrine, which specifically withholds protection for "sham" litigation. Appellants

---

[8] *See, e.g., Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 176 (E.D.N.Y. 2010) (distinguishing case from one that "amounted to far more than mere 'litigation activities,' and instead involved an extensive and broader scheme to defraud"); *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 164 (D. Conn. 2000) (distinguishing case from one in which "litigation *** is part of a[] larger scheme to deprive [a plaintiff] of his property"); *Von Bulow v. Von Bulow*, 657 F. Supp. 1134, 1145 (S.D.N.Y. 1987) (declining to "address the situation where allegedly unjustified suits form a part of some more extensive scheme of racketeering activity").

pressed a *Noerr-Pennington* defense in their prior appeal, yet this Court found that "the record has sufficient evidence to support [a 'sham'] finding." *Gilkison*, 406 F. App'x at 734 n.7. The jury was instructed on the elements of that defense, Tr.1925; Dkt.1550.26-27, yet found it unavailing, Dkt.1633.24-25. And appellants do not invoke *Noerr-Pennington* in this appeal. The First Amendment provides them no further shelter.[9]

### d. *Affirmance will not chill legitimate litigation activities*

Appellants' *amicus* contends that the district court and jury improperly extended RICO to "legitimate" activities of lawyers, and it expresses concern that affirming the judgment will "chill" lawyers' ability to zealously represent their clients. AAJBr.6. Appellants echo these sentiments. Br.1-2, 47-48. This contention is mistaken and the concern unfounded.

Although appellants portray the verdict here as "unprecedented," Br.21, the only thing extraordinary in this case is the conduct for which

---

[9] Appellants' *amicus* does invoke *Noerr-Pennington*, AAJBr.22-24, but because it was not raised by appellants, the defense could provide no basis for reversal even apart from its lack of merit, *Snyder v. Phelps*, 580 F.3d 206, 216-17 (4th Cir. 2009), *aff'd*, 131 S. Ct. 1207 (2011).

appellants were held liable. As we have explained, subjecting to RICO liability those who use litigation to further their racketeering activity is quite unexceptional. The numerous cases we cite, *see* notes 4 & 7, *supra,* which are by no means an exhaustive catalogue, belie any claim that affirming the verdict here would have a "chilling" effect on lawyers. The cases stretch back over two decades, and as this case illustrates, there is no evidence that lawyers have been deterred even from bringing *fraudulent* claims, much less from pursuing "legitimate" ones.

Nor do ordinary lawyers engaged in "legitimate" litigation have anything to fear from affirmance of the judgment below. The verdict in this case turns on the fact that the lawyer defendants were operating as much more than attorneys engaged in routine activities. Instead, they orchestrated the entire claims-manufacturing and -filing process from start to finish. This was not the honest work of ordinary lawyers, but a fraudulent scheme by racketeers. Indeed, *amicus*'s entire submission ultimately rests on the false premise that the litigation pursued by the lawyer defendants was "legitimate," and thus it has no relevance to the facts of this case. Likewise, and contrary to appellants' suggestion,

59

lawyers engaged in "legitimate" activities will not face any "dilemma" as a result of "an impending statute of limitations." Br.48.

Sufficient protections are already in place to prevent honest lawyers from unwittingly subjecting themselves to a fraud or RICO claim. The *Noerr-Pennington* doctrine, for example, protects plaintiffs and their counsel from liability for the filing of a suit so long as it is not a "sham." *Prof'l Real Estate Investors*, 508 U.S. at 60-61. It bears emphasis in this connection that that doctrine arose in the context of antitrust litigation, which exposes defendants to the same "draconian penalties," Br.29n.21—treble damages and attorneys' fees—that they face under RICO. *See* 15 U.S.C. § 15(a). If *Noerr-Pennington*'s protections are sufficient there, then they are sufficient here.

Lawyers are also protected from RICO liability by the "professional services" doctrine. Since *Reves v. Ernst & Young*, 507 U.S. 170 (1993), "most courts have held that an outside professional, such as an attorney, does not conduct an enterprise's affairs through run-of-the-mill provision of professional services." *Taylor v. Bettis*, ___ F. Supp. 2d ___, 2013 WL 5460755, at *9 (E.D.N.C. 2013) (internal quotation marks omitted). It is only lawyers who *operate and manage* a racketeering

60

enterprise that can be subjected to RICO liability.  *Reves*, 507 U.S. at 179.

Finally, the *scienter* requirements of common-law fraud and mail and wire fraud ensure that only lawyers who act recklessly or intentionally will face liability.  These protections are robust on their own and, combined with the others, alleviate any concern that affirming the verdict will chill legitimate litigation activity.

### B.    Appellants Are Not Entitled To Judgment As A Matter Of Law On The Ground That There Was Insufficient Evidence

Appellants next contend that, even if the RICO and fraud claims are legally viable, CSXT failed to prove them, because there was insufficient evidence of (1) falsity, (2) reliance, and (3) causation.  Br.41-49.  Appellants' challenges to the sufficiency of the evidence should be rejected for two independent reasons.  First, appellants did not raise the challenges below and thus they have been forfeited.  Second, there was more than sufficient evidence as to each of the elements and thus the challenges lack merit.

### 1.    Appellants' challenges have been forfeited

In *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), the Supreme Court held that a failure to challenge the

61

sufficiency of the evidence in a post-verdict motion under Federal Rule of Civil Procedure 50(b) precludes a party from challenging the sufficiency of the evidence on appeal. In two independent ways, appellants have forfeited their sufficiency-of-the-evidence challenges by failing to raise them in their post-verdict motion.

*First*, unlike their claims on appeal, appellants' Rule 50(b) motion did not contest the sufficiency of the evidence that was actually before the jury. Instead, appellants argued that certain evidence *should not have been admitted* and that the *remaining* evidence was insufficient to support the verdict. *See Weisgram v. Marley Co.*, 528 U.S. 440, 444 (2000) (contrasting claim that "the evidence is rendered insufficient by the removal of erroneously admitted testimony" with claim that "the evidence, without any deletion, is insufficient"). To quote appellants' post-trial motion:

- "When the improperly admitted evidence and improper arguments of CSX are excluded," the evidence "is woefully insufficient to support the jury's verdict." Dkt1564.6.

- CSXT "obtained a verdict" through "the admission of irrelevant and prejudicial information and evidence" and

"failed to actually produce evidence of fraud or conspiracy."
Dkt.1564.13.

- "CSX obtained a verdict in its favor not by placing sufficient evidence of actual fraud before the jury but by prejudicing the jury's decision-making through the admission of a slew of irrelevant and prejudicial information ***." Dkt.1564.35.

Appellants' post-verdict motion thus was not a true challenge to the *sufficiency* of the evidence at all. It was a collection of challenges to the *admission* of evidence (the vast majority of which have not been renewed on appeal), together with a request for the remedy of judgment as a matter of law (or, in the alternative, a new trial). *See, e.g.,* Dkt.1564.15, 17-18, 22-23, 25, 27-30. "The moving party may appeal only from the grounds stated in the [Rule 50(b)] motion." *Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993). Appellants have appealed on different grounds.

*Second*, even if the Rule 50(b) motion could somehow be construed as a challenge to the sufficiency of all the evidence that was actually before the jury, appellants' sufficiency challenges on appeal still would not have been preserved. A motion for judgment as a matter of law

"must *specify* \*\*\* the law and facts that entitled the movant to the judgment." Fed. R. Civ. P. 50(a)(2) (emphasis added). As the district court correctly recognized, appellants' post-verdict motion "d[id] not explain exactly which elements CSX did not support with proper evidence." Dkt.1633.4. And as this Court has held, "summarily conclud[ing]" in a Rule 50(b) motion "that the evidence was insufficient" is inadequate to preserve such a challenge for appeal. *Belk*, 679 F.3d at 159.

Whether a Rule 50 motion should be granted "calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Unitherm*, 546 U.S. at 401 (internal quotation marks omitted). But a district judge "cannot [be] require[d] \*\*\* to read counsel's mind" in considering post-verdict challenges to the sufficiency of the evidence. *Belk*, 679 F.3d at 157. "The onus is on counsel to adequately convey his or her arguments and requests to the court, making an adequate record for meaningful appellate review." *Id.* at 157-58. Even assuming that they raised a true sufficiency-of-the-evidence challenge in their Rule 50(b) motion, appellants failed to

discharge that burden and thereby forfeited the claims they are seeking to raise on appeal.

## 2. Appellants' challenges lack merit

If the Court does not find that appellants' sufficiency-of-the-evidence challenges have been forfeited, they should be rejected on the merits. Appellants "face[] an extremely heavy burden in challenging the jury's verdict," *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 351 (4th Cir. 1994), and they have not come close to meeting it.

### a. *There was sufficient evidence of falsity*

As the district court instructed the jury, "by filing a complaint, an attorney represents that he or she has conducted a reasonable inquiry into the facts, is satisfied that the suit is well-grounded in both the facts and the law, and that it has not been filed with any improper motive." Dkt.1550.23, Tr.1921-22. The lawyer defendants made this representation when they filed their complaints. The evidence that the representations were false—not just in one respect but in many—is not only legally sufficient but overwhelming. It includes the following:

- The lawyer defendants hired Harron because of his willingness to classify x-rays as "consistent with asbestosis" at an astronomically high rate and regardless of whether the

65

x-rays actually exhibited signs of asbestos exposure. The lawyer defendants regularly tracked Harron's positive-read rate, which was at least three to four times higher than that of any doctor they had previously used. Tr.302-03, 304-05, 307-08, 329, 334-35, 337, 339, 394, 444, 855-58, 916-17, 1039-40; Daley.2012.Dep.6-7; PX119, PX120, PX156.

- The lawyer defendants specifically instructed Harron—and Harron agreed—to identify signs of asbestosis (as opposed to other types of pneumoconiosis), modified the standard ILO form to facilitate this process, and told him to assume that everyone whose x-ray he reviewed had been exposed to asbestos, all in violation of ILO Guidelines and B-reading protocols. Tr.281-84, 547, 553-57, 660-61, 832-33, 838.

- While the prevalence of asbestosis among railroad workers is 2%, PX571, 575-577; Tr.849-55, 904, 921, Harron's positive B-read rate was at least 65%, Tr.620-21, 624-25.

- Harron's and Breyer's B-reads of the 11 illustrative claimants were "scientifically not credible," "disingenuous and scientifically dishonest," "scientifically invalid and

66

wrong," not explainable as an "honest mistake" or by "lack of competence and skill," and the product of a "purposeful *** systematic pattern of over-reading that does not match the scientific literature." Tr.855-58.

- No treating physician had diagnosed any of the illustrative claimants as having an asbestos-related disease before the lawyer defendants filed their claims, nor was there any evidence that any of them in fact had an asbestos-related disease at that time (or any other). Tr.855.

- The lawyer defendants knew that some if not all of the illustrative claimants lacked meaningful occupational exposure to asbestos. They also encouraged overstatement of, and in at least one instance falsified, exposure histories. Tr.342-46, 1438, 1479-81; Baylor.Dep.3-4; Daley.2012.Dep.8; PX115.5, 11; PX209; PX333.

- The lawyer defendants conducted no *bona fide* investigation before filing claims and, in at least one instance, ignored a medical record in their own files that ruled out the possibility of asbestosis. Tr.743, 748-50, 983, 1059-61, 1335-

36; Cassoff.Dep.5; Daley.2009.Dep.4; Daley.2012.Dep.1, 3-4; Knox.Dep.6-10, 18; PX327.

Appellants' arguments do not come close to undermining this evidence—and much more, *see* pp.4-18, 25-30, *supra*—of manufactured and fraudulently filed asbestosis claims. Still less do they show that no reasonable jury could find for CSXT on the basis of the evidence, particularly when it is "view[ed] *** in the light most favorable" to CSXT, with "all reasonable inferences" drawn in its favor. *Buckley v. Mukasey*, 538 F.3d 306, 321 (4th Cir. 2008).

Appellants first argue that "Harron read each claimant's x-rays positive." Br.45. But the evidence permitted the jury to find that Harron was a fraud and that the lawyer defendants knew it. Appellants next argue that the lawyer defendants subsequently "obtained a positive B-reading *** from *** Breyer." Br.46. But as this Court found in the prior appeal, "a reasonable jury could conclude Harron falsely certified [the] x-ray[s] and that Breyer was also involved in a similar scheme[,] particularly if the jury found Breyer's B-read came after receiving Harron's previous diagnosis." *Gilkison*, 406 F. App'x at 734 n.6.

Appellants also argue that Dr. Parker's blinded study, which rejected every one of Harron's B-reads, somehow compels a finding that Harron's B-reads were *not* fraudulent.  Br.46-47.  These arguments failed to persuade the jury, and they provide no basis for overriding its verdict.

Observing that Dr. Parker's panel read some x-rays as 0/1, appellants suggest that this was close enough to a positive B-read because it signifies that the reader "seriously considered" reporting the x-ray as positive.  Br.46.  That suggestion is wrong.  It is undisputed that, to be regarded as positive, an x-ray must be 1/0 or higher.  Tr.557, 593, 885.

Appellants also note that, in a few instances, one member of Dr. Parker's panel reported an x-ray as 1/0.  Br.46.  But the panel *consensus* rejected every one of Harron's positive reads.  And even if an individual x-ray could be read as positive, the jury could find from Harron's "systemic pattern of overreading"—issuing positive B-reads time and time again for x-rays that showed little or no evidence of asbestosis— that, in Dr. Parker's words, Harron's B-reads were intentionally "inaccurate and unreliable."  Tr.834, 858.  In any case, no member of the

panel reported an x-ray as 1/0 for the vast majority of claimants, and CSXT did not have to prove a lack of a good-faith basis as to *all* of them.

Finally, appellants argue that the evidence that the "prevalence rate of asbestosis among railroad workers is 2%" does not prove that the claimants "could not have had asbestosis" or that "there was no good-faith basis to believe that they did when their claims were filed." Br.48. As the district correctly recognized, however, evidence of the prevalence rate showed that "Harron's B-reads were [not] accurate and truthful." Dkt.1633.18. And there was at the very least circumstantial evidence that the lawyer defendants were aware of the prevalence rate, including evidence of Raimond's long experience with asbestos-related occupational claims, Tr.282, 432-39, and evidence that the studies finding a 2% prevalence rate were well-known and highly regarded, Tr.849-54, 903. That evidence is further proof that the lawyer defendants knew or at least suspected that Harron's B-reads were not accurate and truthful, and thus that the asbestosis claims lacked a good-faith basis.

### b. *Insofar as it was required, there was sufficient evidence of reliance*

As we have already explained, *see* pp.48-49, *supra*, reliance is not an element of RICO and appellants have forfeited any argument that it is. To the extent that appellants are challenging the RICO counts on the ground that CSXT did not prove reliance, their claim should therefore be rejected for this reason. Insofar as appellants are challenging the common-law counts on that ground (and even assuming that reliance is an element of RICO), their claim should be rejected because the evidence plainly established reliance.

This Court has already found it "[o]bvious[]" that "CSX would have 'relied' on the representation" made by the lawyer defendants "by filing" each mass lawsuit that they had a good-faith belief "that all elements of the cause of action were met." *Gilkison*, 406 F. App'x at 734. "Consequently," the Court held, "a reasonable jury could find CSX relied to its detriment on the [lawyer] defendants' alleged fraud" when it defended those suits. *Id.* The jury has now so found.

The jury also reasonably could find, and did find, that this reliance was justified. As Peirce himself admitted at trial, it is "a fair statement" that "CSX, as a defendant, was entitled to believe *** that

71

[he] was making legitimate allegations." Tr.964. He further admitted that it is "correct" that CSXT "was entitled to believe" that the lawyer defendants had a "good faith belief in the legitimacy of these allegations" and was "justified in relying on [the] allegations so [it] could start [its] defense." *Id.*

Despite these admissions, which by themselves defeat their claim on appeal, appellants argue that, as a matter of law, CSXT "could not have been fooled" by the false representations that the asbestosis claims had a good-faith basis. Br.43. But the jury could find that CSXT was not aware that the representations were false when they were made, because it had no knowledge of appellants' scheme at that time. Indeed, there is no evidence that CSXT even knew, at the time of filing, that the claims were based on Harron's B-reads.

Appellants claim that CSXT knew that Harron was one of the lawyer defendants' B-readers and should have suspected that he was a fraud. Br.43. But the jury could reasonably have found otherwise. After all, Raimond admitted at trial that he "never told [CSXT] the ***" rate" at which Harron was making positive B-reads and that CSXT had no way of knowing that Harron so rarely issued negative ones. Tr.399,

445-46. Even if Harron was suspected of being a "liberal reader," Br.8-9, that did not tell CSXT that he was a *fraud*—that, in Dr. Parker's words, he was "intent[ionally]" and "quite purposeful[ly]" reporting evidence of asbestosis where none existed. Tr.858.

### c. *There was sufficient evidence of causation*

The causation in this case is straightforward—indeed, self-evident: "[w]ithout the fraud, there would have been no case, and the appellee[] would not have been forced to expend [its] time and resources defending the lawsuit." *Pritt v. Suzuki Motor Co.*, 513 S.E.2d 161, 167 (W. Va. 1998). The lawyer defendants manufactured asbestosis claims and then filed them in mass lawsuits, falsely representing that they had a good-faith basis for the suits. Without the manufacture of the claims, the filing of the mass suits, and the representations that they had a good-faith basis, the cases could not have gone forward. *See* W. Va. R. Civ. P. 11(a). Because they did go forward, CSXT was forced to expend money defending them. CSXT thus suffered injury as a proximate result of the fraud and RICO violations.

Appellants nevertheless argue that there was insufficient evidence of causation because CSXT did not prove that "the *specific 11 FELA*

73

*claims* at issue here, and the Rule 11 certifications of *those specific 11* claims, caused CSX's damages." Br.42. Appellants' focus on the 11 illustrative claims is flawed on multiple levels.

To begin with, as appellants acknowledge, the "predicate acts" of racketeering that CSXT pleaded and then presented to the jury included the "FELA complaints," Br.37, not just the 11 illustrative claims. The filing of those complaints obviously caused CSXT to expend money defending them. Indeed, Peirce admitted as much at trial, Tr.995-96, and appellants appear to concede the point now, Br.43-44. For this reason, the jury could find that CSXT was injured "by reason of" the RICO violations. 18 U.S.C. § 1964(c).

In any event, the lawyer defendants did not—and could not— make separate Rule 11 certifications as to each individual claim; they made a single certification for each mass complaint. By signing and filing a complaint, a lawyer represents that there is a good-faith basis for the "pleading," for the "claims" in the pleading, and for "the allegations and other factual contentions" therein. W. Va. R. Civ. P. 11(b). The jury here was so instructed. Dkt.1550.23; Tr.1921-22. A complaint thus cannot properly be filed *at all* unless there is a good-

faith basis for *every* claim. It would be absurd to think that a lawyer could satisfy Rule 11 by filing a complaint that is only *partially* fraudulent. For this reason, the false representations here were made as to the mass suits, not merely the 11 individual claims, and it was the former as well as the latter that caused CSXT injury.

Finally, in their stipulation on damages, appellants *agreed* that "the amount of reasonable and necessary fees and expenses incurred by CSX in defense of the asbestos claims asserted by [the 11 claimants] *** represents the amounts spent by CSX for the defense of the complaints in which these eleven claims were asserted." Dkt.1516; Tr.959. Appellants cannot now take the position that CSXT's damages are attributable to the mass suits but not to the 11 illustrative claims.

### C.    Appellants Are Not Entitled To A New Trial On The Ground That The District Court Abused Its Discretion In Two Of Its Evidentiary Rulings

Litigants are "entitled to a fair trial but not a perfect one." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks omitted). "In reviewing a grant or denial of a new trial," therefore, "the crucial inquiry is whether an error occurred in the conduct of the trial that was so grievous as to have rendered the

trial unfair." *Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994) (internal quotation marks omitted). The district court ruled on dozens of evidentiary issues before and during trial. Some of the rulings favored CSXT, but a great many favored appellants. *See* pp.23-24, *supra*. As the court at one point observed, "what I have tried to do here is to structure this case so that it could be fair to both sides." Tr.627.

Appellants have now abandoned their challenges to all but two of the district court's evidentiary rulings: its admission of Dr. Parker's testimony and its ruling on "other FELA claims." Br.49-57. These are the only claims on appeal that have actually been preserved. But neither of the evidentiary rulings was error, much less error that was so grievous as to have rendered the trial unfair.

## 1. The district court did not abuse its discretion in admitting Dr. Parker's testimony

This Court accords trial judges "broad discretion in determining whether to admit expert testimony" and will not reverse such a determination absent "a clear abuse of discretion." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (internal quotation marks omitted). The district court's decision to admit the testimony of

Dr. Parker, a former head of the B-reader examination program, does not come close to being a clear abuse of discretion.

Appellants complain that, in forming his opinions, Dr. Parker relied in part on peer-reviewed studies that he did not conduct himself. But epidemiological studies like those discussed by Dr. Parker are regularly relied upon by medical experts in forming opinions about chemical exposure. *See* Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 551 n.2 (3d ed. 2011) ("[e]pidemiologic studies have been well received by courts deciding cases involving toxic substances," even though "[o]ften it is not the investigator who conducted the study who is serving as an expert witness") (collecting cases). Dr. Parker testified that he was familiar with these studies, that he regularly relies on such literature in his clinical practice and academic research, and that he justifiably relied on the studies in forming his opinion in this case. Tr.849-54.

Appellants nonetheless insist that Dr. Parker's discussion of the studies was "inadmissible hearsay," that he "should not have been permitted to merely regurgitate the studies," and that he is not qualified to discuss them because he is "not an epidemiologist or

statistician." Br.49-51. These arguments ignore Federal Rule of Evidence 703, which authorizes an expert to testify to facts and data underlying his conclusions if they are of a type that is reasonably relied upon by experts in the field (and to do so even if the underlying facts are not themselves admissible). *See, e.g.*, *Clinchfield R.R. v. Lynch*, 784 F.2d 545, 553-54 (4th Cir. 1986).

Appellants therefore err in relying, Br.51, on *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), and *Redman v. John D. Brush & Co.*, 111 F.3d 1174 (4th Cir. 1997). Unlike in *Mejia*, Dr. Parker did not "merely repeat[] information he had read or heard," 545 F.3d at 197, or "merely regurgitate" epidemiological studies, Br.51. Dr. Parker's opinion that Harron's B-reads were unreliable and intentionally false "resulted from his synthesis of various source materials," *Mejia*, 545 F.3d at 197—including not only epidemiological evidence, but also his blinded study and his knowledge and experience in the field—as specifically permitted by Rule 703. And unlike in *Redman*, which held that an expert witness could not rely on hearsay when there was "no proof and no reason to believe" that this was "information of a kind reasonably relied on by experts in the field," 111 F.3d at 1179, Dr.

78

Parker testified that he and other pulmonologists routinely rely on epidemiological studies in their clinical and academic work, Tr. 849-50.

Nor did the district court abuse its discretion by allowing the studies to be discussed simply because they involved workers at other railroads in Pennsylvania and Japan, not specifically at CSXT. The fact that the best-available studies are not perfect does not render them irrelevant or inadmissible. Dr. Parker himself told the jury that the studies are not perfect, but are still "the most scientifically credible published studies on the matter" and "well-regarded" in the field. Tr.853, 921. In any event, Dr. Parker explained that, even if the prevalence of asbestosis were somewhat higher, the difference between the reported incidence and Harron's B-reads was so extreme that his numbers still would not be plausible. Tr.852-53, 916-17.

Finally, appellants argue that Dr. Parker's testimony about prevalence rates was irrelevant, because (according to them) they had no knowledge of the studies. As the district correctly ruled in denying appellants' motion for a new trial, "[t]he prevalence rate was relevant to whether *** Harron's B-reads were accurate and truthful, regardless of whether [there was] any evidence showing that the lawyer defendants

were aware of the prevalence rate." Dkt.1633.18; *see* Tr.855-58, 916-17. And there was at the very least circumstantial evidence that the lawyer defendants *were* aware of the prevalence rate. Tr.282, 432-39, 849-54, 903. In light of that evidence, the prevalence rate was also relevant to the existence of the conspiracy and to whether the asbestosis claims had a good-faith basis.

Appellants engaged in "[v]igorous cross-examination" of Dr. Parker and presented substantial "contrary evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *see* Br.50-52. The district court did not abuse its discretion in admitting Dr. Parker's testimony and leaving appellants to those "traditional and appropriate means of attacking" it. *Daubert*, 509 U.S. at 596.

### 2. The district court did not abuse its discretion in its ruling on "other FELA claims"

Appellants next challenge the district court's finding that limited references during trial to fraudulently generated claims other than the 11 illustrative claims "do not constitute grounds for a new trial." Dkt.1633.7. That ruling was clearly correct and certainly not an abuse of discretion.

Appellants claim that CSXT violated an order of the district court that supposedly excluded all evidence, in any context, relating to FELA claims other than the 11 illustrative ones.  But no such order exists. The court granted appellants' pre-trial motion excluding evidence of other asbestosis claims to prove *fraud*, but left open the possibility that such evidence would be admitted in support of CSXT's *RICO* claims. *See* pp.24-25, *supra*.  At trial, the court stated that "I'm not sure that ruling, frankly, dealt with the RICO claim," Tr.326-27, and later "expanded that ruling a little bit because *** there should be some evidence as to pattern and practice, which would *** also go to motive and intent," Tr.627.

As for the order that actually *was* in place, the district court correctly recognized in its post-trial ruling that, for a violation of a court order to warrant a new trial, "the violation must be clear."  Dkt.1633.7 (citing *Pullman v. Land O'Lakes, Inc.*, 262 F.3d 759, 762 (8th Cir. 2001)).  In denying appellants' motion for a new trial, the district court, interpreting its own order, found that the only clear violations were a "few" comments by Dr. Parker during his lengthy testimony, and it rejected appellants' arguments that there were other clear violations.

Dkt.1633.8. In taking the position, contrary to the court's conclusion, that other argument or evidence violated its order, Br.55, appellants are "rowing against a strong current," because, "when a district court's decision is based on an interpretation of its own order," appellate review is "highly deferential." *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co.*, 472 F.3d 99, 114-15 (4th Cir. 2006) (internal quotation marks and alterations omitted). Appellants offer no reason to conclude that the district court misinterpreted its own order, much less that it acted so unreasonably as to have abused its discretion in doing so.

Nor did the court abuse its discretion in finding that any possible prejudice from Dr. Parker's isolated violations of its own order was cured by the court's contemporaneous rulings sustaining appellants' objections and instructing the jury to disregard the comments. *See, e.g., Koger v. Norfolk S. Ry.*, 411 F. App'x 634, 636 (4th Cir. 2011) (per curiam). "Juries are presumed to follow instructions provided them, and the mere fact the jury found for Appellee[] is not evidence that it ignored this curative instruction." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 427 (4th Cir. 1996) (citations omitted). That appellants can cite just two decisions reversing a judgment despite a curative instruction—

and that both are from outside this Circuit and decades old—serves only to confirm that an instruction to the jury is almost always sufficient to cure any prejudice. *See* Br.56n.29. As for the other two decisions cited by appellants, Br.56, neither held that a district court's ruling on a new-trial motion was an abuse of discretion. *See Taylor v. Va. Union Univ.*, 193 F.3d 219, 234-35 (4th Cir. 1999) (denial of motion not abuse of discretion); *McWhorter v. City of Birmingham*, 906 F.2d 674, 676-78 (11th Cir. 1990) (per curiam) (grant of motion not abuse of discretion).

Finally, the district court did not abuse its discretion in concluding that, even if everything appellants have complained of did violate its order, "the complained of comments over the course of a two-week trial" did not deny them "a fair trial." Dkt.1633.8-9. The court's finding that there was insufficient prejudice is entitled to heavy deference, "because the district judge [was] in a position to see and hear the witnesses and [was] able to view the case from a perspective that an appellate court can never match." *Bristol*, 41 F.3d at 186 (internal quotation marks omitted). Appellants fail to offer anything beyond speculation as a basis for overturning that determination. *See Power v. Arlington Hosp. Ass'n*,

42 F.3d 851, 868 (4th Cir. 1994). In any event, there was overwhelming evidence that appellants committed fraud and racketeering *at least* with respect to the 11 illustrative claims, so the other evidence of which appellants complain could not have had any appreciable effect on the verdict.

## II. ON ITS CONDITIONAL CROSS-APPEAL, CSXT IS ENTITLED TO HAVE ITS PUNITIVE-DAMAGES CLAIM SUBMITTED TO THE JURY IF A NEW TRIAL IS ORDERED

Before CSXT's case went to the jury, the district court denied appellants' motion for judgment as a matter of law as to all of CSXT's claims except its request for punitive damages on the common-law counts. Tr.1099-1100, 1722. The court reasoned that punitive damages in a fraud case can be awarded only for "gross fraud" and that there was insufficient evidence of gross fraud here. Tr.1100. The district court's ruling was inexplicable.

While West Virginia law permits a jury to award punitive damages in cases of "gross fraud," *e.g., JWCF, LP v. Farruggia*, 752 S.E.2d 571, 581 (W. Va. 2013) (per curiam), no West Virginia decision of which we are aware has defined that term. Other courts applying a similar rule, however, have indicated that it is sufficient (though

84

perhaps not necessary) for a finding of gross fraud that the defendant made multiple, intentional, affirmative misrepresentations.  *See, e.g.*, *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 512 (7th Cir. 1997); *Logsdon v. Graham Ford Co.*, 376 N.E.2d 1333, 1336 n.2 (Ohio 1978) (per curiam).  CSXT presented more than sufficient evidence to permit a reasonable jury to find gross fraud under this standard—or, for that matter, any other.

The evidence of gross fraud was overwhelming.  The proof at trial showed that appellants engaged in an elaborate and widespread scheme to defraud over the course of several years and that they perpetrated the fraud through a variety of means.  The evidence thus easily permitted the jury to find that the fraud was intentional, affirmative, and repeated.  Indeed, that the jury could and did find that appellants conducted (or conspired to conduct) the affairs of an enterprise through a pattern of mail and wire fraud conclusively establishes that the jury could find that appellants' actions rose above the level of garden-variety fraud.  Whatever else "gross fraud" means, it must at least mean that.

In the event that this Court orders a new trial on the common-law counts, therefore, it should reverse the judgment as a matter of law on

85

the punitive-damages claim and direct that that claim be submitted to the jury that retries the case.  This cross-appeal is conditional, meaning that CSXT is not seeking relief on its punitive-damages claim unless a retrial is ordered.

## STATEMENT REGARDING ORAL ARGUMENT

CSXT believes that the Court's decisional process would be aided by oral argument.  *See* Fed. R. App. P. 34(a)(2)(C).

## CONCLUSION

The judgment of the district court should be affirmed.  If this Court orders a new trial on CSXT's common-law claims, however, it should direct that CSXT's punitive-damages claim be submitted to the jury.

Dated:  April 28, 2014                                    Respectfully submitted,

                                                          /s/ *Dan Himmelfarb*

Marc E. Williams            Samuel L. Tarry, Jr.      Dan Himmelfarb
Robert L. Massie            Mitchell K. Morris        Scott M. Noveck
NELSON MULLINS RILEY        MCGUIREWOODS LLP          Jason R. LaFond
   & SCARBOROUGH LLP        One James Center          MAYER BROWN LLP
949 Third Avenue            901 E. Cary Street        1999 K Street, N.W.
Suite 300                   Richmond, VA 23219        Washington, DC 20006
Huntington, WV 25701        (804) 775-1000            (202) 263-3000
(304) 526-3501

*Attorneys for Plaintiff-Appellee / Cross-Appellant*
*CSX Transportation, Incorporated*

# ADDENDUM

18 U.S.C. § 1341 provides in pertinent part:

### §1341. Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. * * *

18 U.S.C. § 1343 provides in pertinent part:

### §1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. * * *

18 U.S.C. § 1961 provides in pertinent part:

### §1961. Definitions

As used in this chapter—

(1) "racketeering activity" means * * * (B) any act which is indictable under any of the following provisions of title 18, United States Code: * * * section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) * * *;

* * *

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

* * *

18 U.S.C. § 1962 provides in pertinent part:

### §1962. Prohibited activities

* * *

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1964 provides in pertinent part:

**§1964. Civil remedies**

&ast; &ast; &ast;

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee &ast; &ast; &ast;.

West Virginia Rule of Civil Procedure 11 provides:

**Rule 11. Signing of pleadings, motions and other papers; representations to court; sanctions.**

(a) **Signature.** — Every pleading, motion and other paper shall be signed by at least one attorney of record in the attorney's individual name, or if the party is not represented by an attorney shall be signed by the party. Each paper shall state the signer's address and phone number, if any, and The West Virginia State Bar identification number, if any. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

(b) **Representations to court.** — By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, and attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

89

(3) the allegations and other factual contentions have evidentiary support or, of specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) **Sanctions.** — If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) **How Initiated.** —

(A) **By motion.** — A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) **On court's initiative.** — On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) **Nature of sanction; limitations.** — A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, and order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, and order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

(B) Monetary sanction may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

(3) **Order.** — When imposing sanction, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

(d) **Inapplicability to discovery.** — Subdivisions (a) through (c) of this rule do not apply to discovery requests, responses, objections, and motions that are subject to the provisions of Rules 26 through 37.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No.  13-2235(L), 13-2252, 13-2325     Caption:  CSX Transportation, Inc. v. Peirce *et al.*

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.   **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines.  Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines.  Counsel may rely on the word or line count of the word processing program used to prepare the document.  The word-processing program must be set to include footnotes in the count.  Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because:

☒   this brief contains  16,499  [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   **Typeface and Type Style Requirements:**   A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒   this brief has been prepared in a proportionally spaced typeface using  Microsoft Word 2007  [*identify word processing program*] in  14-point Century Schoolbook  [*identify font size and type style*]; **or**

☐   this brief has been prepared in a monospaced spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Dan Himmelfarb

Attorney for  CSX Transportation, Inc.

Dated:  April 28, 2014

92

## CERTIFICATE OF SERVICE

I certify that, on this 28th day of April, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Dan Himmelfarb*

Dan Himmelfarb
*Counsel for Appellee / Cross-Appellant*
*CSX Transportation, Incorporated*