RECORD NOS. 13-2235(L), 13-2252, 13-2325 XAP

In The

# United States Court of Appeals
For The Fourth Circuit

## CSX TRANSPORTATION, INCORPORATED,

*Plaintiff – Appellee/Cross-Appellant*,

**v.**

## ROBERT N. PEIRCE, JR.; LOUIS A. RAIMOND; DR. RAY A. HARRON, M.D.,

*Defendants – Appellants/Cross-Appellees*,

**and**

### ROBERT V. GILKISON; PEIRCE, RAIMOND & COULTER, PC, a/k/a Robert Peirce & Associates, P.C., a Pennsylvania Professional Corporation; JOHN DOE(S); MARK T. COULTER,

*Defendants*,

### RICHARD CASSOFF, M.D.,

*Party-in-Interest*,

### LUMBERMENS MUTUAL CASUALTY COMPANY,

*Intervenor*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA AT WHEELING

———————

PAGE PROOF REPLY AND RESPONSE BRIEF OF
DEFENDANTS-APPELLANTS/CROSS-APPELLEES ROBERT N. PEIRCE, JR.,
LOUIS A. RAIMOND, AND DR. RAY A. HARRON, M.D.

———————

**L. Steven Emmert**
SYKES, BOURDON, AHERN & LEVY, P.C.
281 Independence Boulevard, 5th Floor
Virginia Beach, Virginia 23462
(757) 499-8971

**Walter P. DeForest, III**
David J. Berardinelli
DEFOREST KOSCELNIK
YOKITIS & BERARDINELLI
463 Seventh Avenue, 30th Floor
Pittsburgh, Pennsylvania 15219
(412) 227-3100

**Jerald E. Jones**
WEST AND JONES
360 Washington Avenue
Post Office Box 2348
Clarksburg, West Virginia 26301
(304) 624-5501

*Counsel for Defendants-Appellants/
Cross-Appellees Robert Peirce, Jr.
and Louis Raimond*

*Counsel for Defendants-Appellants/
Cross-Appellees Robert Peirce, Jr.
and Louis Raimond*

*Counsel for Defendant-Appellant/
Cross-Appellee Dr. Ray Harron, M.D.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ..........................................................................................3

    A.    CSX's liability theory impermissibly depends on allegedly improper Rule 11 certifications...............................................3

        1.    CSX's liability theory—and the verdict that rests on it—are defective as a matter of law.....................................3

            a.    As a matter of law, Rule 11 cannot be used to support a private civil recovery under RICO or common-law fraud............................................3

            b.    As a matter of law, CSX could not have justifiably relied on the Rule 11 certifications...................................9

            c.    Neither RICO nor the mail or wire fraud statutes imposes liability for Rule 11 violations.........................13

        2.    CSX's law-of-the-case and waiver arguments are meritless. .......................................................................15

            a.    Defendants, appellees in the prior appeal, were not required to raise their legal challenges as alternative grounds for affirmance. ................................15

            b.    The law-of-the-case doctrine does not apply.................18

            c.    Defendants properly raised their Rule 11 and justifiable-reliance legal arguments below ....................22

    B.    CSX failed to present sufficient evidence to prove that the Rule 11 certifications relating to the 11 FELA claims were false or that CSX justifiably relied to its detriment on them. ..........................26

        1.    CSX failed to adduce sufficient evidence of justifiable reliance. ...............................................................27

2.      CSX failed to present sufficient evidence of proximate causation.................................................................................29

3.      CSX failed to adduce sufficient evidence that the Rule 11 certifications of the 11 underlying claims were false. .............30

    a.      CSX failed to show that the 11 FELA claims lacked any evidence of exposure. ...................................31

    b.      CSX failed to show that the 11 positive B-reads were false or unreliable based on Dr. Parker's testimony.....................................................................33

    c.      CSX failed to show that the Peirce Firm knew the B-reads were false.............................................36

    d.      CSX's other evidence is irrelevant to its claim that the Peirce Firm filed the 11 FELA claims in violation of Rule 11. .......................................37

4.      Peirce and Raimond preserved their sufficiency arguments at the Rule 50 stage. .................................40

C.      In the alternative, this Court should order a new trial due to irrelevant and unfairly prejudicial evidence and argument to the jury.................................................................................43

1.      CSX fails to acknowledge this Court's controlling standard for determining whether an evidentiary error warrants a new trial. ...................................................43

2.      CSX has not met its burden to show that the admission of Dr. Parker's asbestosis prevalence rate testimony almost surely did not lead to the verdict................................44

3.      CSX has not met its burden to show that its repeated references at trial to "thousands" of supposedly false FELA claims filed by the Peirce Firm almost surely did not lead to the verdict...............................................46

CSX's CROSS-APPEAL ............................................................... 47

    CSX's Rule 11-based fraud theory, even if proved, falls well short of the crime-like "gross fraud" required to support punitive damages under West Virginia law. ........................................................ 47

CONCLUSION ...................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*,
  272 F.3d 276 (5th Cir. 2001) ........................................................ 19, 21

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ................................................................18

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
  237 F.3d 394 (4th Cir. 2001) ..............................................................6, 7

*Bank of Montreal v. Signet Bank*,
  193 F.3d 818 (4th Cir. 1999) ..................................................................43

*Belk, Inc. v. Meyer Corp., U.S.*,
  679 F.3d 146 (4th Cir. 2012) ..................................................................25

*Biggs v. Eaglewood Mortg., LLC*,
  353 F. App'x 864 (4th Cir. 2009) ................................................... 10, 11

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ....................................................................... 10, 11

*Buckley v. Mukasey*,
  538 F.3d 306 (4th Cir. 2008) ..................................................................43

*Chevron Corp. v. Donziger*,
  2014 WL 815553 (S.D.N.Y. Mar. 4, 2014) .........................................14

*City of St. Louis v. Praprotnik*,
  485 U.S. 112 (1988) ................................................................................25

*Clark v. Druckman*,
  624 S.E.2d 864 (W. Va. 2005) ....................................................... 6, 7, 9

*College Loan Corp. v. SLM Corp.*,
  396 F.3d 588 (4th Cir. 2005) .......................................................... 25, 26

*Cont'l Ins. Co. v. Fed. Express Corp.*,
  454 F.3d 951 (9th Cir. 2006) ..................................................................21

*Cook v. Heck's Inc.*,
  342 S.E.2d 453 (W. Va. 1986) ...............................................................49

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ..................................................................44

*Crocker v. Piedmont Aviation, Inc.*,
  49 F.3d 735 (D.C. Cir. 1995) ....................................................... 16, 18

*CSX Transp., Inc. v. Gilkison*,
  406 F. App'x 723 (4th Cir. 2010)........................................... 20, 22, 23

*Danforth v. Minnesota*,
  552 U.S. 264 (2008) .........................................................................9

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) .........................................................................43

*Doe v. Chao*,
  511 F.3d 461 (4th Cir. 2007) ....................................................... 16, 17

*Eberhardt v. Integrated Design & Constr., Inc.*,
  167 F.3d 861 (4th Cir. 1999).........................................................42

*Ebker v. Tan Jay Int'l Ltd.*,
  739 F.2d 812 (2d Cir. 1984) ..........................................................26

*Eichorn v. AT&T Corp.*,
  484 F.3d 644 (3d Cir. 2007) ....................................................... 16, 18

*Essroc Cement Corp. v. CTI/D.C., Inc.*,
  720 F. Supp. 2d 131 (D.D.C. 2010) ...............................................49

*Feld Entm't Inc. v. Am. Soc'y for Prevention of Cruelty to Animals*,
  873 F. Supp. 2d 288 (D.D.C. 2012) .................................................6

*FindTheBest.com, Inc. v. Lumen View Tech. LLC*,
  --- F. Supp. 2d ---, 2014 WL 2050610 (S.D.N.Y. May 19, 2014) ......................10

*First Union Commercial Corp. v. GATX Capital Corp.*,
  411 F.3d 551 (4th Cir. 2005).........................................................26

*Fogel v. Chestnutt*,
  668 F.2d 100 (2d Cir. 1981) ..........................................................17

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
  341 F.3d 1292 (11th Cir. 2003)................................................... 8, 13

*Handeen v. Lemaire*,
  112 F.3d 1339 (8th Cir. 1997) ......................................................7, 8

*Heathcoat v. Potts*,
  905 F.2d 367 (11th Cir. 1990).......................................................17

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010) .........................................................................29

*Henry v. Kemp*,
   829 P.2d 505 (Colo. Ct. App. 1992)........................................................3

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992) ...............................................................................29

*Issaschar v. ELI Am. Friends of Israel Ass'n for Child Prot., Inc.*,
   2014 WL 716986 (E.D. Pa. Feb. 25, 2014).........................................10

*Laitram Corp. v. NEC Corp.*,
   115 F.3d 947 (Fed. Cir. 1997) ..................................................... 16, 18

*Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.*,
   --- F. App'x ---, 2014 WL 504086 (4th Cir. Feb. 10, 2014) ...............42

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005)..................................................................14

*Lowery v. Ala. Power Co.*,
   483 F.3d 1184 (11th Cir. 2007)..............................................................12

*Mallard v. Prudential Ins. Co.*,
   1996 WL 170126 (M.D. Ala. Mar. 29, 1996) ......................................12

*Manhattan Constr. Co. v. Place Props. LP*,
   2014 WL 998181 (11th Cir. Mar. 17, 2014) ........................................31

*Meyers v. Lamer*,
   743 F.3d 908 (4th Cir. 2014).......................................................... 12, 24

*Montalvo v. Sondes*,
   637 So.2d 127 (La. 1994).........................................................................3

*Napoli v. United States*,
   32 F.3d 31 (2d Cir. 1994) .......................................................................14

*Nw. Ind. Tel. Co. v. F.C.C.*,
   872 F.2d 465 (D.C. Cir. 1989) ...............................................................17

*O'Malley v. New York City Transit Auth.*,
   896 F.2d 704 (2d Cir. 1990) ...................................................................40

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) ..................................................................................12

*Perrine v. E.I. du Pont de Nemours & Co.*,
   694 S.E.2d 815 (W. Va. 2010) ...............................................................48

*Persinger v. Norfolk & W. Ry. Co.*,
   920 F.2d 1185 (4th Cir. 1990) ...............................................................43

*Raymark Indus. v. Stemple*,
　1990 WL 72588 (D. Kan. May 30, 1990) ...........................................12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
　530 U.S. 133 (2000) ................................................ 26, 29

*Roboserve, Inc. v. Kato Kaguku Co.*,
　78 F.3d 266 (7th Cir. 1996) ...............................................49

*Sejman v. Warner-Lambert Co.*,
　845 F.2d 66 (4th Cir. 1988) ........................................ 19, 22

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
　2014 WL 1801139 (E.D.N.Y. May 7, 2014)......................................10

*State Farm Mut. Auto. Ins. Co. v. Makris*,
　2003 WL 924615 (E.D. Pa. Mar. 4, 2003) ...........................................6

*Stewart v. Dutra Constr. Co.*,
　418 F.3d 32 (1st Cir. 2005) ................................................17

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het
　Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
　407 F.3d 34 (2d Cir. 2005) ................................................21

*Taylor v. Va. Union Univ.*,
　193 F.3d 219 (4th Cir. 1999) ...............................................43

*Tristar Investors, Inc. v. Am. Tower Corp.*,
　2014 WL 1327663 (N.D. Tex. Apr. 3, 2014)......................................10

*U.S. ex rel. May v. Purdue Pharma L.P.*,
　737 F.3d 908 (4th Cir. 2013) ...............................................24

*United States v. Articles of Drug*,
　601 F. Supp. 392 (D. Neb. 1984) ..........................................3

*United States v. Eisen*,
　974 F.2d 246 (2d Cir. 1992) ......................................... 6, 14

*United States v. Murr*,
　681 F.2d 246 (4th Cir. 1982) ...............................................14

*United States v. Pritt*,
　238 F.3d 417 (4th Cir. 2000) ...............................................14

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
　546 U.S. 394 (2006) ...............................................24

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ................................................................ 40, 41

*Wentworth v. Hedson*,
   248 F.R.D. 123 (E.D.N.Y. 2008) ........................................................3

### Rules

Fed. R. Civ. P. 50 .............................................................. *passim*

Fed. R. Evid. 403 .........................................................................45

W. Va. R. Civ. P. 11....................................................... *passim*

### Other Authorities

Mayer Brown LLP, Federal Appellate Practice (2d ed. 2013)...............................38

## PRELIMINARY STATEMENT

This much is clear from the opening briefs:  In order to resolve this appeal, this Court must decide whether lawyers can be held liable to their clients' opponent under RICO and common-law fraud when the opponent claims a violation of Rule 11 of the West Virginia Rules of Civil Procedure—a rule patterned after the federal version and enshrined in the procedural codes of most, if not all, 50 states.

If the Court concludes that lawyers cannot be thus held liable, it must reverse.  If it concludes that they can be, and despite multiple other reasons for reversal here, that ruling alone—the first of its kind from an appellate court in this country—will unleash severe consequences on lawyers, their clients, and our civil justice system.  It will especially burden the federal courts, which will see an influx of similar punitive RICO suits by corporations against lawyers who dared sue them on behalf of injured individuals.

But our legal system is built on fairness and justice, not, as CSX would have it, vengeance and retribution.  And CSX's attempt to use Rule 11 to recover RICO's drastic treble damages is, in any case, defective as a matter of law.  Rule 11 cannot be used to support a private civil recovery or establish an element of a civil cause of action.  Nor can a sophisticated corporate litigant such as CSX justifiably rely on its adversary's lawyer's Rule 11 certification of claims filed against it.  CSX cites no authority that says otherwise.

A mistaken acceptance of CSX's unprecedented legal theory hardly ends this appeal, though, because CSX never proved what it had to in order to support the jury's verdict:  That the Peirce Firm falsely certified, under Rule 11, FELA claims that it filed against CSX on behalf of 11 railroad workers CSX exposed to asbestos; and that CSX, a well-heeled, sophisticated corporate litigant, justifiably relied to its detriment on those certifications or had injuries caused "by reason of" those certifications.  Rather, the evidence that this Court must accept established only that the Peirce Firm relied on an expert whose x-ray readings were confirmed by multiple other experts—including CSX's own—and disputed by others.  But this is nothing more than a battle of experts over an inherently subjective matter (x-ray "B-reading") in litigation—it is not fraud, and it certainly is not "racketeering" subject to RICO's extreme sanctions.

In seeking to justify its extraordinary request for nearly $11 million in attorneys' fees, CSX previously boasted about its "novel" and "unprecedented" claims, requiring the parties and the District Court to "sail[] in uncharted waters," and how it obtained the "*only* [RICO] verdict ever obtained against a lawyer or doctor based on fraudulent personal injury lawsuits."[1]  But now on appeal, CSX has replaced that grandiose description with the notion that this case is garden-variety and "business as usual" under RICO.  Nothing could be further from the

---

[1]    *See* Dkt.1566.6,9n.7,17 (emphasis original).

truth. This appeal presents critically important questions of first impression that, under settled principles of Rule 11 and RICO jurisprudence, should be resolved in Defendants' favor.

## ARGUMENT

**A.    CSX's liability theory impermissibly depends on allegedly improper Rule 11 certifications.**

**1.    CSX's liability theory—and the verdict that rests on it—are defective as a matter of law.**

**a.    As a matter of law, Rule 11 cannot be used to support a private civil recovery under RICO or common-law fraud.**

In their opening brief ("Op.Br."), Defendants demonstrated that CSX's theory of liability was based on the Peirce Firm's Rule 11 certifications made upon filing the 11 FELA claims at issue. (Op.Br.14-15,24) They further showed that such a theory controverted controlling precedent that bars attempts such as CSX's to use alleged Rule 11 violations as the basis for a civil recovery under private rights of action. (*Id.*25-30).[2]

---

2    *See also Wentworth v. Hedson*, 248 F.R.D. 123, 125 (E.D.N.Y. 2008) ("There is no private right of action under Rule 11.") (citations omitted); *Montalvo v. Sondes*, 637 So.2d 127, 131 n.6 (La. 1994) (Rule 11 "does not create a private cause of action, but is rather a remedial tool available to the court") (citations omitted); *Henry v. Kemp*, 829 P.2d 505, 506-07 (Colo. Ct. App. 1992) ("[T]he remedy provided by C.R.C.P. 11 is exclusive; an independent claim, based upon an alleged violation of C.R.C.P. 11, may not be asserted in separate proceedings.") (citing *United States v. Articles of Drug*, 601 F. Supp. 392, 398 (D. Neb. 1984) (same)).

CSX ignores Defendants' authorities and cites no case that comes close to endorsing its novel and dangerous Rule 11 liability theory—because there is none.[3] Without any supporting case law or record evidence, CSX instead makes a series of half-hearted attempts to deflect Defendants' arguments by claiming that its causes of action do not depend on Rule 11 violations, when indisputably they do.

CSX first asserts that it "did not attempt to bring a claim for a violation of Rule 11 and did not seek remedies under Rule 11." (CSX.Br.43). But CSX's own words in the District Court, and elsewhere in its brief on appeal, refute its attempt to revise the liability theory that it chose. (Op.Br.14-15,24 (citing record); CSX.Br.43-44 (admitting that Rule 11 "defines the nature of the representation that is made when a suit is filed"); *id.*50 (stating that its "theory is . . . that [it] relied on [the Peirce Firm's] representation that there was a good-faith basis for" the FELA claims); Dkt.1521.1-2). There can be no doubt that the substantive elements of CSX's claims depend on Rule 11.[4]

It then contends that, while CSX is not "attempting to use Rule 11 as a sword to recover from appellants[,]" it is appellants who "are seeking to use Rule

---

3  CSX further ignores Defendants' argument (Op.Br.29) that the claims here cannot properly be resolved by a jury. Those claims required the jury to decide whether CSX proved that Peirce and Raimond violated Rule 11 when they filed the 11 FELA claims. But only courts can administer Rule 11. (*Id.*).

4  CSX denied any suggestion that it relied on the *allegations* of the underlying complaints. (CSX.Br.50).

11 as a shield from liability. . . ." (*Id.*45) (emphasis removed).  But CSX admits that Rule 11 is critical to its "offensive" claims because without it, there is no misrepresentation and there is no reliance, both of which are required elements of CSX's fraud and RICO claims.  (*Id.*43-44,50; Op.Br.30-31,34-36).

The notion that Defendants are trying to use Rule 11 as a shield or "immuni[ty]" from liability for "litigation misconduct" (CSX.Br.45) is plainly wrong, too.  Defendants did not bring this lawsuit or inject Rule 11 into this case.  Rather, it was CSX that chose to assert in its third amended complaint, and then at trial, the novel theory that it was entitled to damages because it (allegedly) reasonably relied on the Peirce Firm's (allegedly) improper Rule 11 certifications.  (Op.Br.14,32).  Defendants' argument—that purported Rule 11 violations cannot support a private civil recovery—merely responds to this claim.

Having thus acknowledged that Rule 11 is essential to its fraud and RICO claims, CSX offers a few sweeping statements—that Rule 11 certifications "can give rise to common-law fraud or a violation of RICO if they are false and the other elements of the cause of action are satisfied" and that "[n]either West Virginia's common law of fraud nor the federal RICO statute excludes this type of

- 5 -

misrepresentation from its reach."  (CSX.Br.44).  But again, CSX cites nothing to

support these claims.[5]

CSX argues further that the "West Virginia Supreme Court of Appeals has

explicitly endorsed 'claims of . . . fraud' arising from 'an attorney's conduct in the

litigation process,' even in the face of a general litigation privilege and the

availability of sanctions under Rule 11."  (CSX.Br.45-46 (quoting *Clark v.*

*Druckman*, 624 S.E.2d 864, 871-72 (W. Va. 2005)).  But the court in *Clark* did not

suggest that the filing of a lawsuit in violation of Rule 11 constitutes actionable

fraud.  To the contrary, *Clark* aligns with what this Court said in *Baltimore Scrap*

*Corp. v. David J. Joseph Co.*:  That, other than the specific litigation-misconduct

torts (abuse of process and malicious prosecution, which CSX did not bring in this

---

[5]  CSX later cites cases that, it claims, "authorized RICO claims in similar
circumstances."  (CSX.Br.45n.7).  But none of these cases resemble this one—
especially because none involved civil RICO claims predicated on an adversary's
lawyer's purported Rule 11 violation.  *See, e.g., United States v. Eisen*, 974 F.2d
246, 251, 253 (2d Cir. 1992) (affirming criminal RICO conviction of attorneys
who engaged in a scheme to defraud involving counterfeit claims, bribery of
witnesses, and creation of false evidence); *Feld Entm't Inc. v. Am. Soc'y for*
*Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318-19, 327-28 (D.D.C.
2012) ("Plaintiff's allegations in the [complaint] are not limited to claims that
defendants filed false documents with the Court or otherwise engaged in frivolous
and harassing litigation; they claim the entire lawsuit was based on bribery of the
lead plaintiff and witness."); *State Farm Mut. Auto. Ins. Co. v. Makris*, 2003 WL
924615, at *2 (E.D. Pa. Mar. 4, 2003) (attorneys participated in insurance fraud by
preparing false claims submissions, filing complaints containing false sworn
verifications, and suborning perjury—all with "full knowledge" that auto accidents
were "staged and that the alleged injuries and damages were false").

case), the states' procedural and ethical rules, and the state courts and other bodies responsible for administering them, are more than capable of regulating litigation misconduct—particularly the filing of claims that might violate Rule 11. *Clark*, 624 S.E.2d at 871 (holding that filing of suits in violation of Rule 11 might support a malicious prosecution claim, but would not support a negligence claim, and that West Virginia's "Rules of Civil Procedure"—including Rule 11—"[West Virginia's] Rules of Professional Conduct, and the court's inherent authority provide adequate safeguards to protect against abusive and frivolous litigation tactics"); *Baltimore Scrap*, 237 F.3d 394, 403 (4th Cir. 2001) (concluding that "if [an attorney] did indeed misrepresent facts to the court, the proper remedy here is through [state] law, whether it be through the sanctioning process of the state bar, the state Rules of Civil Procedure, or another similar process.  The states are perfectly capable of handling malfeasance in their own courts.") (citations omitted).

Finally, citing *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997), CSX contends that "the unavailability of a private right of action under Rule 11" does not make "a RICO remedy unavailable for litigation misconduct."  (CSX.Br.46-47).  But Defendants are not arguing—and need not argue—that "litigation misconduct" can never give rise to a viable RICO claim.  Their argument is that a violation of Rule 11, in the filing of lawsuits in a state court, does not give rise to a

viable RICO claim. Here, unlike in *Handeen*, there is no basis for imposing RICO's extreme penalties apart from the purported Rule 11 violations; Rule 11 is the sole basis for the purported misrepresentation that CSX was required to prove. *Handeen*, 112 F.3d at 1342-45 & n.8 (affirming summary judgment for defendant on RICO claims based on Rule 11 but reversing summary judgment for defendant on RICO claims alleging that the law firm actively participated in a broad scheme to avoid paying a judgment to the plaintiff and to defraud the bankruptcy court).[6]

The U.S. Supreme Court, this Court, the West Virginia Supreme Court of Appeals, and other appellate courts have all emphatically stated that Rule 11 is not a "substitute for tort damages," and does not exist "to compensate wronged parties by means of affirmative relief," give rise to an "independent cause of action," or create "substantive rights." (Op.Br.25-26) (citations omitted). CSX offers no explanation for how Rule 11 nevertheless can form the basis of its RICO and fraud claims, the jury's verdict, or the nearly $11 million in attorneys' fees it seeks.

---

[6] CSX also misstates the Eleventh Circuit's holding in *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292 (11th Cir. 2003) (cited at Op.Br.27). It claims *Green Leaf Nursery* is distinguishable because the "dismissal there was predicated on Florida's litigation privilege, which, unlike West Virginia's, contains no exception for fraud." (CSX.Br.46n.5). That is untrue. Florida's litigation privilege only provided the grounds in that appeal for affirming the dismissal of plaintiffs' state law claims, not their RICO claims. *Green Leaf Nursery*, 341 F.3d at 1302-03. The Eleventh Circuit explicitly affirmed the dismissal of the plaintiffs' RICO claims because the plaintiffs "cannot demonstrate justifiable reliance" on alleged misrepresentations in discovery responses provided in an adversarial litigation. *Id.* at 1306-08.

In the end, if Mr. Peirce or Mr. Raimond violated West Virginia Rule 11 when their firm filed the 11 FELA lawsuits, the West Virginia courts had all the power they needed to sanction that conduct. *Clark*, 624 S.E.2d at 871. Creating broad new categories of RICO and fraud liability for that conduct thus not only is unnecessary; it threatens to interfere with the state courts' settled jurisdiction over the conduct of lawyers in the cases before them. It also forces the federal courts, in separately filed civil cases, into a supervisory role over state courts that they constitutionally may not perform. *See Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) ("While we have ample authority to control the administration of justice in the federal courts—particularly in their enforcement of federal legislation—we have no comparable supervisory authority over the work of state judges.") (citation omitted).

> **b.    As a matter of law, CSX could not have justifiably relied on the Rule 11 certifications.**

In their opening brief, Defendants argued that CSX's claims failed as a matter of law for an independently sufficient reason: CSX could not have justifiably relied on the Peirce Firm's Rule 11 certifications relating to the 11 FELA claims and therefore cannot satisfy the "by reason of" causation element of RICO or the justifiable reliance element of common law fraud. CSX's response here is noticeably bereft of supporting authorities too—because there are none.

CSX first contends that it was not required to prove justifiable reliance to establish its RICO claims under *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) and this Court's unpublished decision in *Biggs v. Eaglewood Mortgage, LLC*, 353 F. App'x 864 (4th Cir. 2009) (per curiam).   (CSX.Br.49). CSX merely quotes the language from *Bridge* that RICO plaintiffs routinely rely on for this point, but it ignores the rest of the opinion, which clearly articulates the need to show some form of reliance in a mail or wire fraud civil RICO case in order to prove RICO's "by reason of" causation element.  Post-*Bridge*, courts have repeatedly reached the same conclusion.[7]

This Court's unpublished decision in *Biggs* is not to the contrary.  Although this Court affirmed the grant of summary judgment to defendants on plaintiffs' RICO claims there, it stated, in dicta, that *Bridge* eliminated the requirement that a plaintiff prove reliance in order to prove a RICO "violation."  353 F. App'x at 867. The Court did not appear to say, however, that reliance would *never* be required in

---

[7]   Op.Br.32-34; *see also FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 2014 WL 2050610, at *6 (S.D.N.Y. May 19, 2014) ("Because a plaintiff must show [under RICO] that he is 'injured in his business or property by reason of' a pattern of mail or wire fraud, reliance is an essential part of demonstrating causation between a defendant's misrepresentations and the plaintiff's injury."); *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 2014 WL 1801139, at *20 (E.D.N.Y. May 7, 2014) (same); *Tristar Investors, Inc. v. Am. Tower Corp.*, 2014 WL 1327663, at *12, *14 (N.D. Tex. Apr. 3, 2014) (same); *Issaschar v. ELI Am. Friends of Israel Ass'n for Child Prot., Inc.*, 2014 WL 716986, at *5 (E.D. Pa. Feb. 25, 2014) (same).

- 10 -

a mail fraud RICO case in order to establish RICO *causation*. And the Court did not specifically address RICO's "by reason of" requirement. To the extent that *Biggs* could be read to stand for the proposition that reliance is *never* necessary to establish RICO's "by reason of" requirement, it is at odds with *Bridge*.[8]

On the merits of Defendants' justifiable reliance argument, CSX acknowledges that its theory of liability is that it "relied on [the Peirce Firm's Rule 11] representation that there was a good-faith basis for those claims" (CSX.Br.50); *see also* Dkt.853¶¶164-65). But CSX can never show that it could, as a matter of law, have justifiably relied to its detriment on the certifications.

CSX does not address any of Defendants' authorities (Op.Br.25-27,35-36) holding that a purported Rule 11 violation cannot be used to prove the substantive elements of a private right of action. It makes the bold claim that a "defendant is entitled to assume, without further inquiry, that the plaintiff's lawyers have complied with their obligations under Rule 11 . . . and that counsel's representation that there is such a basis is true." (CSX.Br.51). But CSX cites nothing to support this assertion.

CSX's principal authorities are this Court's decision in the prior appeal and Mr. Peirce's trial testimony. But this Court, in the prior appeal, did not specifically

---

8   Notably, neither this Court, nor any court other than the District Court in this case, has cited *Biggs* for its interpretation of *Bridge*.

- 11 -

consider or decide the justifiable reliance question. (*Infra* 18-22). And, of course, Mr. Peirce's general statement that CSX was "entitled to believe" that there was a good-faith basis for the 11 FELA claims at issue is not cognizable *legal* support for the proposition of *law* that CSX advances.[9] Beyond this, CSX cites a few cases (CSX.Br.51n.6), but none of those holds or even implies that a Rule 11 certification constitutes an affirmative representation of fact upon which a litigation adversary can justifiably rely.[10]

CSX then contends (at 51-52) that a Rule 11 certification is made not only to courts but also to one's adversary in the lawsuit. CSX again ignores the authorities

---

[9]    Even if Mr. Peirce's testimony could be characterized as some concession on the justifiable reliance legal argument Defendants raise on appeal, it certainly has no binding effect on this Court, which "retains the independent power to identify and apply the proper construction of governing law." *Meyers v. Lamer*, 743 F.3d 908, 913 (4th Cir. 2014) (citations and internal quotation marks omitted); *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953) (courts "not bound to accept" party's "concession . . . on a question of law").

[10]    *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007) (in removing an action to federal court, the defendant makes "a representation that the action belongs before the court" and "we"—meaning, the court—"assume that [a Rule 11] representation is made in good faith") (citation omitted); *Mallard v. Prudential Ins. Co. of Am.*, 1996 WL 170126, at *2 (M.D. Ala. Mar. 29, 1996) (in evaluating the timeliness of removal, finding "that it was reasonable for the Defendants to rely on the veracity of the pleadings"—not the Rule 11 certification—"and the Defendants are therefore not charged with knowledge of removability" prior to learning of the falsity of the allegations); *Raymark Indus. Inc. v. Stemple*, 1990 WL 72588, at *2, *5, *12 (D. Kan. May 30, 1990) (finding that plaintiff was entitled to rely on mandatory attorney certifications accompanying thousands of claims forms submitted pursuant to a class action settlement in paying those claims).

- 12 -

cited in Defendants' opening brief at 35-36, which confirm that a Rule 11 certification is made to the court, not one's adversary. And CSX does not cite a single case for its claim, relying instead (at 52) on a section of the Restatement (Second) of Torts dealing with misrepresentations in arms-length *business transactions.* No court has ever cited that provision for the proposition that a litigant can rely on its adversary's Rule 11 certification.

Finally, CSX challenges (at 52-53) Defendants' reliance on *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, where the Eleventh Circuit explained that a litigant cannot rely even on its adversary's signed discovery responses— which, unlike Rule 11 certifications, do make representations to the litigant. 341 F.3d 1292, 1305 (11th Cir. 2003). CSX contends that *Green Leaf Nursery* implicitly acknowledges that there may be circumstances where a litigant can justifiably rely on its adversary's representations. But this proves too much: As noted, Defendants need not, and do not, argue that a litigant can never rely on representations made to it by its adversary. Rather, Defendants argue that a litigant cannot rely on its adversary's lawyer's Rule 11 certifications. *Green Leaf Nursery* is squarely on point.

### c. Neither RICO nor the mail or wire fraud statutes imposes liability for Rule 11 violations.

Defendants have asserted a third legal challenge to the judgment below— that the filing of a lawsuit, even one in violation of Rule 11, is not a violation of

the mail and wire fraud statutes or a "predicate act" under RICO. (Op.Br.36-41). Once again, CSX has no meaningful response.

CSX cites a number of cases where courts found that certain litigation-related conduct violated the mail or wire fraud statutes or amounted to RICO predicate acts.[11] (CSX.Br.53-56&n.7). But none of these involved RICO claims, like CSX's, founded on a purported Rule 11 violation in the filing of a lawsuit.[12]

CSX's response to the argument that affirmance here will chill lawyers' advocacy is no response at all. The chilling effect that would result here is not, as CSX suggests, that lawyers would be reluctant to engage in the gross misconduct in CSX's selected cases, such as the outrageous bribery-driven scheme in *Chevron*. Rather, it is that lawyers would be reluctant to file cases for their injured clients at all unless absolutely certain that the law and the evidence ultimately will be found

---

[11] CSX relies heavily on this Court's decisions in *United States v. Murr*, 681 F.2d 246 (4th Cir. 1982) and *United States v. Pritt*, 238 F.3d 417 (table), 2000 WL 1699833, at *6-8 (4th Cir. 2000) (per curiam). But neither *Murr* nor *Pritt* involved a civil RICO claim based on a Rule 11 violation. (*See also* Op.Br.41n.26).

[12] CSX cites a number of cases for its assertion that that "those who use litigation to further racketeering activity are routinely subjected to RICO liability." (CSX.Br.56.n7). None of those cases addressed whether RICO liability can be imposed where the only alleged predicate acts are complaints and other litigation-related documents, however, and each involved extreme misconduct such as bribery, extortion, and witness tampering that is not present here. *See, e.g., Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 364-65 (9th Cir. 2005) (witness tampering); *Napoli v. United States*, 32 F.3d 31, 33 (2d Cir. 1994) (witness bribery); *Eisen*, 974 F.2d at 253 (same); *Chevron Corp. v. Donziger*, 2014 WL 815553 (S.D.N.Y. Mar. 4, 2014) (extortion, money laundering, obstruction of justice and witness tampering including judicial bribery).

- 14 -

to prove each element of their claims. (Op.Br.47-48). Without that unachievable certainty, there is little doubt that the threat of treble RICO damages and, as here, millions or tens of millions of attorneys' fees—not to mention the stigma of being branded a "racketeer"—will substantially deter lawyers from filing legitimate file lawsuits on behalf of their clients.

### 2.    CSX's law-of-the-case and waiver arguments are meritless.

Given the legal defects in the case that CSX was erroneously permitted to try, it should come as no surprise that it spends nine pages of its brief asserting varieties of waiver and law-of-the-case arguments aimed at persuading this Court not to pull back the curtain. It asserts that the prior appeal before this Court—which did not involve or resolve the legal issues that Defendants raise now—nonetheless precludes Defendants from asserting those issues under various law of the case and waiver theories. It also argues that, even if the prior appeal does not bar Defendants' contentions, Defendants forfeited them by failing to raise them properly in the District Court. None of these arguments has any merit.

### a.    Defendants, appellees in the prior appeal, were not required to raise their legal challenges as alternative grounds for affirmance.

CSX argues (at 40) that Defendants waived their legal challenges to CSX's Rule 11 legal theory because, as appellees in CSX's prior appeal, they did not attack the theory at that time. CSX thus invokes the "derivative waiver rule"—a

- 15 -

"weaker" variant of the law of the case doctrine under which "[a] legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, governs future stages of the same litigation[.]" *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (citation omitted). The derivative waiver rule is plainly inapplicable here.

The law is clear that the rule does not apply to parties who were *appellees* in a previous appeal—particularly where, as in this case, appellees could not have cross-appealed any issue in that previous appeal, much less the issue claimed to have been waived. *Id.* at 740-41; *Eichorn v. AT&T Corp.*, 484 F.3d 644, 657-58 (3d Cir. 2007); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 954 (Fed. Cir. 1997). The derivative waiver rule rests on principles of judicial economy, *Crocker*, 49 F.3d at 740, and judicial economy is not promoted by requiring an appellee in those circumstances to assert every conceivable alternative ground for affirmance. *Eichorn*, 484 F.3d at 657-58; *Crocker*, 49 F.3d at 740 ("[F]orcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation.").

CSX relies (at 40) on this Court's decision in *Doe v. Chao*, 511 F.3d 461 (4th Cir. 2007), but *Doe* is not remotely on point. There, a plaintiff made numerous requests for attorneys' fees. One request (based on work performed on a

summary judgment motion) was granted, while the other request (based on work performed on a contempt motion) was denied. The plaintiff could have cross-appealed the denial of the latter claim, but it failed to do so. Thus, this Court concluded that the district court's denial of the request could not be revisited. *Id.* at 464-66. That is a far cry from this case, where Defendants—appellees in the prior appeal with no basis to file a cross-appeal because judgment had been rendered in their favor—did not raise every conceivable alternative ground for affirmance of that favorable ruling.

CSX cites out-of-circuit cases (at 40) to support its notion of derivative waiver, but they provide no support. *Stewart v. Dutra Construction Co.*, 418 F.3d 32 (1st Cir. 2005), is inapposite on its face. The appellee in the previous appeal had "made certain concessions" and the court emphasized that "[w]e do not mean to imply that a party who seeks summary judgment on one ground automatically waives other grounds should its motion be denied." *Id.* at 35-36 n.1. *Northwestern Indiana Telephone Co. v. F.C.C.*, did not even apply the derivative-waiver rule to a former appellee. 872 F.2d 465 (D.C. Cir. 1989). And in *Heathcoat v. Potts*, 905 F.2d 367 (11th Cir. 1990) (per curiam) and *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981), the courts made no mention of the party's previous status as appellee or the fact that judicial economy is defeated by a rule requiring appellees to raise

every conceivable ground for affirmance.  *See Eichorn*, 484 F.3d at 657-58; *Laitram Corp.*, 115 F.3d at 954; *Crocker*, 49 F.3d at 740.

### b.    The law-of-the-case doctrine does not apply.

CSX also maintains that, in the prior appeal, this Court silently took the extraordinary step of endorsing—and adopting as the law of this case—CSX's unprecedented Rule 11-based legal theory when the Court reversed the District Court's summary-judgment ruling on the sufficiency of the evidence as to one of the 11 FELA claims at issue.  (CSX.Br.38-41).

An unprecedented decision endorsing CSX's Rule 11 theory would be contrary to the text, history, and purpose of the rule, as well as the uniform case law construing it.  And it would galvanize a growing movement to use RICO to attack an adversary's lawyers and transform every state or federal lawsuit into a potential RICO suit later.  (Op.Br.1-2n.1,40).  But law of the case is a discretionary doctrine and it does not mandate acceptance of such an erroneous legal principle with such serious adverse consequences because the "ultimate responsibility of the federal courts, at all levels, is to reach the *correct* judgment under law."  *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (Law of the case "does not and cannot limit the power of a court …") (emphasis added).

More fundamentally, law of the case does not apply here because Defendants' Rule 11 and justifiable-reliance legal arguments were not decided by

this Court in the prior appeal. The doctrine applies both to questions "expressly addressed" and those decided by necessary implication, provided they were "fully briefed to the appellate court." *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001). It "does not reach questions which might have been decided but were not." *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks and citation omitted).

Neither the validity of CSX's Rule 11 theory of RICO liability, nor the question whether it could justifiably rely on the Rule 11 certifications for RICO purposes, were briefed or decided by this Court in CSX's prior appeal. That appeal was from a decision by the District Court granting summary judgment to Peirce and Raimond on CSX's state common-law fraud and civil-conspiracy claims—but not CSX's RICO claims—based on a single FELA claim filed on behalf of Earl Baylor.[13] (Dkt.785). The District Court found that there was no evidence that Peirce or Raimond knew that Baylor did not have asbestosis and, therefore, CSX could not show that Peirce and Raimond acted with the requisite scienter. (Dkt.785.10-11). The District Court did not mention, much less ground its decision in, the legal soundness of CSX's reliance on Rule 11 or the Peirce Firm's certifications.

---

[13] CSX's RICO claim based on Mr. Baylor's FELA claim was disposed of on other grounds. (Dkt.264.5-10).

On appeal, Peirce and Raimond defended the District Court's reasoning, but did not raise either of the legal arguments that CSX now claims are barred. (CANo.09-2135, Dkt.91). Nor did this Court analyze or resolve those arguments anywhere in its opinion—and certainly not in its resolution of the RICO claims. *CSX Transp., Inc. v. Gilkison*, 406 F.App'x 723 (4th Cir. 2010). Instead, it reversed the grant of summary judgment on CSX's Baylor-related state common-law claims because there were disputed issues of material fact for a jury to resolve. *Id.* at 733-34. The Court in no way endorsed CSX's unprecedented Rule 11-based legal theory; nor was it required to do so in order to rule in CSX's favor.

In his concurring opinion, Judge Davis alone addressed CSX's Rule 11 theory. *Id.* at 737. He still was able to concur "fully in the panel opinion," *id.* at 736, because, despite his misgivings about the Rule 11-based theory, the majority did not analyze or endorse it, and Judge Davis thought it should receive a "proper airing" on remand. *Id.* at 738. Had the majority approved of CSX's theory, Judge Davis could not have concurred "fully in the panel opinion"—he may have concurred in the judgment, but not in the approval of CSX's theory.

CSX cannot point to any part of the majority's prior decision that addressed or even mentioned Rule 11, much less the validity of CSX's use of Rule 11, in the context of CSX's RICO claims or otherwise. Where, as here, an issue was not briefed by both parties or decided by the district court, it cannot be deemed to be

"necessarily decided" by the appellate court for law of the case purposes. *See, e.g.,* *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44 (2d Cir. 2005) (no law of the case "because neither the district court nor this court was ever squarely presented with the question"); *Alpha/Omega Ins. Servs.*, 272 F.3d at 280-81 (same). And when a court rejects summary judgment because there are genuine issues of material fact, it does not implicitly endorse the legal basis of the plaintiff's claims. *See, e.g., Cont'l Ins. Co. v. Fed. Express Corp.*, 454 F.3d 951, 954 (9th Cir. 2006) (court abused discretion in applying law of the case because prior decision "[d]enying summary judgment rendered no decision on what law governed" and the "dispositive legal issue [had] not yet [been] ruled upon").

CSX's law-of-the-case argument fails for an additional reason—the case that gave rise to this appeal is materially different from the case previously before this Court. Following the Court's decision in the prior appeal, CSX filed its third amended complaint (Dkt.853), the parties engaged in further discovery, and CSX abandoned its "system of fraud" theory, admitting that "the eleven claims at issue . . . are the only claims from which we can attempt to prove fraud and from which we can attempt to prove damages." (Dkt.1557.2-3 (quoting Dkt.960.68-69,80)). The parties then proceeded to trial on these amended claims and narrowed theory, creating an evidentiary record not previously before this Court. Law of the

case therefore has no application given these substantially changed circumstances. *Sejman*, 845 F.2d at 69 (doctrine does not apply where, *inter alia*, "a subsequent trial produces substantially different evidence").

> ### c.    Defendants properly raised their Rule 11 and justifiable-reliance legal arguments below.

CSX argues further that Defendants forfeited their Rule 11 and justifiable-reliance legal challenges because they failed to raise them in their Rule 50 motions or elsewhere below; and, with respect to justifiable reliance, because they failed to object to a jury instruction that said (erroneously) that reliance need not be proved to establish RICO's causation requirement.    (CSX.Br.41-42,48-49).    These arguments fail as well.

Defendants raised their Rule 11 and justifiable-reliance legal challenges at multiple stages in the District Court, including in their Rule 50 motions.  Initially, they challenged CSX's reliance on Rule 11 before trial when they sought to exclude the testimony of one of CSX's experts because it "concern[ed] his opinions that West Virginia Rule of Civil Procedure 11, the Code of Professional Responsibility, and the common-law duty of candor were violated," which were "not relevant to any issues before the jury."  (Dkt.1396.1-2,4-5 (citing *Gilkison*, 406 F. App'x at 737 (Davis, J., concurring)).

Peirce and Raimond again challenged CSX's Rule 11 theory in a motion in limine when, at trial, CSX revised its legal theory to focus on the filing of the 11

FELA claims. (Dkt.1520; *id.*9 (citing *Gilkison*, 406 F. App'x at 737 (Davis, J.,

concurring)). They renewed this challenge later in their Rule 50(a) and (b)

motions, expressly incorporating their earlier motion in limine. (Tr.1086:11-15;

Dkt.1564.21 (citing Dkt.1520), 22-24,29; Dkt.1604.12n.17). During trial, Peirce

and Raimond objected to CSX's attempt to inject "ethical violations" into the case.

(Tr.1008:22-1009:15). And at the charge conference, they again clearly contested

CSX's use of Rule 11. (Tr.1780:19-24). Peirce and Raimond's counsel could not

have objected on this issue any more clearly or often.

Peirce and Raimond likewise disputed CSX's justifiable reliance on the Rule

11 certifications. They raised this argument in their motions to dismiss

(Dkts.888.14-15, 890.14), for summary judgment (Dkt.1329.22), in a motion in

limine (Dkt.1381.3-5), in their Rule 50(a) argument (Tr.1088:25-1089:9), and,

finally, in their Rule 50(b) motion (Dkts.1564.3, 1564.8&n.6).

To support its petition for attorneys' fees, CSX acknowledged that the

"Defendants filed no less than 13 separate dispositive motions seeking the

dismissal of CSXT's claims and opposed each of CSXT's requests for leave to

amend[,] leaving 'no stone unturned and no defense unpursued.'" (Dkt.1566.8).[14]

---

[14] CSX insisted further that Peirce and Raimond "alone raised over 20 separate
arguments for why CSXT's claims should be dismissed" and "challenged nearly
every legal and factual aspect of them, [even] attack[ing] the very notion of
CSXT's claims...." (Dkt.1566.8-9&n.6,17).

- 23 -

Yet now, CSX scours the landscape in a hunt for unturned stones and unpursued defenses, in the hopes of a cheap victory.

Peirce and Raimond raised their legal arguments in support of dismissal and summary judgment on CSX's claims, objected to evidence at trial and to the court's Rule 11 instruction, sought to preclude CSX's change in legal theory through in limine motions, and sought judgment as a matter of law during and after trial. This amply preserved these arguments for this Court's review. *See Meyers*, 743 F.3d at 913 (considering appellant's legal argument that defense did not apply as a matter of law because permitting appellees to invoke the defense "would be contrary to the rule of law"); *U.S. ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 913 n.3 (4th Cir. 2013) (appellant preserved legal argument by generally "opposing the dismissal below and on appeal" and noting that "'[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law'") (citation omitted).

CSX is also mistaken in that the filing of a Rule 50(b) motion is not a prerequisite to this Court's review of an otherwise-preserved *legal* challenge. While appellate review of a *sufficiency-of-the-evidence* challenge is contingent on the appellant having moved under Rule 50 for judgment as a matter of law, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 406 (2006), this rule

does not apply to *legal challenges*. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 160-61 (4th Cir. 2012) (appellant did not waive legal challenges by failing to raise them in a Rule 50 motion because the rule "is not concerned with pure questions of law that are detached from the evidence, not within the domain of the jury, and only ever properly ruled upon by the judge") (internal quotation marks omitted).

Finally, contrary to CSX's contention at 48-49, Defendants were not required to object to the District Court's instruction on RICO reliance in order to preserve their justifiable-reliance legal argument.[15]  The law is clear that "the failure to object to an instruction does not render the instruction the 'law of the case' for purposes of appellate review." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (plurality opinion) (no waiver where "the focus of petitioner's challenge is not on the jury instruction itself, but on the denial of its motions for summary judgment and a directed verdict") (internal quotation marks and citation omitted).  Indeed, this Court squarely rejected CSX's jury-instruction waiver argument in *College Loan Corp. v. SLM Corp.*, where it held that the appellant did not waive a legal argument that it did not raise in an objection to the pertinent jury instruction because, as here, "when the jury was instructed, the court was 'fully aware of the [appellant's] position'" and "'had obviously considered and rejected

---

[15]  Defendants did expressly object to the District Court's Rule 11 instruction, Tr.1780:19-24, and the court elsewhere gave a proper "by reason of" RICO instruction that incorporated reliance concepts (Dkt.1550.15).

- 25 -

that position.'"  396 F.3d 588, 599 n.10 (4th Cir. 2005) (citation omitted).  The

Court should reach the same conclusion here.[16]

**B.    CSX failed to present sufficient evidence to prove that the Rule 11 certifications relating to the 11 FELA claims were false or that CSX justifiably relied to its detriment on them.**

CSX acknowledges that its fraud and RICO claims are based on purported

Rule 11 violations.  (CSX.Br.43-44,50).  CSX therefore was required to prove that

it justifiably relied on the Rule 11 certifications of the 11 specific FELA claims at

issue, and that Peirce and Raimond committed actionable fraud by violating Rule

11.   In view of the record as a whole, and giving "credence to the evidence

favoring" CSX "as well as that evidence supporting" Defendants "that is

uncontradicted and unimpeached" (*Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150-51 (2000)), CSX failed to present sufficient evidence of

justifiable reliance or actionable fraud.

---

16 CSX relies solely on *First Union Commercial Corp. v. GATX Capital Corp.*,
411 F.3d 551, 557 (4th Cir. 2005), for its argument, but that case is inapposite.
There, this Court found that an appellant's argument had been waived because the
appellant affirmatively assented to an answer of a question from the jury before
challenging that answer later on appeal.  *Id.* at 556-57.  There was no such
acquiescence here, however.  And in any case, this Court is obliged to apply the
controlling substantive law to a legal challenge such as Peirce and Raimond's—not
the law as determined, here erroneously, by the district court in its instructions to
the jury.  *See Ebker v. Tan Jay Int'l Ltd.*, 739 F.2d 812, 825 n.17 (2d Cir. 1984)
(Friendly, J.) (court of appeals "must review the district judge's order in light of
the 'applicable law which is controlling, and not what the trial court announces the
law to be in [its] instructions'") (citation omitted).

**1.    CSX failed to adduce sufficient evidence of justifiable reliance.**

CSX identifies nothing in the record to show that it incurred legal-defense costs as a direct result of its justifiable reliance on the allegedly improper Rule 11 certifications on these 11 FELA claims.   It first cites (at 71) this Court's observation in the prior appeal that CSX would have relied on the Rule 11 certification of Earl Baylor's FELA claim.   But that statement is irrelevant to sufficiency of the evidence here because it was not before the jury in this case. Then, unable to point to any CSX witness who testified as to CSX's reliance, CSX (at 71-72) relies on the testimony of *Mr. Peirce* that CSX was entitled to believe the Rule 11 certifications.   But Peirce was not involved in CSX's defense.   Nor was he privy to the state of mind of CSX's representatives.    His general observation about reliance plainly is no substitute for proof that CSX in fact believed the Rule 11 certifications and detrimentally relied on them.

Indeed, as discussed in Defendants' opening brief (at 3-10, 43-44), in addition to the uncontradicted testimony of Defendants, there is extensive and unimpeached testimony *from CSX's own representatives*, which confirms that CSX did not rely on the Rule 11 certifications.   That testimony establishes that:

- CSX was a seasoned FELA defendant with a systematic approach to claims handling (Op.Br.3-10);

- CSX knew that the Peirce Firm and other firms conducted screenings, how they were conducted, that CSX's workers filed FELA claims based

on them, and that most asbestosis cases resulted from screenings, but that knowledge did not affect its settlement calculations (Op.Br.6-10);

- CSX knew that the Peirce Firm almost exclusively used Dr. Harron as its B-reader[17] (Op.Br.6-12);

- CSX had significant prior experience with Dr. Harron (Op.Br.7-10);

- Mr. Raimond told CSX's outside counsel that Dr. Harron was reading x-rays positive at a rate 3-4 times greater than the firm's prior B-reader (PX120; Tr.1063-65);

- Mr. Peirce told CSX representatives that he estimated that Dr. Harron read "slightly more than half" of x-rays as positive[18] (Op.Br.8);

- CSX thought that Dr. Harron was a liberal reader and had an even higher positive-read rate, upwards of 90-100% positive (Op.Br.8);

- The only person involved in the underlying litigation aware of the obscure academic articles indicating that only 2% of railroad workers in certain limited study populations had asbestosis was a CSX representative, and he concluded that those studies were totally irrelevant to the FELA claims facing CSX (Op.Br.52-53); and

---

[17]  CSX claims (at 72) that "there is no evidence that CSXT even knew, at the time of filing, that the claims were based on Harron B-reads."  But CSX indisputably knew that the Peirce Firm primarily had been using Dr. Harron since the mid-1990s.  (Tr.1064-72).  Later, after Judge Jack's opinion in 2005—but before the filing of 5 of the 11 FELA claims at issue—CSX told the Peirce Firm it would not settle any claims based on Dr. Harron's B-reads, and suggested that the Peirce Firm have the x-rays read by another B-reader before settlement negotiations could continue.  (Tr.1047:9-25,1049:6-14,1054:18-1059:9).

[18]  CSX claims that "[f]or many years, CSXT was unaware of the impossible rate at which [Dr.] Harron was issuing positive B-reads," but provides no supporting record cite.  (CSX.Br.12).  It also notes (at 72-73) Mr. Raimond's testimony that he "never told" CSX the exact read rate, but CSX ignores the uncontradicted testimony from Peirce and Raimond that they provided CSX high estimates of Dr. Harron's read rate, and that CSX believed that his read rate was significantly higher than it actually was.  (*See also* Op.Br.8&n.5).

- CSX did not believe that Dr. Harron's B-reads were accurate and discounted the settlement value of claims based on them (Op.Br.8-10).

This uncontradicted evidence demonstrates that CSX did not believe that the FELA claims were well-grounded in fact, and any purported reliance by CSX on the Peirce Firm's certifications was unjustified. CSX argues, without any citation to the record, that the jury "could reasonably have found otherwise." (CSX.Br.72). But CSX cannot establish sufficiency of the evidence merely on grounds that the jury could have disbelieved this uncontradicted evidence—the majority of which came from the mouths of its own representatives. *See Reeves*, 530 U.S. at 150-51.

### 2. CSX failed to present sufficient evidence of proximate causation.

Apart from reliance, CSX failed to prove any proximate causation under RICO because there is no evidence of a "direct relation" between its defense costs and "the injurious conduct alleged"—the Rule 11 certifications of the 11 FELA claims. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

CSX argues that it proved causation because, without the Rule 11 certifications, the underlying FELA complaints would not have gone forward and CSX would not have incurred any fees. (CSX.Br.73-75). This, however, is only "but for" causation, and plainly is not sufficient under RICO. *See Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) ("[U]nder civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'") (quoting *Holmes*, 503 U.S. at

- 29 -

268)).  Indeed, as the District Court correctly noted, "[i]f [CSX] would have incurred the alleged damages regardless of any RICO violation …, then those damages are not proximately caused by that defendant's RICO violation." (Dkt.1550.15-16).  And CSX still cannot point to evidence showing that, if the 11 FELA claims had not been certified and included in the many claims that CSX opposed through venue motions, CSX would not have incurred the fees it spent on those motions.  (Op.Br.11,18-19,22,43-44).

The *only* evidence that CSX cites in its causation argument is the parties' damages stipulation.  (CSX.Br.75).  But the stipulation only "represents the amounts spent by CSX for the defense of the complaints in which these eleven claims were asserted" (Dkt.1516; Tr.959:3-12)—it is not evidence of causation.  If it were, the District Court would not have needed to instruct the jury on causation at all—but it did.[19]  (Dkt.1550.15-17,22-24,34-35).

### 3.    CSX failed to adduce sufficient evidence that the Rule 11 certifications of the 11 underlying claims were false.

On falsity, too, CSX fails to point to sufficient evidence that the Peirce Firm violated Rule 11 when it filed the 11 FELA claims—*i.e.*, that the firm had "no information" supporting the allegations that each FELA claimant had been exposed

---

[19]  Counsel for Peirce and Raimond made clear that any stipulation on damages would not concede the reliance issue.  (Tr.794:24-795:20).  The District Court agreed: "you'll have a stipulation on damages …. And reliance will still be open." (Tr.795:17-19).

to asbestos for a sufficient latency period and had been given a positive x-ray B-reading by a certified B-reader.  (Op.Br.44-45); *see also Manhattan Constr. Co. v. Place Props. LP*, 2014 WL 998181, at *2 (11th Cir. Mar. 17, 2014) (affirming denial of Rule 11 sanctions because "we cannot say that there was no factual basis for the allegations in the complaint").  CSX does not dispute that this is the standard of proof it had to meet.

### a.  CSX failed to show that the 11 FELA claims lacked any evidence of exposure.

CSX first suggests (at 67) that "some if not all" of the 11 claimants lacked "meaningful" exposure—though "meaningful" exposure is not the governing standard under FELA.  (CSX.Br.67).  Yet, it does not dispute that it exposed its workers to products containing asbestos, and did not deny exposure during settlement negotiations with the Peirce Firm.  (Op.Br.3,6,45).  Moreover, expert Dr. Ellenbecker testified, without contradiction, that the 11 claimants "were all repeatedly and regularly exposed to significant levels of airborne asbestos arising from their work at CSX."  (Tr.1134:11-24, 1166:25-1167:9).

CSX further claims that the Peirce Firm "fabricated" the exposure history of one of the claimants—Earl Baylor.[20]  (CSX.Br.5,67).  This is more misdirection.

---

[20]  CSX argues that the Peirce Firm "encouraged overstatement of … exposure histories."  (CSX.Br.67).  But the questionnaires CSX cites (*e.g.*, PX209) were sent to clients *after* the cases were filed, to confirm the asbestos-exposure history the
Continued on following page

- 31 -

The Peirce Firm filled out an intake questionnaire during Baylor's 2003 screening interview in which it learned about his significant asbestos exposure. (PX328.6). Two years later, Baylor returned an incomplete asbestos questionnaire in which *he* listed "Asbestos" as his "Claimed Exposure" and noted that he had difficulty breathing, but did not specify what products he had been exposed to. (PX333).

Danielle Daley testified that it was the Peirce Firm's standard practice to take incomplete asbestos questionnaires returned by clients, call the client, confirm the specific asbestos products to which the client had been exposed based on their intake questionnaire responses, and note the confirmed exposures on the form. (Daley.2012.Dep.179-83, Dkt.1519). She further testified that the notations for "Asbestos rope, cement, Asbestos valve packing" appeared to have been filled in by legal assistant Shannon Zeto during a follow-up call with Baylor, pursuant to the firm's standard practice to confirm his intake responses.[21] (*Id.*; PX328, PX333).

---

Continued from previous page

Peirce Firm obtained during screening-intake interviews and documented in intake questionnaires. (Tr.1062). There also is no evidence that the allegedly fabricated Baylor questionnaire (PX333) was ever provided to CSX. (Dkt.1404.1-4).

[21] Baylor acknowledged filling out the Questionnaire, but gave conflicting responses as to whether the handwriting was his. *Compare* Baylor.2009.Dep.55-56 (twice responding that it was his handwriting), Dkt.1524; *with id.*57-58 (responding that portions were not his writing, but verifying his signature). Baylor later confirmed, however, that he spoke on the phone with a secretary or someone else at the Peirce Firm. (*Id.*71-72).

Baylor confirmed in writing that he had asbestos exposure. (PX333). He stated that he had been exposed to asbestos products known to the Peirce Firm, though *he* may not have recognized what the products contained. *Compare* Baylor.2009.Dep.59-60,86-91,95, Dkt.1524 (as a trackman, he replaced rails and crossties; working in a machine shop, he was exposed to pipes "wrapped with some kind of white looking stuff," repaired and replaced train brakes, and slept in camper cars); *with* Tr.1140-52, 1165-67 (expert witness Dr. Ellenbecker informed Peirce Firm that asbestos rope used in replacing rails; brakes contained asbestos; shop and camper car pipes were insulated with asbestos); *see also* Tr.1312-15, 1388-91. CSX did not prove that "no information" supported Baylor's claim, or that the Peirce Firm "fabricated" his (or any other claimant's) exposure history.

### b.    CSX failed to show that the 11 positive B-reads were false or unreliable based on Dr. Parker's testimony.

CSX does not, and cannot, dispute that the Peirce Firm had a positive B-read consistent with asbestosis for each of the 11 claims before they were filed, and that each of the claimants had a positive reading from at least two certified B-readers (Drs. Harron, Breyer, and/or Mezey). Rather, it argues that "the evidence permitted the jury to find that [Dr.] Harron was a fraud and that the lawyer defendants knew it," relying almost exclusively upon Dr. Parker's opinion that Dr. Harron's B-reads were "scientifically not credible." (CSX.Br.66-68).

But Dr. Parker's unreliable extrapolations were based on three academic studies of limited populations that CSX's own in-house counsel, Templeton Fitch, called irrelevant to the Peirce Firm's FELA claims. (Op.Br.53). CSX ignores that crucial admission and does not explain how these "very circumscribed" studies could be used, as Dr. Parker did, to extrapolate a universal prevalence rate applicable to CSX's workers. (*Id.*51-52). The missing link is that CSX did not present any evidence of the actual asbestosis prevalence rate among its own sizeable railroad worker population to compare with Dr. Harron's findings. Dr. Parker's speculation cannot supply that link.

Once Dr. Parker's prevalence rate opinion is removed from the equation, there is no basis for his accusation that Dr. Harron purposefully misread x-rays. Dr. Parker's study of the 11 claims presents nothing more than a dispute between two experts, which cannot establish a Rule 11 violation. (Op.Br.46-47). While some of CSX's hand-picked B-readers later disagreed with Drs. Harron, Breyer, and Mezey's positive B-reads, that certainly does not mean that the Peirce Firm could not properly have relied upon those positive reads in filing the 11 claims.

CSX all but ignores Dr. Mezey and its attack on Dr. Breyer amounts to nothing more than that Dr. Breyer must have been a fraud because Dr. Harron was a fraud. (CSX.Br.68). But Dr. Breyer's agreement with Dr. Harron hardly makes him a fraud. Although Dr. Breyer was provided with Dr. Harron's prior findings—

- 34 -

just as CSX's B-readers were—he testified that he read the x-rays independently (Tr.1239-40, 1254-55), and there was no evidence that he violated any ILO guidelines. And Dr. Breyer was not alone: Other B-readers who re-read x-rays for Dean Hartley's firm—including one who Dr. Parker defended and respects—confirmed Dr. Harron's B-reads over 80% of the time. (Op.Br.11-12,n.7). CSX's B-readers like Dr. Renn were more extreme in their conservatism—never finding evidence of asbestosis and rarely agreeing with a plaintiff's expert. (Op.Br.7).[22]

Nor is there any basis for CSX's suggestion (at 69) that, before filing a FELA complaint, the Peirce Firm had to conduct a blinded panel study or have a "consensus" positive. Dr. Parker admitted that blinded panel studies are used in epidemiological settings and that NIOSH did not begin recommending the use of multiple readers of "contested studies" in litigation until 2006 (Tr.892:11-14, 893:6-22)—by which time the 11 positive x-rays had already been re-read as "consensus" positive by Drs. Breyer or Mezey.

More fundamentally, CSX does not deny that B-reading is subjective and that experts often disagree over whether an x-ray is positive or negative. (Op.Br.47,n.28). CSX misrepresents (at 69) that a 0/1 reading is not "seriously

---

[22] Contrary to CSX's speculation, Dr. Breyer raised his price for reviewing x-rays because the Peirce Firm wanted the results within two weeks (Tr.1259-60)—not, as CSX speculates, because of Judge Jack's opinion. (CSX.Br.14). To reach CSX's conclusion about Dr. Breyer, one would have to believe that this entire industry of paid consulting litigation experts, on both sides of the bar, were fraudsters.

considered positive" when that is the exact definition provided in the ILO guidelines and by CSX's expert. (PX572.11; Tr.727:13-728:11). CSX could not prove that the positive (1/0) readings were *fraudulent* just because it could find experts whose collective reading was negative, particularly when many of their readings were positive (1/0) or indicated that they seriously considered reading the x-ray as positive (0/1). (Op.Br.46; DX38-C-D). Therefore, CSX's retrospective panel study is not proof that the 11 claims at issue are false or that the Peirce Firm, let alone Mr. Peirce and Mr. Raimond, had any knowledge of that falsity.

### c.    CSX failed to show that the Peirce Firm knew the B-reads were false.

CSX argues that the Peirce Firm had "circumstantial" awareness of the purported 2% asbestosis prevalence rate because Mr. Raimond had litigated asbestosis claims for a long time and the three obscure studies that Dr. Parker relied on were "well-known and highly regarded"— and consequently, Peirce and Raimond should have suspected that Dr. Harron's read rate was too high. (CSX.Br.70). But no witness testified that the studies were "well-known" to anyone, let alone attorneys outside the B-reader field. (Tr.849-53). CSX's Fitch, the only person who had ever heard the 2% figure, concluded that the studies had "no relation" to the FELA claims against CSX. (Op.Br.52-53). Thus, no reasonable jury could conclude that these attorneys should have reached the *opposite* conclusion of CSX's representatives. Additionally, it is pure speculation

- 36 -

to assume that *attorneys* could have interpreted these limited studies as representative of a universal prevalence rate applicable to *CSX's* workers.

### d. CSX's other evidence is irrelevant to its claim that the Peirce Firm filed the 11 FELA claims in violation of Rule 11.

CSX argues that the Peirce Firm *could have* done more to investigate and file the underlying complaints, but it failed to present any testimony that the firm was *required* to do more. Consequently, the following categories of evidence, even if true, cannot substantiate the verdict[23]:

---

[23] Defendants object to CSX's improper and repeated references to inflammatory allegations that were excluded from trial or for which there is absolutely no supporting record evidence. (CSX.Br.9-10 (claiming that Dr. Harron had an even higher read rate than indicated at trial, though the record citation and ensuing pages do not support that claim), 10 (citing studies relied upon by Dr. Parker, PX571, 575-577, which were not admitted, Dkt.1554, 1500.35-36), 10 (alleging that Dr. Harron read all positives for 294 days, but recognizing the court excluded this purported evidence), 10 (alleging that Dr. Harron read all positives for 294 days, but recognizing the court excluded this purported evidence), 11 (alleging that Dr. Harron read 1,001 of 1,033 x-rays positive in early 2001, but the citation is to CSX's counsel referencing an unsubstantiated claim made in its opening statement), 11 (alleging that most of Dr. Harron's negative readings "were actually" based on "unreadable" x-rays, when the uncontradicted testimony showed that x-rays rated quality 3 are medically readable), 11 (claiming that Dr. Harron reported "hundreds or thousands of unreadable x-rays as negative" to "conceal" his "true positive rate," but providing no record citation), 12-13 (providing a slanted view of Judge Jack's opinion that was not admitted into evidence, and ignoring that the case before her had nothing to do with the Peirce Firm, its litigation practices, its clients, or the underlying complaints), 12 (citing PX12, which was not admitted at trial, Dkt.1500.2, 1554.1, for the false suggestion that Defendants tried to mediate cases before Judge Jack issued her opinion)).

Continued on following page

- **The X-rays Were Legal And Readable:**  CSX did not adduce any evidence that the screening procedures or power-of-attorney forms violated any laws or ethical standards.  It also did not adduce any evidence that Mr. Corbitt—a certified radiologic technologist with a hospital-grade mobile x-ray machine (Tr.202-06; Op.Br.5)—broke any laws by not having a license from each state in which he took x-rays, or that the Peirce Firm had an obligation to ensure his licensing.  (Tr.199).

  Nor did those facts affect the readability of the x-rays.  Although CSX identified instances in which Corbitt produced x-rays of the lowest readability (quality "3"), those x-rays still were medically readable (PX372; Tr.198).  There was no proof that the Peirce Firm filed any claims based on any unreadable x-rays, including the 11 at issue. (DX38C-D).

- **Screenings & ILO Forms Were Proper:**  After obtaining x-rays, the Peirce Firm's B-readers were asked, assuming that CSX's workers had occupational exposure to asbestos, whether their x-rays showed scarring consistent with asbestosis.  (Op.Br.5).  This was a common screening procedure and nothing about the Peirce Firm's procedure or ILO forms was unusual or violated any legal or medical standards.  (*Id.*).  CSX was fully aware of these facts, which had no impact on CSX's settlement calculations.  (*Id.*6).

- **Repeat Screenings Did Not Automatically Yield Positive B-Reads:** CSX argues that many CSX "employees attended multiple screenings, each time increasing the odds that at least one x-ray would receive a positive B read" (CSX.Br.11 (citing Tr.398-99))—but once again, the record does not support its claim.  The only workers identified as returning for multiple screenings were the 11 claimants at issue.  (*Id.*). Moreover, the unrebutted testimony of Mr. Peirce established that only 2% of the persons the Peirce Firm screened who ultimately tested positive had previously tested negative.  (Op.Br.16,n.11).  The uncontradicted evidence also showed that asbestosis is a progressive

Continued from previous page

Because the "record on appeal under Rule 10(a) may not contain matters that were not before the lower court, and the court of appeals will not look outside the record on appeal to decide the case[,]" Mayer Brown LLP, *Federal Appellate Practice* 210 (2d ed. 2013), this Court should ignore these references.

disease, (*id.*), and that low-level scarring is difficult to detect and subject to expert dispute (*id.*47,n.28). Thus, some people with negative x-rays later had a positive x-ray once the disease progressed to low-level scarring. (*Id.*). CSX's suggestion that these individuals should not have been read as positive for lung scarring because their physical condition did not change (CSX.Br.17) is illogical, since minor lung scarring does not manifest itself in physical impairment. (Tr.861-62, 975-76, 987-88).

- **No Asbestos "Bias"**:     There was no evidence that Dr. Harron's knowledge that the Peirce Firm screened for asbestosis violated B-reading protocols for *litigation*. Indeed, when Dr. Harron read x-rays for government agencies, like NIOSH or the Navy, he knew that they were screening for black lung or asbestosis, respectively. (Tr.549-50). Dr. Harron further testified that B-readers are only required to not have any exposure history when conducting blinded epidemiological studies— not litigation screenings. (*Id.*). He did not have the history for these claimants at the time he made the B-reads, which did not violate the guidelines. (Tr.549-50, 553-54, 580, 582).

- **No Diagnosis Or Prescription Required**: CSX never disputes that a medical or differential diagnosis is not required to file a FELA claim. (Op.Br.4n2). Despite mentioning a lack of prescriptions without citation (CSX.Br.4), CSX did not adduce any evidence that x-ray prescriptions were required. (Tr.196). Thus, whether the Peirce Firm obtained a diagnosis or x-ray prescription before filing the FELA claims is irrelevant.

- **No Physical Injury Required**: Also irrelevant is the fact that these individuals lacked physical injuries. Individuals with minor lung scarring—compensable under FELA—often do not exhibit physical symptoms. (Op.Br.3-4; Tr.861-62, 975-76, 987-88). Even Dr. Parker admitted that a person can have asbestosis but not manifest any physical symptoms. (Tr.861-62).

- **Medical Records Obtained As Needed:** The evidence is undisputed that the Peirce Firm ordered medical records from its clients' doctors when it had knowledge of prior treatment for lung-related issues. (Tr.979-985). CSX claims that the Firm's files "*often* contained medical records that *might* rule out asbestosis" (CSX.Br.16-17 (emphasis added)), but potentially contrary evidence would not preclude the filing of a FELA claim. (Op.Br.46-47).

- 39 -

And despite claiming that such records "often" were found in the firm's files and "[i]n *at least* one instance" the firm "fabricated" evidence, CSX only cites Baylor for both points. (CSX.Br.15,17). Baylor indicated at intake that he had prior medical treatment and the Peirce Firm did order his medical records. (Tr.1060-61). Mr. Peirce testified that the records received included a CT scan that was negative for asbestosis scarring, but that the record was in a separate file for Baylor in a different department of the law firm and was not known to the litigation department until the filing of this suit. (*Id.*; PX327). One administrative oversight is not evidence of a scheme to defraud. *See O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990) ("Acts done inadvertently, mistakenly, or in good faith without an intent to defraud do not satisfy the requirements of the [mail fraud] statute.") (citation omitted).

In any case, had the litigation department known of the CT scan, it still would not have been required, under Rule 11, to abandon the claim. (Op.Br.44,46-47). Dr. Knox, who read the CT scan, admitted that (1) his report omitted mention of a non-specific "single band of parenchymal scarring versus discoid atelectasis at the right lung base" that could be asbestosis, (2) the scan missed 4 centimeters of the Claimant Baylor's lung, and (3) based on the CT scan, he could not rule out the possibility that Claimant Baylor had asbestosis. (Knox Dep.73-76, 100-02, 117, 134-36, 145, Dkt.1527). Dr. Parker similarly admitted that a person with a completely negative x-ray could still have asbestosis. (Tr.859-60).

### 4. Peirce and Raimond preserved their sufficiency arguments at the Rule 50 stage.

Given the absence of record evidence supporting the verdict, CSX once again turns to waiver, claiming that Peirce and Raimond failed to preserve their sufficiency-of-the-evidence arguments in their Rule 50(b) motion. But Defendants clearly contested the sufficiency of the evidence in their Rule 50(a) and (b) motions. (Tr.1085-93; Dkt.1564.6,8; Dkt.1604.5-8). In the face of this record, relying on *Weisgram v. Marley Co.*, 528 U.S. 440 (2000), CSX first attempts to contrive some distinction between challenging the *sufficiency* of all the evidence

- 40 -

before the jury and challenging the *admissibility* of certain evidence before the jury and claiming that the properly admitted evidence was insufficient. It argues that because Peirce and Raimond's challenge was of the latter variety, it failed to preserve the sufficiency challenges they raise on appeal. (CSX.Br.62-63). *Weisgram* plainly did not draw such a distinction.

According to CSX, the Supreme Court in *Weisgram* was "contrasting [a] claim that 'the evidence is rendered insufficient by the removal of erroneously admitted testimony' with [a] claim that 'the evidence without any deletion, is insufficient." (CSX.Br.62). But *Weisgram* did not even involve a waiver issue—it simply considered the question whether a court of appeals may instruct a district court to enter judgment against a jury verdict winner if the court of appeals concludes that the evidence did not support the jury's verdict. 528 U.S. at 444. In answering that question, the Court stated:

> Appellate authority to make this determination is no less when the evidence is rendered insufficient by the removal of erroneously admitted testimony than it is when the evidence, without any deletion, is insufficient.

*Id.* Thus, contrary to CSX's misleading quotation, *Weisgram* did *not* distinguish between or contrast these two instances—it *equated* them.[24] CSX's novel forfeiture theory is baseless.

---

24  Unsurprisingly, CSX does not cite a single case—from this Court or any other circuit—that has relied on *Weisgram* for this supposed distinction.

CSX separately argues that Peirce and Raimond failed to specify the law and facts that entitled them to judgment as a matter of law. (CSX.Br.63-64). But Peirce and Raimond explicitly argued that CSX failed to produce sufficient evidence of a predicate act of fraud. (Dkt.1564.1 ("[T]he actual evidence of mail or common law fraud or conspiracy is woefully insufficient."); *id.*3,8). They likewise asserted that CSX failed to produce sufficient evidence of a "by reason of" link between the alleged fraud and CSX's alleged injury. (*Id.*3 ("Such information that was known to CSX, as a matter of law, cannot support a verdict for RICO (because of RICO's 'by reason of' requirement) or for common law fraud (because of the 'justifiable reliance' requirement)."); *id.*8n.6).

Under this Circuit's precedent, Peirce and Raimond satisfied their duty to specify the law and facts entitling them to judgment as a matter of law. *See Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.*, --- F. App'x ---, 2014 WL 504086, at *6 (4th Cir. Feb. 10, 2014) (brief statement in Rule 50 motion that "settlement amounts alone were insufficient to demonstrate what damages resulted from any alleged bad faith" sufficient to preserve challenges to proof of causation and damages) (citations omitted); *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 866 n.1 (4th Cir. 1999) (a "general objection that [plaintiff] had not made out a prima facie case" in a Rule 50(a) motion was sufficient to preserve an argument related to a specific element of the prima facie case).

**C.   In the alternative, this Court should order a new trial due to irrelevant and unfairly prejudicial evidence and argument to the jury.**

**1.   CSX fails to acknowledge this Court's controlling standard for determining whether an evidentiary error warrants a new trial.**

CSX's response to Defendants' new-trial arguments is tainted by its failure to acknowledge how this Court reviews evidentiary errors. This Court's precedents make clear that it is the beneficiary of an evidentiary error at trial—here CSX—who "has the burden to show that the error almost surely did *not* affect the outcome of the case." *Persinger v. Norfolk & W. Ry. Co.*, 920 F.2d 1185, 1189 (4th Cir. 1990) (emphasis in original; internal quotation marks and citation omitted). Thus, CSX must demonstrate, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (en banc), *abrogated in part on other grounds in Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (internal quotation marks and citation omitted). If CSX cannot meet this burden, then the evidentiary error is not harmless, and a new trial is warranted. *Buckley v. Mukasey*, 538 F.3d 306, 320-21 (4th Cir. 2008) (remanding for a new trial under the *Taylor* standard); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 834 (4th Cir. 1999) (same).

- 43 -

**2.    CSX has not met its burden to show that the admission of Dr. Parker's asbestosis prevalence rate testimony almost surely did not lead to the verdict.**

Analyzed under the proper standard, it is clear that CSX cannot meet its burden to show that the District Court's erroneous decision to allow Dr. Parker to testify as to the supposed asbestosis prevalence rate "almost surely did *not* affect the outcome of the case."

In particular, CSX offers nothing in response to Defendants' argument that the admission of Dr. Parker's 2% prevalence rate opinion seriously prejudiced them.  (Op.Br.53).  Allowing CSX to put the supposed 2% prevalence rate before the jury—a rate based on narrow studies done of non-CSX railroad workers in Pennsylvania and Japan—prejudiced Defendants because it improperly led the jury to conclude that the 11 FELA claims here, filed on behalf of CSX workers and based on Dr. Harron's reads, must have lacked an objective basis in fact and law.  Dr. Parker's opinions to that effect—that the B-reads were intentionally false and scientifically unreliable—was based on his 2% prevalence rate opinion.  (Op.Br.50,53).  That propensity argument is the essence of prejudice—encouraging the jury to act based on speculation and surmise rather than evidence and fact.  *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (expert's assertion "that he read two articles" offered "little more than speculation").  The

- 44 -

unfairly prejudicial and misleading effect of Dr. Parker's prevalence rate opinion alone should have precluded its admission. *See* Fed. R. Evid. 403.

CSX devotes little more attention (at 79-80) to arguing that Dr. Parker's prevalence-rate opinion was somehow relevant to its claims. It first refers to the District Court's bare statement that the "prevalence rate was relevant to whether . . . Harron's B-reads were accurate and truthful. . . ." (Dkt.1633.18). The District Court's conclusory statement was unexplained and unsupported—and, as Defendants showed in their opening brief, plainly incorrect. (Op.Br.52-53). CSX provides no argument to support the District Court's relevance finding—just the District Court's say-so.[25] Nor does CSX dispute Defendants' contention in their opening brief that, "[w]hether a selected sample of railroad workers in Pennsylvania and Japan had asbestosis is irrelevant to whether 11 known CSX railroad workers had x-rays evidencing asbestosis." (Op.Br.52).

Finally, CSX asserts (at 80) that there was "circumstantial evidence" that Peirce and Raimond were aware of the supposed prevalence rate, but the portions of the record that it cites provide no support for that assertion. Rather, they merely show that Raimond was generally familiar with B-readers and the screening process—not the obscure studies Parker relied on. And CSX ignores the record

---

[25] CSX also ignores the unequivocal testimony of its own in-house counsel, Templeton Fitch, who stated that the studies bore "no relation" to the FELA claims filed on behalf of CSX's workers. (Op.Br.53).

citation provided by Defendants in their opening brief, which demonstrates that neither Peirce nor Raimond knew about the supposed prevalence rate. (Op.Br.49,53 (citing Dkt.1394.11-12,n.6); *supra* 36-37).

CSX fails to address at all the prejudicial effect of Dr. Parker's testimony, and its claim that the testimony was relevant rests on nothing more than a few inapposite record cites and the District Court's *ipse dixit* conclusion. The District Court's admission of Dr. Parker's testimony accordingly was not harmless error, and the Court should vacate the judgment and remand for a new trial.

### 3. CSX has not met its burden to show that its repeated references at trial to "thousands" of supposedly false FELA claims filed by the Peirce Firm almost surely did not lead to the verdict.

CSX's response to Defendants' argument regarding its repeated and improper references at trial to the "thousands" of supposedly false FELA claims filed by the Peirce Firm is long on sleight of hand, but short on substance.

CSX does not, for example, dispute Defendants' claim—based on numerous and specific cites to the record—that it repeatedly referred at trial to FELA claims other than the 11 at issue. (Op.Br.55-56). Nor does it even attempt to show how its repeated references to "fraudulent" claims other than the 11 CSX confined its lawsuit to did anything but severely prejudice Defendants.

Instead, CSX tries to re-characterize Defendants' argument as whether CSX's violations of the District Court's order were sufficiently "clear" to warrant a

new trial. (CSX.Br.81-83). But that is not the argument Defendants made. They argued that CSX's repeated references at trial to the "thousands" of other FELA claims were irrelevant and prejudicial, and, because they likely affected the outcome below, warranted a new trial. (Op.Br.54-57). The dispositive question is, were CSX's references at trial irrelevant and prejudicial—not merely whether they violated the District Court's order. The answer to that question is yes.

Finally, CSX seeks refuge for its blatant trial misconduct in the District Court's cautionary instruction. (CSX Br.82-83). Indeed, CSX does not cite a single case where this or any other appellate court found that a cautionary instruction nullified the prejudicial effect of the type and volume of improper references that were made here, particularly where, as here, the record otherwise was devoid of evidence probative of the plaintiff's claims.

## CSX's CROSS-APPEAL

### CSX's Rule 11-based fraud theory, even if proved, falls well short of the crime-like "gross fraud" required to support punitive damages under West Virginia law.

The District Court concluded that CSX had presented insufficient evidence of gross fraud to support a punitive damages award under West Virginia law. (Dkt.1617.75). Now—on the condition that this Court orders a new trial on its common law fraud claims—CSX seeks to have its punitive-damages claim

submitted to the jury, asserting that it presented sufficient evidence of gross fraud. (CSX.Br.84-86).  This argument fails for at least two reasons.

First, CSX's common-law claims are predicated on an alleged violation of West Virginia Rule 11—a rule of procedure that cannot support an award of compensatory damages, and certainly cannot support an award of punitive damages.  (Op.Br.25-30; *supra* 3-9).  The availability of punitive damages for a Rule 11 violation would only magnify the dangerous chilling effect on lawyers and increase the likelihood that courts would be flooded with vindictive lawsuits like CSX's.  And the West Virginia Supreme Court of Appeals has explicitly declined to allow punitive damages in situations where their availability would incentivize the filing of such suspect lawsuits.  *See Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815, 881 (W. Va. 2010) (rejecting punitive damages on medical-monitoring claims and noting decision could "serve[] as a disincentive" to lawyers "tempted to bring an onslaught of medical monitoring litigation") (citation omitted).  The Supreme Court of Appeals' cautionary approach applies even more forcefully here, where CSX seeks to transform already-sanctionable Rule 11 violations into grounds for duplicative punishment in the form of punitive damages.

Second, there is no evidence that Defendants engaged in anything close to the kind of conduct that warrants an award of punitive damages under West

Virginia law.  A showing of simple fraud is insufficient to recover punitive damages under West Virginia law—instead, a plaintiff must show "gross fraud." *Cook v. Heck's Inc.*, 342 S.E.2d 453, 461 (W. Va. 1986).  Gross fraud involves substantial misconduct, and contrary to CSX's argument (at 85), the alleged existence of more than one misrepresentation is not in itself sufficient to meet the high standard for punitive damages.  Rather, gross fraud involves "intentional, deliberate and outrageous" conduct "similar to that usually found in a crime." *Roboserve, Inc. v. Kato Kaguku Co.*, 78 F.3d 266, 275-76 (7th Cir. 1996) (internal quotation marks and citations omitted).  Thus, "proof of even intentional misrepresentation may not suffice to justify punitive damages" where the evidence does not show "outrageous and malicious conduct."  *Essroc Cement Corp. v. CTI/D.C., Inc.*, 720 F. Supp. 2d 131, 147-48 (D.D.C. 2010) (allegations that defendant "had actual knowledge of the fact that it was issuing bad checks . . . and made willful misrepresentations" to secure a contract did not amount to gross fraud) (internal quotation marks and citations omitted).

CSX does not come close to meeting this standard.  The Peirce Firm's Rule 11 certifications of the 11 FELA claims were strongly supported by the evidence. The evidence supporting two of the three elements of each of the 11 FELA claims was undisputed.  (Op.Br.45).  And on the third element—whether x-rays for each of the 11 claimants had been read positive by a certified B-reader—the evidence

- 49 -

shows that at least 2 of 3 independent B-readers retained by the firm read those x-rays positive; one of CSX's hand-picked B-readers read 8 of them positive or seriously considered finding them positive; 4 of the claimants received at least one positive reading from CSX's B-readers; and the consensus of CSX's selected panel found that 6 of the x-rays that Dr. Harron marked negative could in fact be interpreted as positive or seriously considered positive.    (Op.Br.45-46; DX38-C-D).  This, plainly, does not come close to the crime-like gross fraud that might support punitive damages under West Virginia law.  The District Court's dismissal of CSX's punitive damage claim should therefore be affirmed.

## CONCLUSION

The District Court's judgment should be reversed and judgment as a matter of law entered in Defendants' favor.  Alternately, the Court should grant a new trial given the irrelevant and unfairly prejudicial evidence CSX was permitted to introduce before the jury.  If the Court elects to grant a new trial, it should affirm the dismissal of CSX's punitive damages claim.

Dated:  May 29, 2014               By:   _s/_  L. Steven Emmert _____

Jerald Elton Jones                      L. Steven Emmert
LAW FIRM OF WEST AND JONES              SYKES, BOURDON, AHERN & LEVY, P.C.
360 Washington Avenue                   281 Independence Blvd.,
P.O. Box 2348                           Building One, Fifth Floor
Clarksburg, WV 26301                    Virginia Beach, VA 23462
Tel.: (304) 624-5501                    Tel: (757) 499-8971
                                        Fax: (757) 456-5445

                                        Walter P. DeForest, III
                                        David J. Berardinelli
                                        DEFOREST KOSCELNIK YOKITIS &
                                        BERARDINELLI
                                        Koppers Building, 30th Floor
                                        436 Seventh Avenue
                                        Pittsburgh, PA 15219
                                        Tel.: (412) 227-3100
                                        Fax: (412) 227-3130


*Attorneys for Defendants-Appellants-Cross-Appellees*
*Robert N. Peirce, Jr., Louis A. Raimond, and Dr. Ray A. Harron, M.D.*

- 51 -

## CERTIFICATE OF COMPLIANCE WITH
## RULES 32(a)(7)(B) AND 28.1(e)(2)(A)(i)

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) because it contains 13,149 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of FRAP 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: May 29, 2014                    By:  _s/_  L. Steven Emmert

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2014, the required copies of the foregoing Reply and Response Brief of Appellants were filed with the Clerk of the Court via hand delivery and electronically using the Court's CM/ECF System, which will serve such filing electronically on all registered CM/ECF users.


By:  _s/_  L. Steven Emmert